IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, and RICHARD RASCHER, Plaintiff-Intervenor, | ) ) ) ) | |
| | ) | Civil Action No. 1:17-cv-06753 |
| v. | ) | |
| | ) | Judge Franklin U. Valderrama |
| S&C ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' JOINT MOTIONS IN LIMINE**

Steven L. Brenneman (IL ARDC #6190736)
L. Brandon Liss (IL ARDC #6321013)
FOX SWIBEL LEVIN & CARROLL LLP
200 West Madison Street, Suite 3000
Chicago, IL 60606
Telephone: (312) 224-1200
sbrenneman@foxswibel.com
bliss@foxswibel.com

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     ARGUMENT ...............................................................................................1

        1.      Motion in Limine No. 1: Medical Information is Admissible ............................1

        2.      Motion in Limine No. 2: Medical Provider Testimony is Admissible .............3

        3.      Motion in Limine No. 3: Evidence of Rascher's Admission He That Wanted to Return to Work, but Could Not Due to His Pain is Admissible ...............5

        4.      Motion in Limine No. 4: Evidence of the Policy Prohibiting Individuals from Being in Plant Production Areas with Assistive Devices is Admissible. ......................................................................................................6

        5.      Motion in Limine No. 5: Evidence of Defendant's Offer to Conduct an FCE for Rascher is admissible ..............................................................7

        6.      Motion in Limine No. 6: Evidence of Rascher's August 2015 Termination is Admissible ..............................................................................7

        7.      Motion in Limine No. 7: Evidence of Rascher's Obituary is Admissible........8

        8.      Motion in Limine No. 8: Evidence of Disability Payments is Admissible ......9

        9.      Motion in Limine No. 9: Rascher's Admission He Knew He was Required to Return to Work by August 2015 is Admissible .....................................10

        10.     Motion in Limine No. 10: Evidence of Rascher's Use of Narcotics and Defendant's Prohibition of the Use of Narcotics is Admissible .................11

        11.     Motion in Limine No. 11: The Term "Disparaging Remarks" is Vague, and the Court Should Therefore Reserve Rulings for Trial ..............................14

        12.     Motion in Limine No. 12: Evidence Regarding the Truth or Falsity of Witness Testimony Should be Ruled on at Trial ................................14

        13.     Motion in Limine No. 13: Evidence that is Publicly Available is Admissible ......................................................................................................15

i

Defendant S&C Electric Company ("Defendant" or "S&C") submits this memorandum in opposition to the Joint Motions in Limine of Plaintiff Equal Employment Opportunity Commission ("EEOC") and Plaintiff-Intervenor the Estate ("Estate") of Richard Rascher ("Rascher") (collectively, "Plaintiffs").

## I.    INTRODUCTION[1]

Plaintiffs bear the burden of establishing that the evidence they seek to exclude "is clearly inadmissible on all potential grounds." *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993); *Lyles v. Gambino*, No. 14 C 1406, 2019 WL 5654227, at *1 (N.D. Ill. Oct. 31, 2019). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne*, 831 F. Supp. at 1400. As set forth below, Plaintiffs have failed to meet their burden on motions in limine 1-13, and thus each should be denied.

## II.   ARGUMENT

### 1.    Motion in Limine No. 1: Medical Information is Admissible

Plaintiffs assert all evidence of Rascher's medical information that was not reviewed in connection with Rascher's discharge is irrelevant and should be excluded. MIL at 2-3. Contrary to Plaintiffs' motion, Rascher's medical information is directly related to whether Plaintiffs can carry their burden of proving Rascher was a qualified individual. *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020) ("it is the plaintiff's burden to provide evidence such that a rational jury could find her to be a qualified individual"); *Pellack v. Thorek Hosp. & Med. Ctr.*, 9 F. Supp. 2d 984, 990 (N.D. Ill. 1998). Here, Rascher's medical condition – as evidenced by his own physicians' and physical therapists' records and observations – is directly relevant to a key issue in this case:

---

[1] Plaintiffs' Joint Pretrial Statement (ECF No. 143) is cited as "JPS" and Plaintiffs' Motions in Limine (ECF No. 144) is cited as "MIL."

whether he was a "qualified individual" under the ADA who could perform his essential job functions. Evidence of Rascher's medical information will have "a tendency to make" it more or less probable that Rascher could sit, stand, walk, climb stairs, lift, and be around moving equipment as required to perform his job. *See* Fed. R. Evid. 401.[2] This is true regardless of whether Defendant had access to and/or reviewed that information before Rascher's termination.[3] Therefore, the motion should be denied.

In addition, Plaintiffs' citations to *Rooney v. Koch Air, LLC,* 410 F.3d 376, 382 (7th Cir. 2005) and *Mlsna v. Union Pac. R.R.,* No. 18-CV-37-WMC, 2021 WL 1200596, at *2 (W.D. Wis. Mar. 30, 2021) are misplaced. *Rooney* was a summary judgment appeal that did not deal with the issue of admissibility. *Rooney,* 430 F.3d at 379. In *Rooney,* the defendant discovered "after-acquired evidence" that the plaintiff could not drive, as required for his job, because his license was invalid due to multiple DUIs. *Id.* at 382. Thus, the Seventh Circuit did "not place any weight on that fact" because it was unrelated to the plaintiff's medical condition, including the injury upon which the alleged discrimination was based. *See id.* In the instant case, all medical evidence directly relates to the conditions for which Rascher was on leave and upon which Plaintiffs base their ADA claim. Thus, *Rooney* is inapposite.

---

[2] *See e.g.,* Ex. A, Baggett Decl. ¶¶ 19-21, 35; Ex. B, Rascher 24:17-28:21, 29:8-30:8, 32:5-34:9, 36:15-24, 39:22-42:10; 44:1-2, 45:22-49:6; Ex. C, Roman 52:4-53:24; 87:21-23; Ex. D, Dietzen 51:20-52:20, 64:24-65:19, 74:4-10; Ex. E, Savino 27:7-28:9; Ex. F, Lange 48:21-49:21, 51:8-13, 69:22-71:9; Ex. G, Baggett 204:3-16; Ex. H, S&C282.

[3] Plaintiffs' description of the medical information that Defendant reviewed is not accurate. MIL at 3. That information was not limited to Rascher's doctors' return-to-work notes. It also included physical therapy records, Dr. Khanna's August 31, 2015 examination notes, and Kathleen Clawson's first-hand observations. (Ex. H, S&C342-346; Ex. I, Clawson 42:19-24, 53:2-55:1, 74:15-79:4, 129:7-131:19, 152:17-155:7, 156:11-157:18; 166:15-19, 217:8-222:16; Ex. A, Baggett Decl. ¶ 40.) In addition, Plaintiffs fail to inform the Court that Defendant's leave of absence policy *required* Rascher to provide Defendant with medical documentation before August 29, 2015 for Defendant to evaluate any potential return to work. (*E.g.,* Ex. H, S&C415-426, 393-409.) It is undisputed that Rascher never did so. Thus, Plaintiffs cannot attempt to capitalize on Rascher's own failure to abide by the leave of absence policy to exclude voluminous evidence of Rascher's inability to perform his essential job functions.

Plaintiffs misrepresent the holding in *Mlsna*. Like *Rooney*, *Mlsna* was a summary judgment case that did not decide admissibility. 2021 WL 1200596, at *3. There, the court raised in dicta whether *Rooney*'s holding could, in some instances, be extended to after-acquired evidence of *medical conditions unrelated* to the condition underpinning the alleged discrimination. *Id.* at *2-3. Contrary to Plaintiff's parenthetical citation, MIL at 3, *Mlsna* did not hold that medical records were not relevant to liability; rather, the court expressly stated "[o]f course, this is not to decide the relevance of any after-acquired evidence, especially as to the plaintiff's sworn statement of disability." *Mlsna,* 2021 WL 1200596, at *3. In fact, *Mlsna* explicitly states that numerous Seventh Circuit cases "permit[] after-acquired evidence to be considered to determine whether an individual is 'qualified' within the meaning of the ADA." *Id.* at *2 n. 1.[4]

### 2. Motion in Limine No. 2: Medical Provider Testimony is Admissible

Plaintiffs seek to exclude testimony from Rascher's treating medical providers "beyond the scope of the care they provided to Rascher" on the ground that the providers were not disclosed as experts. MIL at 3.[5] However, Plaintiffs' motion sets up a strawman argument because the evidence in question is not "expert" testimony but rather Rascher's own doctors' treatment and observations of him. In fact, these are the very same doctors who signed Rascher's tardy return-to-work letters, upon which Plaintiffs' case depends. Further, Plaintiffs cite no authority for the proposition that a medical provider's testimony is barred when the provider is not disclosed as an expert. *See id.* No such authority exists. Rascher's own treating providers' observations during his leave of absence are

---

[4] Citing *Johnson v. ExxonMobil Corp.*, 426 F.3d 887 (7th Cir. 2005) (considering in qualified individual analysis sworn statement in disability application made *after* termination); *Butler v. Vill. of Round Lake Police Dep't*, 585 F.3d 1020, 1023 (7th Cir. 2009) (considering post-termination disability benefits application in qualified individual analysis); *Lee v. City of Salem, Ind.*, 259 F.3d 667, 678 (7th Cir. 2001) (considering pre and post-termination disability benefits applications in qualified individual analysis).

[5] Motion in Limine No. 2 is largely duplicative of No. 1. Accordingly, Motion in Limine No. 2 should be denied for the same reasons stated in § II.1 *supra*.

directly relevant to whether Rascher was a qualified individual under the ADA – an element on which Plaintiffs carry the burden of proof. *See, e.g., Johnson v. Norfolk S. Ry. Co.*, No. 3:12-CV-102-JD, 2015 WL 3738545, at *3 (N.D. Ind. June 15, 2015) ("Treating [m]edical witnesses may testify as fact witnesses concerning their personal observation, examination, diagnosis, and treatment"); *see also Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 421 (7th Cir. 2016) (attending physician statement would be admissible and was properly considered as evidence employee was not capable of returning to work); *supra* at § II.1. (discussing relevance under Fed. R. Evid. 401 of medical evidence to qualified individual determination). Thus, Plaintiffs cannot exclude his medical providers' testimony.[6]

Alternatively, Plaintiffs seek to limit the treating medical professionals' testimony by mischaracterizing the scope of treatment by one of his treating physicians, Dr. Jacob Bitran. *See* MIL at 4. Plaintiffs couch Bitran's testimony as an "expert opinion on Rascher's ability to walk and work based on his orthopedic conditions." *Id.* at 4, 5. However, Bitran's testimony is based upon his examination, observation, and treatment of Rascher.[7] The Bitran testimony with which Plaintiffs quarrel, *id.* at 5 (citing Bitran 75:2-24), is taken directly from Bitran's reading and review of a report for a CT scan that Bitran himself ordered. (Ex. J, Bitran172-173; Ex. K, Bitran 70:13-71:7.) None of this testimony is opinion or requires qualification as an expert. Rather, this testimony goes to the heart of the "qualified individual" determination. *Smith v. Certain unknown Cook Cty. Dep't of Corr.*

---

[6] Plaintiffs' deceptively claim Defendant did not request information from Rascher's medical providers. As stated *supra* at § II.1, Defendant's leave of absence policy expressly required Rascher to submit medical documentation, from his medical providers before August 29, 2015 for Defendant to evaluate if he wished to return to work. MIL at 3. Notably, the "return to work notes" Plaintiffs reference were also submitted *after* the August 29, 2015 expiration of Rascher's leave of absence. *Id.*

[7] *See, e.g.,* Ex. J, Bitran 068-070 (July 13, 2015 progress note addressing complaint of rectal cancer management, physical therapy/status post-right hip arthroplasty, and frustration of [pace] of rehabilitation and conducting full physical examination concluding "No physically strenuous activity" and "able to carry out light or sedentary work").

*Officers*, No. 05 C 1264, 2009 WL 10739265, at *2 (N.D. Ill. Apr. 14, 2009) (treating physicians may

testify as to symptoms, diagnoses, treatment).[8]

### 3.     Motion in Limine No. 3: Evidence of Rascher's Admission He That Wanted to Return to Work, but Could Not Due to His Pain is Admissible

Plaintiffs seek an order excluding Rascher's own statement on August 6, 2015 to his physical

therapist that "I want to go back to work but I have to walk up 18 stairs and I can't focus because of

the pain." MIL at 5 (citing IBJI 300). Rascher's physical therapist contemporaneously recorded his

statement in an official PT progress note. *Id.* As such, Rascher's statement is admissible on

numerous grounds under the Rules of Evidence: the statement is (i) Rascher's own statement

offered against him; (ii) his then-present description of his condition while he perceived it; (iii)

regarding his then-existing physical and sensory condition (i.e., pain); (iv) pertinent to his medical

diagnosis and treatment; (v) recorded in the course of regularly conducting physical therapy

treatment; and (vi) against his own interest as an unavailable declarant. Fed. R. Evid. 801(d)(2)(A)

(party admission); 803(1) (present sense impression); 803(3) (then-existing physical mental,

emotional, or physical condition); 803(4) (statement made for medical diagnosis or treatment);

803(6) (records of a regularly conducted activity); 804(3) (statement against interest).[9]

Plaintiffs also claim Rascher's statement should be excluded because his condition improved

sufficiently between when the statement was made on August 6, 2015 and the expiration of his leave

of absence about three weeks later on August 29. MIL at 6. However, even if this were true (it is

not), the jury may assign to Rascher's admission the weight it deems appropriate. *See, e.g., Tompulis v.*

---

[8] Plaintiffs do not suggest any way in which any other doctor or physical therapist might offer testimony outside the alleged scope of his or her treatment of Rascher. Indeed, they concede this motion pertains exclusively to Bitran. *See* MIL at 5 (concluding that "As such, any opinion *by Dr. Bitran* as to how Rascher's orthopedic conditions effected [sic] his ability to walk and do his job should be barred.") (emphasis added).

[9] Plaintiffs continue their erroneous mantra that Defendant not reviewing certain medical evidence in advance of Rascher's separation militates against admissibility under Rules 401 and 402. MIL at 5. For the reasons stated *supra* at §§ II.1-2, this evidence is relevant, and their position lacks merit.

*Schwartz & Freeman*, No. 92 C 7375, 1994 WL 419607, at *3 (N.D. Ill. Aug. 9, 1994) (testimony inconsistent with records goes to the weight of the evidence not its admissibility). Plaintiffs are free to argue that other medical documentation after August 6, 2015 supports their position. Any prejudicial effect of Rascher's statement that he could not return to work therefore does not *substantially* outweigh its probative value. *See Est. of Gee ex rel. Beeman v. Bloomington Hosp.*, No. 1:06-CV-00094-TWP, 2012 WL 639517, at *4 (S.D. Ind. Feb. 27, 2012) ("Rule 403 is heavily tilted in favor of admissibility").

### 4. Motion in Limine No. 4: Evidence of the Policy Prohibiting Individuals from Being in Plant Production Areas with Assistive Devices is Admissible.

Plaintiffs assert that evidence of Defendant's policy prohibiting individuals from being in the plant production areas who utilize an assistive device (such as crutches, a cane, or a medical boot) to ambulate should be excluded on the basis Defendant cannot establish a proper foundation. MIL at 6. First, Plaintiffs claim Defendant does not have any assistive device policy because Mark Lange testified that "all of Defendant's safety policies are in writing," and "Defendant had no written policy about the use of assistive devices." *Id.* However, the testimony Plaintiffs cite states: "Q. Are all of *the important* safety policies at S&C in writing?...A. I would say yes." (Ex. F, Lange 35:2-7) (emphasis added). As such, Plaintiffs have deliberately misquoted Lange's testimony to support their false claim that no policy exists. Plaintiffs' misrepresentation is fatal to their argument.

Second, multiple witnesses have already testified to personal knowledge of Defendant's longstanding practice of prohibiting employees who need an assistive device from being in the plant production areas. (Ex. F, Lange 48:16-49:2, 56:1-15 (employees prohibited from production area when any medical walking assistive devices); Ex. G, Baggett 203:16-20 (same); Ex. I, Clawson 60:20-61:10 (same).) Moreover, any lack of a written policy goes to the weight of these witnesses' testimony rather than its admissibility. *See Tompulis*, 1994 WL 419607, at *3. Accordingly, a proper foundation exists to introduce evidence of Defendant's policy regarding the use of assistive devices

6

in the production areas. *See* Fed. R. Evid. 602 (witnesses may testify to a matter only if there is evidence to support personal knowledge, which may consist of the witness's own testimony).

### 5. Motion in Limine No. 5: Evidence of Defendant's Offer to Conduct an FCE for Rascher is admissible

Plaintiffs' motion in limine No. 5 is the mirror opposite of Defendant's motion in limine No. 2, which seeks to allow evidence relating to S&C's November 2015 invitation to conduct a functional capacity exam on Rascher. For the reasons stated in the Memorandum in Support of Defendant's Motions in Limine (pp. 6-9), Plaintiffs' motion should be denied, and the evidence of the FCE invitation should be allowed into evidence.

### 6. Motion in Limine No. 6: Evidence of Rascher's August 2015 Termination is Admissible

Seeking to upend the fundamental role of the jury as factfinder, Plaintiffs next request the Court to bar evidence and testimony that Rascher was terminated in August 2015 in accordance with Defendant's leave of absence policy. Plaintiffs argue that the Court has already ruled Rascher was not terminated in August 2015. MIL at 8. Here again, Plaintiffs mischaracterize the record.

First, in its January 14, 2020 Order, the Court declined to find that Defendant was, as a matter of law, "entitled to summary judgment simply because Rascher failed to provide a doctor's release by August 29, 2015." (Dkt. 100 at 2; Dkt. 114 (denying motion for reconsideration and stating same).) Second, Plaintiffs' citation to the Court's earlier ruling denying S&C's Rule 12(b)(6) motion to dismiss, *EEOC v. S&C Elec. Co.*, 303 F. Supp. 3d 687, 689 (N.D. Ill. 2018), is immaterial, as that decision accepted Plaintiffs' Amended Complaint allegations as required by Rule 12(b)(6). Third, Plaintiffs conveniently ignore that the Court expressly stated at the summary judgment oral argument that "there's a lot of factual nuance" regarding whether "his [i.e., Rascher] [time] period was up on August 29th...even though [the Court] realize[s] that there are good points to be made

7

on both sides." (Ex. L, 3/5/20 Trans., 12:12-22.) Thus, the Court left open for trial whether Rascher was separated on August 29, 2015. In any event, the jury – not the Court – is the finder of fact.

There is plenty of record evidence to show Defendant indeed separated Rascher effective August 29, 2015. (*See, e.g.,* Ex. G, Baggett 46:13-47:8 (Defendant accepted Rascher's request for it to reconsider his August 29, 2015 termination which Defendant treated as an appeal), 128:21-23 (stating Rascher was terminated August 29, 2015); Ex. H, S&C 274-276 (March 11, 2015 letter to Rascher stating employment would be terminated if Rascher could not return to work by August 29, 2015), S&C 264 (July 30, 2015 letter stating same), S&C 503-506 (Burton checklist documenting August 29, 2015 LTD termination date); Ex. M, Burton 101:24-103:18, 112:4-14 (August 20, 2015 meeting informing Rascher of same).) This evidence should be allowed for the jury to determine this fact issue. *See* Fed. R. Evid. 401.

### 7. Motion in Limine No. 7: Evidence of Rascher's Obituary is Admissible

Plaintiffs seek to exclude Rascher's obituary as inadmissible hearsay. MIL at 9. However, "obituaries are admissible under Federal Rule[] of Evidence 902(6), which provides that newspaper articles are self-authenticating." *United States v. Hatfield*, No. 08-30020-DRH, 2008 WL 4516320, at *3 (S.D. Ill. Oct. 3, 2008) (rejecting argument obituaries are hearsay).[10] Further, the statement in Rascher's obituary that he "retire[d] after 52 years of service" does not constitute hearsay as defined by Rule 801. Under Rule 801(d)(2), "a statement [] offered against an opposing party," which "was made by the party in an individual or representative capacity" is not hearsay. In this case, Defendant has reason to believe Rascher's obituary was created by the Estate, who now stands in Rascher's place. (Dkt. 137-138 (substitution of Estate for Rascher).) Thus, the statement that Rascher retired

---

[10] Rascher's obituary appeared in a newspaper. *E.g.,* Ex. N; *https://www.legacy.com/us/obituaries/dailyherald/name/richard-rascher-obituary?pid=198585932* (last visited July 4, 2021).

from Defendant is admissible and relevant to show Rascher's separation was a retirement rather than an improper discharge.

In addition, the statement regarding Rascher's retirement is admissible under Rule 804's hearsay exception for statements against interest by unavailable declarants. Rascher is unavailable to testify because he has passed away. Fed. R. Evid. 804(a)(4). The statement is against Rascher's interest because it concedes Defendant did not discriminate against him, and thus is contrary to his pecuniary interest and invalidates his claim against Defendant. *Id.* at 804(b)(3)(A). Accordingly, the obituary statement that Rascher's separation was a retirement (i.e., LTD retirement) rather than a discriminatory termination should not be excluded.

### 8. Motion in Limine No. 8: Evidence of Disability Payments is Admissible

Plaintiffs claim that Rascher's disability insurance payments were provided by a collateral source and thus such evidence should be excluded as irrelevant and confusing to the jury as it relates to damages. MIL at 9. This motion should be denied first and foremost because the key condition to receive these disability payments was Rascher's stated inability to perform his job; this is relevant to the question of whether he was a qualified individual. *See* Fed. R. Evid. 401. To be and remain eligible for STD pay, Rascher had to document his inability to work and remain under continuing physician care. (Ex. H, S&C415-426, 332-333, 336-337, 298-300; Ex. G, Baggett 113:15-17; Ex. A, Baggett Decl. ¶¶ 12, 14, 26, 28-29.) Rascher was similarly required to provide the LTD insurance carrier medical documentation showing he was unable to work to receive LTD benefits. (Ex. H, S&C393-414, 630-637; Ex. G, Baggett 67:6-8; Ex. A, Baggett Decl. ¶¶ 13, 15-16, 29.) As such, both Rascher's receipt of disability payments, and his statements applying for these benefits, are directly relevant to show his own admitted inability to perform his essential job functions and therefore are admissible.

Moreover, contrary to Plaintiffs' motion, Rascher's disability payments are not subject to the collateral source rule. The collateral source rule operates "not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice. In an employment case, if the employer is the source of the funds at issue, then the payments can be deducted from the award." *Flowers v. Komatsu Mining Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999). Here, Defendant was the source of the disability funds at issue because it provided to Rascher free of charge the short-term disability income and the long-term disability insurance policy through which he received the payments. (*See, e.g.,* Ex. H, S&C415-426, 630-637, 394-414; Ex. G, Baggett 68:22-24, 139:16-20; Ex. A, Baggett Decl. ¶¶ 12-13.) Thus, the cases cited by Plaintiffs involving governmental SSDI benefits are inapposite. MIL at 10 (citing *Stragapede v. Evanston*, 125 F.Supp.3d 818, 828-829 (N.D. Ill. 2015 and *Schuster v. Shepard Chevrolet, Inc.,* No. 99 C 8326, 2002 WL 507130, at *7 (N.D. Ill. Apr. 3, 2002)). Because Defendant provided Rascher's disability payments, the payments are subject to deduction from any award.

**9.    Motion in Limine No. 9: Rascher's Admission He Knew He was Required to Return to Work by August 2015 is Admissible**

Plaintiffs next attempt to exclude Rascher's statement to a therapist that he had been awarded disability benefits "until August [2015] where he must return to work or lose his job." MIL at 10-11 (citing Lutheran 724-725 (attached hereto as Exhibit O)). Plaintiffs' attempt to exclude this admission by Rascher should be rejected.

As a threshold matter, Plaintiffs' premise that a privilege applies under Rule 501 because "Rascher has alleged only garden variety emotion distress" is wrong. MIL at 10. In *Laudicina v. City of Crystal Lake*, the court held that under Seventh Circuit precedent, plaintiffs waive the psychotherapist-patient privilege upon placing their mental health at issue, "even when only claiming to seek compensation for 'garden variety' mental health damages." 328 F.R.D. 510, 512-18 (N.D. Ill. 2018) (collecting cases) (explaining Seventh Circuit applies waiver of the psychotherapist-patient

privilege broadly and rejects the "garden variety" approach). Thus, Plaintiffs' basis for exclusion is fundamentally flawed. *See* MIL at 10.[11]

Rule 501's application is also improper because Rascher's statement that he knew he must return to work by August 2015 or be separated is admissible on multiple independent grounds. *See, e.g., Equal Emp. Opportunity Comm'n v. Int'l Profit Assocs. Inc.,* No. 01 C 4427, 2010 WL 11619208, at *2 (N.D. Ill. June 3, 2010). For example, Rascher's statement is probative under Rule 401 as to whether he was legitimately discharged in August 2015 pursuant to S&C's leave of absence policies. Further, the statement is relevant to rebut Plaintiffs' anticipated argument that Rascher was not aware of the requirements of S&C's leave of absence policies. The statement also passes muster under Rule 801(d)(2)(A) as a statement offered against an opposing party made by that party, and Rule 804(3)(A) because it is a statement against Rascher's interest (and Rascher is an unavailable declarant).

### 10. Motion in Limine No. 10: Evidence of Rascher's Use of Narcotics and Defendant's Prohibition of the Use of Narcotics is Admissible

Plaintiffs want to exclude evidence of Rascher's use of narcotics, but fail to offer any legitimate basis for doing so. MIL at 11. Aside from the title of Motion in Limine No. 10, Plaintiffs' brief does not actually address the admissibility Rascher's prescriptions for narcotic drugs; instead, it asserts Rascher did not take such pain medication, and then focuses on the admissibility of Defendant's policy. *See id.* On this basis alone, Plaintiffs fail to justify the exclusion of evidence

---

[11] In any event, Plaintiffs have waived any right to privilege. As Plaintiffs concede, they did not assert privilege upon production of the two-page consultation summary at issue, nor did they object to its public filing in the parties' summary judgment submissions. *See* MIL at 11 (citing Lutheran 724-725 (Ex. O)). Designating the document as confidential under the protective order does not alter this result, because the protective order expressly states such designations do not govern admissibility at trial. (Dkt. 56 ¶ 11.) Thus, even if Plaintiffs had a basis to claim privilege (and thus potential exclusion under Rule 501), they have waived such privilege by waiting nearly two years to, until the eve of trial, to raise the issue. *See, e.g., Ritacca v. Abbott Lab'ys,* 203 F.R.D. 332, 335 (N.D. Ill. 2001); *Int'l Profit Assocs. Inc.,* 2010 WL 11619208, at *2 (denying motion in limine because "the [psychotherapist-patient] privilege may be waived").

related to Rascher's repeated prescriptions by his treating physicians over a course of time for narcotic pain medication.

Additionally, excluding Rascher's prescriptions for narcotic painkillers and Rascher's use of these drugs is – like other medical evidence discussed above – probative as to whether Rascher was a "qualified individual" under the ADA who could perform his essential job functions in light of his diminished physical capacity. *Supra* at II.1-2. As noted above, whether or not S&C was aware of or considered these medical facts at the time of separation is not the question; instead, the relevant inquiry is Rascher's ability to perform the job. *Supra* at II.1-2; MIL at 11. Ultimately, Rascher's narcotics prescriptions and use of same corroborate Defendant's assessment that Rascher could not perform his essential job functions, and the evidence is therefore relevant to the jury's "qualified individual" determination. *See* Fed. R. Evid. 401.

Here again, Plaintiffs attempt to support their motion with misrepresentations of the record. Plaintiffs' statement that Rascher testified "he did not take pain medicine" is cherry-picked out of context. MIL at 11. Instead, Rascher was asked if he recalled telling his physical therapist that he was in "in pain and the pain medication wasn't helping." (Ex. B, Rascher 231:5-7.) His full response includes his claim that "pain medicine does not work on me." (*Id.* at 151:15-152:3; 231:8-10 (confirming he was prescribed narcotics, took narcotics, but felt he did not get good results from the drugs).) As such, Rascher's testimony establishes he actually did take narcotics; indeed, it would be impossible for Rascher to know the efficacy of the narcotics without having taken these drugs. Plaintiffs' reliance on Rascher's testimony therefore fails establish any basis to exclude evidence regarding Rascher's use of narcotics.

Further, even if Rascher had testified he did not take narcotics, Plaintiffs' motion still fails. That statement would directly contradict the voluminous progress notes and testimony from Rascher's doctors and physical therapists. (*See, e.g.*, Ex. P, LM Prasad045-046, 050-052, 056-057; Ex.

Q, IBJI056-060; Ex. J, Bitran068-070, 117-120 (establishing Rascher's prescriptions for Hydrocodone, Tramadol, and Norco from December 2014 through at least March 2018).)[12] As such, Rascher's testimony would not bar admission of this evidence; rather, it would be a credibility determination for the jury. *See, e.g., Woods v. Amazon.com, LLC*, No. 17 C 4339, 2019 WL 2323874, at *14 (N.D. Ill. May 30, 2019); *Burroughs v. Cook Cty. Clerk*, No. 17 C 5098, 2019 WL 10892151, at *2 (N.D. Ill. Mar. 6, 2019) ("plaintiff's testimony and centrality of her credibility…weigh heavily in favor of admission"). The jury should be free to conclude Rascher's testimony is less believable than that of his treating physicians, physical therapists, and their written records.

Plaintiffs also move to exclude evidence related to Defendant's policy prohibiting employee use of narcotics in the performance of their duties. MIL at 11-12. This evidence is admissible on several grounds. First, to be a qualified individual, Rascher must have been able to perform his essential job functions; under S&C's policy, he could not do so if he was taking narcotics. Thus, Defendant's narcotics policy tends to make it less probable that Plaintiffs can prove Rascher was a qualified individual. *See* Fed. R. Evid. 401. Further, Defendant's policy against the use of narcotics is evidence of the safety hazards Rascher would encounter at Defendant's facilities – especially with regard to the production area (e.g., moving vehicles, walking surface irregularities, slip and fall hazards, forklifts, overhead cranes, bins, pallets, hoses, and other objects). *See supra* at 2 n. 2.

In the alternative, Plaintiffs' wish to exclude S&C Vice President of Human Resources Donna Baggett's testimony regarding the narcotics policy due to an alleged lack of personal knowledge under Rule 602. MIL at 12. Here again, Plaintiffs misrepresent the witness's testimony. Contrary to Plaintiffs' claim that "any information she had about a narcotics policy…was

---

[12] *See also* Ex. R, Park 40:16-42:19, 49:4-51:10, 51:18-52:7, 58:13-59:12; Ex. S, Clay 14:24-15:23, 22:3-8, 30:8-31:11, 33:8-34:4; Ex. K, Bitran 83:4-86:7, 91:16-95:4; Ex. T, Higgins 29:3-14; Ex. B, Rascher 151:21-152:16.

information that she received from Clawson," Baggett testified she was familiar with the narcotics policy before emailing Clawson regarding the same. (Ex. G, Baggett 172:7-173:3 (confirming Baggett was "somewhat familiar with [the narcotics policy]" before she read Clawson's email and knowledge, that Defendant "would wait until the person didn't have that need [for narcotics]," and that Defendant "require[s] a release from the doctor" with respect to narcotics usage).) Baggett's testimony as S&C's VP of HR is properly founded and is therefore admissible under Rule 602.

11. **Motion in Limine No. 11: The Term "Disparaging Remarks" is Vague, and the Court Should Therefore Reserve Rulings for Trial**

Plaintiffs Motion in Limine No. 11 seeks to bar "generalized, negative remarks about the EEOC." MIL at 12. Plaintiffs' motion is vague and ambiguous insofar as it fails to offer any ascertainable definition of what they seek to exclude. Plaintiffs cite only to *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, No. 13-CV-346-BBC, 2014 WL 4829173, at *4 (W.D. Wis. Sept. 29, 2014). In *Ultratec*, a non-government plaintiff sought to exclude disparaging remarks about the USPTO related to 35 U.S.C. 282's presumption that patents are valid. *See* Ex. V, *Ultratec*, No. 13-CV-346-BBC at Dkt. 422 (Ultratec's motion in limine). Unlike *Ultratec*, Plaintiffs' request here comes in a starkly different in factual context and the term "disparagement" is not defined in relation to any statute. MIL at 12. Thus, while Defendant has no intention of "disparaging" the EEOC, the Court's ruling on this issue is best reserved for trial where context will exist for what Plaintiffs may deem "disparaging." *See, e.g., Betts v. City of Chicago, Ill.*, 784 F. Supp. 2d 1020, 1031 (N.D. Ill. 2011) (reserving ruling for trial where "the court will be better able to rule on the admissibility…when the context…is clear").

12. **Motion in Limine No. 12: Evidence Regarding the Truth or Falsity of Witness Testimony Should be Ruled on at Trial**

Plaintiffs' Motion in Limine No. 12 requests exclusion of testimony about whether one witness believes another's is truthful. MIL at 12. Plaintiffs cite *United States v. Freitag*, which held that it was impermissible to ask the witness if other witnesses were lying, rather seeking testimony as to

the accuracy of other witnesses' testimony. 230 F.3d 1019, 1024 (7th Cir. 2000). To the extent Plaintiffs solely seek to bar questions expressly asking whether another witness is lying, Defendant does not object. Beyond this, any rulings on this issue should be made at trial in context, as any conflicting testimony among witnesses necessarily raises credibility issues. *See, e.g., United States v. Evans,* No. 09 CR 152, 2010 WL 2104171, at *4 (N.D. Ill. May 25, 2010) (witness's "testimony and credibility will certainly be an important aspect of the trial if he testifies, especially if – as is certain – his testimony conflicts with that of other witnesses").

### 13.    Motion in Limine No. 13: Evidence that is Publicly Available is Admissible

Plaintiffs ask the Court to bar the introduction of previously unproduced discovery or undisclosed witnesses. Defendant does not intend to call any undisclosed witness and does not oppose that portion of the motion. However, Plaintiffs' request should be denied to the extent it seeks to bar publicly available information that is both reasonably related to prior discovery and produced in advance of trial, as there would be no unfair surprise or undue prejudice. *See, e.g., Thorncreek Apartments III, LLC v. Mick,* 886 F.3d 626, 636 (7th Cir. 2018) (affirming admissibility of publicly available financial records that pre-dated scope of discovery and were produced before trial); *see also United States v. Price,* 13 F.3d 711, 719 (3rd Cir. 1994) (unfair surprise is a consideration under Rule 403).

WHEREFORE, for the reasons stated above, Defendant respectfully requests this Court to deny Plaintiffs' Motions in Limine Nos. 1-13.

Dated: July 6, 2021

Respectfully submitted,

S&C Electric Company

By: */s/ Steven L. Brenneman*
  One of its attorneys

Steven L. Brenneman (IL ARDC #6190736)
L. Brandon Liss (IL ARDC #6321013)
Fox Swibel Levin & Carroll LLP
200 West Madison Street, Suite 3000
Chicago, IL 60606
Telephone: (312) 224-1200
sbrenneman@foxswibel.com
bliss@foxswibel.com

16

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on July 6, 2021 he caused the foregoing **Defendant's Opposition to Plaintiffs' Motions in Limine** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which shall send notification of such filing to all counsel of record.

*/s/ Steven L. Brenneman*
Steven L. Brenneman

4198055 v2 -

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, and RICHARD RASCHER, Plaintiff-Intervenor, | ) ) ) ) | |
| v. | ) ) | Civil Action No. 1:17-cv-06753 |
| S&C ELECTRIC COMPANY, | ) ) | Judge Robert W. Gettleman |
| Defendant. | ) ) ) | |

## <u>DECLARATION OF DONNA M. BAGGETT</u>

I, Donna M. Baggett, declare:

1.     I am an adult and am legally competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration, and I would testify competently thereto.

2.     I have worked in the Human Resources department at S&C Electric Company ("S&C") for 30 years.  Since January 1, 2012, I have been the Vice President of Human Resources, which is the position I hold today.  During all relevant times, I have been a custodian of employee-related records at S&C.

3.     S&C designs and manufactures switching and protection products for electric power transmission and distribution and offers related services.  S&C's principal place of business and primary manufacturing facility is a 46-acre industrial complex located at 6601 North Ridge Boulevard, Chicago, Illinois 60626.

4.     During all relevant times, S&C has employed over 1700 employees at its Chicago facility.  S&C has been a prominent employer in Chicago for over 100 years.

5.     As Vice President of Human Resources, in 2014 and 2015 and during all relevant times, my job duties have included, but were not limited to, supervising the Benefits Services team, the Health Services team, and the traditional Human Resources team, among others. The services encompassed in these areas include, without limitation, maintaining personnel records; applying employment-related policies, procedures, and practices such as leaves of absence, short-term disability, long-term disability, and anti-discrimination; providing counseling, advocacy, and problem resolution services for employees; providing benefits and overseeing benefit plans, policies, and practices; and operating S&C's on-site occupational health clinic.

6.     S&C is committed to providing its employees with a workplace that is free of discrimination and harassment. During all relevant times, S&C has maintained and enforces policies and procedures prohibiting discrimination and harassment.

7.     One of S&C's guiding principles is that its culture promotes trust, teamwork, dignity and respect within its diverse workforce. S&C's Statement of Purpose & Guiding Principles sets forth these principles, a copy of which is attached as Exhibit A. (This document was marked as Deposition Exhibit 42 in the deposition of Richard Rascher ("Rascher") held on December 12, 2018.)

8.     S&C's equal employment opportunity policy ("EEO policy") provides that discrimination (including discrimination based on race, color, age, disability, gender, religion, and national origin) and retaliation is strictly prohibited. A copy of S&C's EEO policy at all times relevant in this case is attached as Exhibit B. (This document was marked as Deposition Exhibit 40 in Rascher's deposition held on December 12, 2018.)

9.     S&C's policy on maintaining a workplace free of harassment sets forth the Company's commitment to equal employment opportunity and preventing, responding to, and

2

3603738 v1 -

eliminating unlawful discrimination and harassment. A copy of S&C's harassment policy at all times relevant in this case is attached hereto as Exhibit C. (This document was marked as Deposition Exhibit 41 in Rascher's deposition held on December 12, 2018.)

10.     Both the EEO policy and the harassment policy provide that S&C does not tolerate discrimination, retaliation, or harassment on any basis including age, disability, race, color, national origin, gender, religion, and will take appropriate corrective action against any employee who is found to have violated this policy. These policies further set forth a process for reporting complaints of discrimination and/or harassment, and the Company's commitment to investigate complaints.

11.     Attached as Exhibit D is a true and correct copy of S&C's Policy Bulletin No. 61, titled "Leaves of Absence – Monthly and Annual Pay Groups." (This document was marked as Deposition Exhibit 44 in Rascher's deposition held on December 12, 2018.) Attached as Exhibit E is a true and correct copy of S&C's Policy Bulletin No. 51, titled "Excused Absences and Leaves of Absence – Hourly Pay Group." (This document was marked as Deposition Exhibit 43 in Rascher's deposition held on December 12, 2018.) Both of these policies have been in effect during all relevant times and among other things provide that the maximum length of a leave of absence is six months, and that an extension of up to an additional six months may be granted for a maximum time off of one year. The policies provide that if an employee does not return to work at the end of one year, the employee will be terminated from employment. The policies further provide that an employee returning from a leave of absence due to illness or injury must provide a release to return to work from a physician and the release must be acceptable to S&C's Health Services department.

3

12.     Employees who are unable to work because of an illness or injury may receive income under S&C's self-funded short-term disability (STD) pay practice and S&C's long-term disability (LTD) insurance plan. Under S&C's STD pay practice, the cost of which is borne entirely by S&C without cost to the employee, salaried, exempt employees who are absent from work due to a non-work injury or illness continue to receive full salary from S&C for up to six months. To be and remain eligible for STD pay, an employee must provide acceptable medical documentation of the employee's inability to work to S&C's Health Services department and remain under the continuing care of a physician. Rascher, a salaried, exempt employee, provided adequate medical documentation of his total disability and received full salary throughout the entire six months of his STD leave of absence.

13.     An employee who is unable to return to work after six months of STD leave may apply for LTD benefits through S&C's LTD insurance, which is provided free of charge to all full-time S&C employees, and which pays two-thirds of an employee's salary.  To obtain LTD benefits, an employee must provide the LTD insurance carrier medical documentation establishing the employee is unable to work. In order to continue to receive LTD benefits, the employee must remain unable to work, and is required to notify the LTD carrier and S&C of any change in health status that would allow the employee to return to work, with or without reasonable accommodation.

14.     Attached as Exhibit F is a true and correct copy of S&C's Short-Term Disability Pay Practice summary booklet. (This document was marked as Deposition Exhibit 45 in Rascher's deposition held on December 12, 2018.) This document has been in effect during all relevant times and among other things provides that:

> After any non-occupational absence for injury or illness of over
> five days or more or after any outpatient or inpatient surgery, a

> Return to Work Release providing sufficient medical documentation and completed by the treating physician must be personally returned to Health Services before an employee may report to work. Health Services must agree that the employee is fit to resume the essential functions of their job and may require further medical clearance prior to releasing the employee to return to work.

In addition, the document provides that whenever an employee is off work, the employee must keep supervision informed regarding the length of an absence and plans for returning to work.

15.    Attached as Exhibit G is a true and correct copy of S&C's Long-Term Disability Plan summary plan description dated August 2014. (This document was marked as Deposition Exhibit 47 in Rascher's deposition held on December 12, 2018.) This document has been in effect during all relevant times and among other things provides that an employee who is absent from work for a period of twelve consecutive months due to a disability will be terminated from employment.

16.    Attached as Exhibit H is a true and correct copy of S&C's Long-Term Disability Plan summary plan description dated August 2012. (This document was marked as Deposition Exhibit 46 in Rascher's deposition held on December 12, 2018.) Like the August 2014 version (Exhibit G), this document among other things provides that an employee who is absent from work for a period of twelve consecutive months due to a disability will be terminated from employment.

17.    S&C hired Rascher in 1962 as a Junior Draftsman. Over the next three decades Rascher held positions of Draftsman, Designer, Assistant Supervisor, Supervisor, and Senior Design Coordinator. In the mid-1990s, Rascher ascended to the position of Senior Product Designer in S&C's Department 712, which is devoted to custom-made switches and fuses. In 2012, his job title was changed to Principal Designer, but his duties did not change in any material way with this title change. Rascher was the only Principal Designer in his department.

5

In his positions since the mid-1990s, Rascher oversaw a team of more junior designers who worked with him on the second floor "mezzanine" of Building 12 at S&C's Chicago manufacturing complex.

18. Rascher's essential functions as Principal Designer included processing new customer orders; creating and/or overseeing design changes for customer-driven modifications to standard S&C products; preparing design files; collaborating with S&C's sales personnel and product specialists; overseeing the work of more junior designers; and interacting with employees on the plant floor to answer production inquiries and troubleshoot unique issues that often arose in the custom-manufacturing process. Rascher's duties required sitting, standing, walking, climbing stairs, moving in and through S&C's manufacturing environment, reading and understanding blueprints, communicating with others, and inspecting work of others. At times Rascher also needed to lift and work with large reference binders which, along with the blueprints, were maintained on the mezzanine of Building 12.

19. As part of his job duties Rascher would walk up and down a 22-step stairwell between the manufacturing areas of S&C's plant and the Building 12 mezzanine where Rascher's work station and his team of more junior designers were located. There are no passenger elevators to the mezzanine in Building 12. Rascher's essential functions included going to multiple locations on the production floor of Building 12A (which is adjacent to Building 12) where the very large products Rascher supported were built. This was required to support the custom product manufacturing operations, including troubleshooting problems that often arose as assemblers worked to build products according to the specific, customized designs. The distance from the Building 12 mezzanine stairwell to these various manufacturing areas of Building 12A measures at least 248 feet.

6

20.     Due to the size and layout of S&C's 46-acre Chicago manufacturing complex, the distance from the nearest handicap parking space in the "Green" parking lot north of Building 12A, where Rascher normally parked, to his work station on the mezzanine level of Building 12 measures 668 feet and includes a ramp at the building entrance (in lieu of stairs) plus 22 stairs up to the mezzanine; these stairs range in height from 7-3/8 inches to 7-7/8 inches. The only alternative parking spot that would have been closer to Rascher's work station was a handicap parking space in the "Green" lot east of Building 12, which measures 562 feet to Rascher's work station and includes the same 22 stairs noted above. This route, however, includes a 58-foot incline to 33.5 inches of elevation (0.58 inch height change per foot of run), and requires an individual to walk around an active loading dock and to navigate past pallets and equipment that are staged in front of the loading dock at any given time. The 58-foot incline is frequently used by forklifts to transfer products and materials from inside to outside the building and vice versa, which has resulted in a pitted surface on the incline.

21.     On a near-constant basis, S&C's production areas (including the pedestrian walkways throughout these areas) necessarily contain equipment, materials, moving vehicles, irregularities in walking surfaces, and other potential obstacles which can present slip, trip, and fall hazards around which employees must maneuver. S&C's production areas include forklifts, lift trucks, carts, large overhead cranes carrying suspended loads of steel parts, finished products, and other items, and other powered vehicles moving bulky materials and/or heavy products, as well as temporary spills and work items such as bins, pallets, hoses, cords, and other protruding objects. In part as a result of these potential hazards posed to individuals with poor mobility, during all relevant times S&C maintained an unwritten policy that prohibits individuals from being in plant production areas who utilize (whether permanently or just temporarily) an

7

assistive device to ambulate, such as a cane, crutches, leg brace, or walking boot. This policy has been in effect for many years and is designed to protect employees who must rely on an assistive device for safe ambulation due to balance or strength deficits or other mobility impairments from the variables on the plant floor. As a result of the myriad risks, employees cannot safely work in, or walk into or through, S&C's manufacturing production areas while utilizing an assistive device, and thus during all relevant times S&C has not allowed an employee to be in such areas while using an assistive device. Rascher's duties required him to walk into and through these production areas.

22.     An employee taking a prescribed narcotic pain medication or other medication that affects mental or physical function, due to an acute injury, is not cleared to return to work by S&C's Health Services department if the employee either (1) has taken such medication within 4 (four) hours of the start of the work shift, or (2) is under the influence of any such medication during any work hours. In addition, an employee who has been on a disability leave is not cleared to return to work by Defendant's Health Services department until the employee is completely off narcotic medications (and other medications that affect mental or physical function) or has transitioned to non-narcotic / non-impairing medication during working hours.

23.     If Rascher's troubleshooting duties on S&C's manufacturing floor and his collaborative work with S&C's product specialists, more junior designers, and assembly personnel were not performed, the consequences would include production delays and S&C's inability to build custom products in an efficient, cost-effective, and timely manner in accordance with customer specifications, and failure to meet promised delivery dates on customers' orders.

8

24.     On September 2, 2014, Rascher started a medical leave of absence, which originally was scheduled to run through October 6, 2014. His last day worked before the leave was August 29, 2014. Rascher's leave was extended multiple times, first under S&C's STD pay practice and ultimately under S&C's LTD benefits policy. His approved leave ended on August 29, 2015. He did not submit any medical return-to-work releases before his maximum 12-month leave ended on August 29, 2015.

25.     Attached as Exhibit I is a true and correct copy of the S&C Health Services progress notes for Rascher between September 2014 and September 2015, which contain contemporaneously kept notes of Health Services employees relating to their communications and interactions with Rascher. (This document was marked as Deposition Exhibit 11 in Kathleen Clawson's deposition held on March 13, 2019.) These notes are records kept in the course of S&C's regularly conducted business activity, and were made and kept in S&C's Health Services department's files in the regular course and practice of S&C's business. These notes reflect that S&C's occupational health nurses had numerous conversations with Rascher and sent him letters dated September 10, 2014, October 3, 2014, and December 1, 2014. These notes reflect that on November 13 and December 1, 2014 and February 18, 2015, Rascher spoke with Sophia Quang, an occupational health nurse at S&C. Among other things, during both the November 13 and December 1, 2014 conversations, Quang discussed with Rascher that S&C's return-to-work policies required him to provide a written return-to-work release from his doctor before he could return to work.

26.     Attached as Exhibit J is a true and correct copy of the letter dated September 10, 2014 from Sophia Quang to Rascher.

9

3603738 v1 -

27.     Attached as Exhibit K is a true and correct copy of the letter dated October 3, 2014 from Sophia Quang to Rascher.

28.     Attached as Exhibit L is a true and correct copy of the letter dated December 1, 2014 from Sophia Quang to Rascher. (This document was marked as Deposition Exhibit 50 in Rascher's deposition held on December 12, 2018.)

29.     In addition to the communications between Rascher and occupational nurses in S&C's Health Services department, communications also took place between Rascher and Marcia Burton, one of S&C's employee benefits professionals, during Rascher's year-long absence from work. Attached as Exhibit M is a true and correct copy of the letter dated January 21, 2015 from Marcia Burton to Rascher. (This document was marked as Deposition Exhibit 51 in Rascher's deposition held on December 12, 2018.)

30.     Attached as Exhibit N is a true and correct copy of the letter dated March 11, 2015 from Marcia Burton to Rascher. (This document was marked as Deposition Exhibit 56 in Rascher's deposition held on December 12, 2018.)

31.     Attached as Exhibit O is a true and correct copy of the letter dated July 30, 2015 from Marcia Burton to Rascher. (This document was marked as Deposition Exhibit 57 in Rascher's deposition held on December 12, 2018.)

32.     Attached as Exhibit P is a true and correct copy of the letter dated August 20, 2015 from Marcia Burton to Rascher. (This document was marked as Deposition Exhibit 59 in Rascher's deposition held on December 12, 2018.)

33.     Attached as Exhibit Q is a true and correct copy of a "Retirement Checklist" dated August 20, 2015, created by Marcia Burton for and during her August 20, 2015 in-person

meeting with Rascher. (This document was marked as Deposition Exhibit 58 in Rascher's deposition held on December 12, 2018.)

34.     Attached as Exhibit R is a true and accurate copy of a document titled "Job Titles, Qualifications, and Duties for Detailers and Designers," which provides a description of the job duties for various positions, including the position of Principal Designer which was held by Rascher. (This document was marked as Deposition Exhibit 38 in Rascher's deposition held on December 12, 2018.)

35.     Attached as Exhibit S is a true and accurate copy of an application submitted to MetLife to approve Rascher for Long-Term Disability benefits. (This document was marked as Deposition Exhibit 53 in Rascher's deposition held on December 12, 2018.) The "Employee's Job Description" page (labeled S&C282) was completed by Chris Roman, who was Rascher's direct supervisor. (This single page was marked as Deposition Exhibit 39 in Rascher's deposition held on December 12, 2018.) The "Employee Statement" pages (labeled S&C285 and S&C295) were completed by or on behalf of Rascher.

36.     Attached as Exhibit T is a copy of the contemporaneous notes Dr. Rajeev Khanna, M.D. wrote during the time he met with Rascher on August 31, 2015, to evaluate Rascher's ability to return to work and perform essential job functions. (This document was marked as Deposition Exhibit 62 in Rascher's deposition held on December 12, 2018.)

37.     Rascher was terminated from employment upon expiration of the maximum one-year leave of absence because he did not submit any medical return-to-work release by the time his approved leave of absence expired on August 29, 2015, and S&C's Health Services department determined as of August 31, 2015 that he was not able to perform the essential functions of his job, with or without accommodations, because he could not function

11

independently within S&C's large manufacturing complex primarily due to his obvious significant difficulty ambulating, balance deficits, and trouble with sit-to-stand transfers due to lower extremity weakness. Although the determination that Rascher could not return to work was made on August 31, 2015, the effective date of his termination was August 29, 2015, because that was the date his maximum 12-month leave of absence ended.

38.     On September 2, 2015, S&C's human resources department initiated the process to complete a Termination Notice for Rascher – the official human resources record of an employee's separation from employment. After receiving a voice message from Rascher on September 4, 2015 stating he would be submitting doctors' return-to-work notes, S&C's human resources department suspended its processing of Rascher's Termination Notice. After S&C's Health Services department reviewed and considered the documents Rascher submitted on September 8, 2015, S&C's human resources department completed processing Rascher's Termination Notice. The effective date of Rascher's separation from employment was August 29, 2015, in accordance with S&C's policy and S&C's repeated communications to Rascher.

39.     Attached as Exhibits U, V, W, and X, are true and correct copies of return-to-work doctors' notes Rascher submitted to S&C on September 8, 2015. (These documents were marked as Deposition Exhibits 65, 67, 68, and 69 in Rascher's deposition held on December 12, 2018.)

40.     Attached as Exhibit Y is a true and correct copy of the August 26, 2015 Illinois Bone and Joint Institute physical therapy notes for Rascher which S&C received in September 2015 and which were kept since then in S&C's Health Services department's files in the regular course and practice of S&C's business. (This document was marked as Deposition Exhibit 9 in Kathleen Clawson's deposition held on March 13, 2019.)

3603738 v1 -

41.     Attached as Exhibit Z is a true and correct copy of emails sent by and between Kathleen Clawson and Dr. Khanna on September 9, 10, and 11, 2015 regarding the decision not to clear Rascher to return to work.  (A portion of this email thread was marked as Deposition Exhibit 6 Kathleen Clawson's deposition held on March 13, 2019.)

42.     Attached as Exhibit AA is a true and correct copy of the letter dated September 14, 2015 from S&C's Health Services department to Rascher. (This document was marked as Deposition Exhibit 70 in Rascher's deposition held on December 19, 2018.)

I declare under penalty of perjury under the laws of the United States that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Executed this 1st day of August, 2019, at Chicago, Illinois.

_Donna M. Baggett_
Donna M. Baggett

13

3603738 v1 -

Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
      U.S. EQUAL EMPLOYMENT            )
 4    OPPORTUNITY COMMISSION,          )
      PLAINTIFF and RICHARD            )
 5    RASCHER, Plaintiff,             )
                                      )
 6                  Plaintiffs,       )
                                      )      No. 1:17-CV-6753
 7         vs.                        )
                                      )
 8    S&C ELECTRIC COMPANY,           )
                                      )
 9                  Defendant.        )

10

11            The videotaped deposition of RICHARD RASCHER,

12    called by the Defendant for examination, taken pursuant

13    to notice and pursuant to the Federal Rules of Civil

14    Procedure for the United States District Courts

15    pertaining to the taking of depositions, taken before

16    Kim Kocimski, Certified Shorthand Reporter, at 200 West

17    Madison Street, Suite 3000, Chicago, Illinois,

18    commencing at 9:08 a.m. on December 12, 2018.

19

20

21

22

23

24
```



```
 1   APPEARANCES:

 2       U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
         MR. BRADLEY S. FIORITO
 3       500 West Madison Street
         Suite 2000
 4       Chicago, Illinois 60661
         Phone:  (312) 353-7525
 5       E-mail:  bradley.fiorito@eeoc.gov

 6            On behalf of the Plaintiff;

 7       JOETTE S. DORAN & ASSOCIATES, P.C.
         MS. JOETTE S. DORAN
 8       2300 North Barrington Road
         Suite 400
 9       Hoffman Estates, Illinois 60169
         Phone:  (847) 490-5309
10       E-mail:  joette@joettedoran.com

11            On behalf of the Plaintiffs;

12       FOX SWIBEL LEVIN & CARROLL, LLP
         MR. STEVEN L. BRENNEMAN
13       200 West Madison Street
         Suite 3000
14       Chicago, Illinois 60606
         Phone:  (312) 224-1206
15       E-mail:  sbrenneman@foxswibel.com

16            On behalf of the Defendant.

17   ALSO PRESENT:  Robin Kim (videographer)

18

19

20                  *    *    *    *    *    *

21

22

23

24
```



```
 1   WHEREUPON:

 2                      RICHARD RASCHER,

 3   called as a witness herein, having been first duly

 4   sworn, was examined and testified as follows:

 5                       EXAMINATION

 6   BY MR. BRENNEMAN:

 7        Q.   Good morning, Mr. Rascher.  Can you state your

 8   name?

 9        A.   Richard Rascher.

10        Q.   Can you spell your last name?

11        A.   R A S C H E R.

12        Q.   Have you ever had your deposition taken

13   before?

14        A.   No, I haven't.

15        Q.   Okay.  Let me explain about what we will be

16   doing today.  As you know, I represent S&C Electric

17   Company.  I'm going to be asking you a series of

18   questions.  And you can see there's a court reporter

19   here who's transcribing everything that everyone here

20   says today.  You'll be expected to answer my questions

21   to the best of your ability and please do so audibly

22   rather than a gesture or -- or such as a shrug of the

23   shoulders or a nod of your head because it's important

24   that we capture everything that is -- is stated today.
```



```
 1   did mention building 12-A; is that correct?

 2        A.   Yes.

 3        Q.   What happened in building 12-A that related to

 4   your work?

 5        A.   12-A is where the -- after our drawings were

 6   finished and the parts were fabricated and it went to

 7   shelves in that building, the assemblers would pull the

 8   parts and assemble it.  They would put it on skids and

 9   shipping would remove it to the shipping area.

10        Q.   Okay.  So building 12 is at least one of the

11   places that actually manufactured some of the parts that

12   you were designing, correct?

13        A.   Would use the parts that we designed.

14        Q.   Would use the parts that you were designing?

15        A.   Yes.

16        Q.   Okay.

17        A.   The fabrication areas were throughout the

18   facility, building -- S&C Electric is not just a little

19   small brick.  It's -- It's -- It goes from Pratt --

20   Pratt Avenue to Devon and the whole length of Ridge

21   there.  So fabrication by these machines and so forth

22   took up a lot of buildings.

23        Q.   Yeah.

24             In fact, was --
```



```
 1                    (Short interruption.)

 2    BY MR. BRENNEMAN:

 3        Q.    Is the -- Is the S&C industrial complex there

 4    on Ridge, do you know how many acres it -- it takes up?

 5        A.    No, I do not.

 6        Q.    Would 45 or 46 sound about right?

 7        A.    I can't answer that.

 8        Q.    Okay.  But as you said, it runs from Pratt on

 9    the north to --

10        A.    Devon.

11        Q.    -- Devon on the -- on the south and the full

12    length of Ridge on the -- on the west and the railroad

13    tracks on the east, correct?

14        A.    Right.

15        Q.    And would you go to building 12-A as part of

16    your duties as principal designer?

17        A.    Yes, I would.

18        Q.    And what did you do in building 12-A?

19        A.    If there was difficulty assembling our parts,

20    I would go down there and see what the problem was and

21    assist them in making -- not assisting, I would tell

22    them what parts needed to be modified in order to make

23    the arrangement workable.

24        Q.    You were pretty good at that, weren't you?
```



1        A.    I was very good at that.

2        Q.    In fact, were you viewed as basically the

3    resident expert at S&C on handling that kind of work?

4        A.    People had called -- Other employees had

5    called -- said that's what I was.

6        Q.    But you're too modest to take -- take the

7    title, is that what you're telling me?

8        A.    I didn't gloat over that type of stuff.  I

9    thought I was doing the job I was being paid for.

10       Q.    Who do you recall interacting with in building

11   12-A when you would go there to do the things you

12   described?

13       A.    Well, the manager of that or -- was -- I'm

14   trying to remember his name.  It's been a while since

15   I've dealt with him.  He's the -- I don't recall his

16   name right now.

17       Q.    Does Tony -- Is Tony --

18       A.    That's it.

19       Q.    -- Savino (phonetic) one of the people?

20       A.    Yeah, Tony Savino.

21       Q.    Okay.  So just so we're clear, you -- when --

22   on occasions when you would go to building 12-A, you

23   would interact with Tony Savino who was a manager in

24   that area that you described?



1       A.    That's right.

2       Q.    How frequently in your job would you go to the

3  manufacturing plant floor?

4       A.    It depends on the problems that we had, how

5  often I would be down there.  Sometimes it could be

6  every day.  And Tony would call me up on the phone and

7  ask me to come down and solve a problem and I would work

8  with his trouble workers there to see what the problem

9  was and what we could do to solve it.

10      Q.    Is --

11      A.    And sometimes it took two of us to figure out

12  how to do it.  Mr. Roman would join me and we would come

13  up with a solution.

14      Q.    Mm-hmm.  Help me understand the kinds of

15  problems and solutions you would come up with when you

16  did that.

17            Was it changing a way a process was done or

18  changing a part or refabricating something?  What was it

19  exactly?

20      A.    Sometimes it -- it would take a -- a new part

21  to be fabricated to make this design work.

22      Q.    What about other examples?

23      A.    Sometimes we would say this wasn't assembled

24  properly and this is how it should be assembled.



1      Q.   So the drawings were correct but the

2   assemblers on the floor weren't following your

3   instructions?

4      A.   That happened on occasion.

5      Q.   And that would be an example of going down to

6   the floor to straighten them out?

7      A.   Assist them not straighten them out.

8      Q.   Okay.

9      A.   I did not force them to do something.  I would

10  make suggestions.  I worked well with -- That's why Tony

11  appreciated me coming down and assisting because he knew

12  I would have a solution.

13     Q.   Did you work with blueprints in your job as

14  principal designer?

15     A.   They were CAD drawings.

16     Q.   So that's computer-aided or a computer program

17  of the drawings?

18     A.   Yes.

19     Q.   Okay.  Was there ever a point when you had

20  actual paper blueprints that you used?

21     A.   Yes.

22     Q.   When did that end or -- or if it did end,

23  did -- what -- what -- during what period of time were

24  you using the paper?



1          A.    I guess I need a definition of what you mean

2    by blueprints.

3          Q.    Well -- Okay.  Good question.

4                Apart from a computer program or computer

5    data, computer-stored information, were there any actual

6    hard copies of blueprints that you used that you had

7    stored in binders or file cabinets, for example?

8          A.    Yes.  We had file cabinets full of that type

9    of drawings and they were also old drawings that were

10   scanned into the system that you could view on a -- on a

11   computer.

12         Q.    Okay.  Did -- Let's say in the last couple of

13   years of your employment with S&C, did you have the need

14   to refer to or use the actual paper hard copies of the

15   blueprints?

16         A.    Yes.

17         Q.    Okay.  And where were -- where were those

18   stored in connection with your cubicle?

19         A.    Well, if they were older drawings, blueprints

20   of stuff that went -- got destroyed, I would say,

21   because of everything going onto the computer system, a

22   file cabinet in our office had a lot of old drawings --

23   copies of old drawings that the print room did not have.

24   And on occasion the print room would ask me for that



1    drawing and I would find it.

2         I was the keeper of old stuff.  I had file

3    cabinets full of stuff; 53 years will accumulate a lot

4    of information.  And a lot of people would come to me

5    including the engineers and see if I had a copy of this

6    or the vintage of the drawings of -- of the circuit

7    switchers dates back to when I first started working for

8    S&C back in 1962.

9         And we -- the -- the circuit switcher has

10   progressed to different designs from type A to type G to

11   mark 2, mark 3, mark 4, mark 5, the vintage.  And I

12   would keep some of these older drawings, and people from

13   the other departments would come to me and ask me if I

14   had an -- an older version because the original of the

15   older version got destroyed.

16        And it was also S&C Canada that took over a

17   lot of our product line and they would -- we would send

18   drawings up to them for that, for fabricating that

19   product line.  And somehow Fidel Batish (phonetic) would

20   call me up and ask me what -- if I had a copy of that

21   drawing and I did have a copy of it, because somehow

22   theirs -- the drawings that we used to fabricate here or

23   draw and were sent up to Canada to be -- because of that

24   product line, they stored it in a facility someplace and



1    engineering in the original lab building upstairs.  He

2    would come over and ask me if I had some old drawings

3    pertaining to those and sometimes I had them and

4    sometimes I didn't.

5         Q.   At your -- At your workstation, how much of

6    the day did you spend sitting, typically?

7         A.   The -- The day that I spent doing what?

8         Q.   Sitting, just seated?

9         A.   Sitting?

10        Q.   At your workstation.

11        A.   I would say three-quarters of a day.

12        Q.   And your day was how many hours?

13        A.   I started at 7:30 in the morning and I was

14   lucky if I left by 5:00.

15        Q.   In addition to sitting, did you -- did you do

16   standing as part of your job?

17        A.   Yes.  And when I walked over and assisted a

18   coworker, I didn't sit down next to them, I would stand

19   there and say that you should do this and this, and then

20   they would do that, and then they'd come back and ask me

21   if it was right.  I did walk in my office.

22        Q.   Okay.  When -- The example you just gave as

23   assisting a coworker, are you referring to other

24   designers --



 1          A.    Designers, yes.

 2          Q.    -- in Department 712?

 3                And where were those designer's workstations

 4    located in relation to yours?

 5          A.    Probably out to your lobby, the length of this

 6    room; each one had a cubicle that had an L-shape desk

 7    with a file cabinet on top of it where I kept all the

 8    old price sheets.

 9          Q.    Can you approximate the number of feet or

10    yards that you're describing?

11          A.    Is that important?

12          Q.    I'm just curious.  I mean, we could --

13          A.    I would say the length of this room, what- --

14    whatever that measures out to be.

15          Q.    Okay.  And then would it also be correct that

16    you walked and did standing when you were engaging in

17    these activities on the -- on the production floor, for

18    example, in building 12-A?

19          A.    Yes.

20          Q.    You had to walk to get there, correct?

21          A.    I walked down there.  I walked down -- I think

22    it's almost 20 steps going down and then walk over to

23    building 12-A, which was on the same level.

24          Q.    So the 20 steps that you're referring to, is



1    that the number of steps that you at least are

2    approximating from the ground level of building 12 to

3    the mezzanine where your office was?

4        A.    Yes.

5        Q.    Okay.  And then building 12-A was a nearby

6    building to --

7        A.    Yes, it was.

8        Q.    -- building --

9            Okay.

10       MR. BRENNEMAN:  Let's mark this as 37.

11                    (Rascher Deposition Exhibit No. 37

12                      marked as requested.)

13   BY MR. BRENNEMAN:

14       Q.    Mr. Rascher, you've been handed what's been

15   marked as Defendant's Deposition Exhibit 37.  This has

16   Bates pages S&C 358 through 364.

17           Is this a copy of a performance appraisal you

18   received at S&C?

19       A.    Yes, it is.

20       Q.    Is this the last one that you received as an

21   employee there?

22       A.    Yes, I believe this is it.

23       Q.    And is the compensation rate in that box about

24   two-thirds of the way down on the first page your salary



1      Q.   Do you know what Mr. Roman was referring to as

2   "hot jobs"?

3      A.   Short turnaround jobs that had to be done

4   quickly.

5      Q.   And did those require -- Well, give me an

6   example of one of those jobs when you were at S&C, what

7   it -- what it required you to do.

8      A.   I guess, the one word to -- not guess -- it

9   was put out fires.  By fires, I mean that the customer

10  was the -- wanted the switch now not yet -- not

11  tomorrow, they wanted it now.  And we were required to

12  put forth our best design and -- quickly and everybody,

13  manufacturing and so forth, product specialists, do

14  their best to accommodate the customer's request.

15     Q.   And so did that require you to be

16  communicating with, as you say, the product specialists,

17  the people on the manufacturing floor, those sorts of

18  things?

19     A.   I would communicate with them, yes.  I

20  wouldn't use the word, you know -- You better get this

21  done now, you know.  I would say the customer's

22  requested this ship -- this ship by a certain date and

23  we -- everybody at S&C had to do their best to make sure

24  that was accomplished.



1              Do you see that?

2      A.    Yes.

3      Q.    What sorts of safety issues or safety

4  conscious efforts did you make at S&C?

5      A.    There was a program that S&C had, people

6  should suggest things that are not -- that somebody

7  could get hurt doing.  And so there was a program that

8  they had if you made suggestions of some sort, you got a

9  free -- maybe a free coffee or free sweet roll or

10  something at lunchtime and you were rewarded for giving

11  your thoughts for something that needed some attention.

12      Q.    And you made some of those suggestions?

13      A.    Yes, I did.

14      Q.    Do you recall any particular issue that you

15  made a suggested solution for?

16      A.    Let's see.  Offhand, no.  I -- It was just if

17  you saw a problem, you would make a suggestion.  You

18  filled out a form and -- or sometimes I didn't even go

19  through forms stage.  I would make a suggestion to the

20  floor supervisor or somebody that something needed some

21  attention before somebody got hurt.

22      Q.    Did any of your suggestions have to do with

23  any of the activities on any of the -- any of the

24  production areas of S&C?



```
1        A.    Yes.

2        Q.    Give me an example.

3        A.    A clutter of the aisles would be one.

4        Q.    To eliminate the obstacles in the --

5        A.    Right.

6        Q.    -- manufacturing area?

7              Okay.  And why would that have helped safety?

8        A.    If a -- If something was extending into the

9   pathway or the aisles and somebody would walk by and

10  trip on it, it -- it would be a preventive by suggesting

11  something be done to eliminate this problem.

12       Q.    There are lots of heavy equipment on the

13  manufacturing floor at S&C?

14       A.    Yes, there is.

15       Q.    Including in building 12-A?

16       A.    Yes, there is.

17       Q.    A lot of moving parts?

18       A.    Yes, there is.

19       Q.    Are there forklifts going through the area

20  from time to time?

21       A.    Yes, there --

22       Q.    Other kinds of indoor vehicles, moving parts,

23  and things like that?

24       A.    Yes.
```



1    Q.   Are some of the products that are being

2    manufactured -- Let's just talk about building 12-A, for

3    example.  Are some of those products as big as this

4    table?

5    A.   The products for the circuit switcher that go

6    into substations usually, there are three phases.  Yes,

7    they would be the size of -- the length of one, two --

8    three of your tables here.

9    Q.   Three of these tables?

10   A.   I'm talking about the -- the length of it.

11   And then there would be insulators mounted on there,

12   sometimes either three or four, and then the live parts

13   which would be the -- where the current path would go

14   through when these switches are located in a substation.

15   And then they have -- they have braces on them to

16   prevent them from tilting over, and they -- the shop

17   people mount them to wooden skids and the Jeep drivers

18   would push those wooden skids across the floor to

19   shipping.

20   Q.   In addition to the moving vehicles and the

21   other things you described, were there cranes or are

22   there cranes and lifting equipment on the production --

23   in the production areas --

24   A.   Yes.  There's --



1    Q.    -- that you referred to?

2    A.    -- cranes for -- that are mounted to the

3  ceiling, I-beams.

4    Q.    And those cranes are lifting some of these

5  large pieces of equipment --

6    A.    Yes, they are.

7    Q.    -- and taking them from one place to other?

8        Okay.

9        Is that true?

10   A.    That's correct.

11   MR. BRENNEMAN:   Ready for 38.

12              (Rascher Deposition Exhibit No. 38

13               marked as requested.)

14  BY MR. BRENNEMAN:

15   Q.    Before we look at that, Mr. Rascher, do you

16  know how many buildings are on the campus at S&C?

17   A.    Well, there's more than building 12 and 12-A.

18  So a number of buildings that exist on this campus, I

19  cannot answer that.

20   Q.    Is it --

21   A.    I don't know.

22   Q.    -- a couple of dozen?

23   A.    Couple dozen, more than 12.

24   Q.    I'm just asking if it's -- how many -- how



```
 1          A.    Other departments had principal designers

 2    also.

 3          Q.    Do you think this Exhibit 38 is an accurate

 4    description of the various duties of the various job

 5    titles in your department?

 6          A.    Could you repeat that?

 7          Q.    Sure.

 8          MR. BRENNEMAN:  Do you want to just read it back?

 9                      (Record read as requested.)

10    BY THE WITNESS:

11          A.    Yes.

12          Q.    Still looking at the last page, which is

13    page 472 --

14          A.    What was the question?

15          Q.    I haven't -- I haven't given you one yet.

16          A.    Oh.

17          Q.    (Continuing.) -- this -- the third bullet

18    there says:  Serves as teacher and trainer frequently

19    for less experienced designers.

20                Is that a reference to what you described

21    earlier about your -- your teaching and training duties

22    for other designers in the department?

23          A.    Yes.

24          Q.    And then two bullets down, it -- it says:
```



```
1    Reviews the technical work of others and frequently

2    participates in discussions to solve unusual technical

3    problems.

4              Was that also part of what your job was?

5         A.   Yes.

6         Q.   You -- You testified that Chris- --

7    Christopher Roman was your -- was your manager.  How

8    long had he been your manager before you separated

9    from -- from S&C, approximately?

10        A.   When Ted Gutman retired, which was ...

11        Q.   More than 15 years before you separated?

12        A.   I do not know the exact date that Chris took

13   over our department.

14        Q.   Was it at least ten years before you separated

15   from S&C?

16        A.   Yes, I would agree to that.

17        Q.   All right.

18        MR. BRENNEMAN:  Let's mark this as 39.

19                    (Rascher Deposition Exhibit No. 39

20                     marked as requested.)

21   BY MR. BRENNEMAN:

22        Q.   Mr. Rascher, you've been handed what's been

23   marked as Defendant's Deposition Exhibit 39, which is a

24   single page labeled S&C 282.
```



```
 1                 Do you know what this is?

 2        A.   I remember seeing it, yes.

 3        Q.   When did you see this?

 4                     (Witness viewing document.)

 5   BY THE WITNESS:

 6        A.   I remember it says -- Chris Roman filling out

 7   a form like this.  We were evaluating the efforts that

 8   were required -- the efforts that -- that you did, what

 9   you used your -- your hands for, your feet for.  We had

10   safety meetings every now and then also that -- we saw

11   movies showing you the proper way to lift things.

12             And to go more detailed on this, all I can

13   say, I saw the form.

14        Q.   Did -- Did you help Chris Roman fill out this

15   form?

16        A.   I don't recall.

17        Q.   Did -- Did Chris Roman confer with you when --

18   while he was filling out this form?

19        A.   I can't answer that clearly.

20        Q.   You don't remember?

21        A.   No.

22        Q.   Or why can't you answer that?

23        A.   I don't remember.

24        Q.   Do you recall whether this form was being
```



```
 1   filled out as part of your long-term disability

 2   application?

 3          A.   I don't know.

 4          Q.   Do you agree that your job required about five

 5   to six hours of sitting per day?  I'm looking at the

 6   form.

 7          A.   Yes.

 8          Q.   Okay.  And about one to two hours of standing

 9   per day?

10          A.   What's included in -- in standing?  I mean,

11   standing to go to the cafeteria, standing to use the

12   washroom?  I'm not trying to get sarcastic here but I

13   just don't understand where you're going with this.

14          Q.   Well, I think -- And I didn't fill out the

15   form, obviously, but I think it's trying to describe

16   your actual duties as opposed to your lunch break.  So I

17   would not include going to the cafeteria, but while

18   you're actually performing work, would -- would your

19   duties have entailed about one to two hours of standing

20   per day?

21          MR. FIORITO:  I'm going to object to the form.

22   BY MR. BRENNEMAN:

23          Q.   You can answer.

24          A.   I can?
```



1        Yes.

2        Q.    Okay.   How much walking in the course of a day

3    did you do, typically, as far as the amount of time

4    spent walking?

5        A.    45 minutes, an hour.   It depends what -- if I

6    was walking to the shop to solve a problem or if I was

7    walking to assist a fellow designer.

8             This was filled out by Mr. Roman in January

9    of 2015.   At that time, I was not back working at S&C.

10   I was on a short-term disability.

11       Q.    If you look at the bottom of this form, it's

12   actually No. 21, it says:   Be around moving equipment

13   and/or machinery; and it looks like Mr. Roman checked

14   yes.

15            Do you agree that your job entailed being

16   around moving equipment and/or machinery?

17       A.    Yes.

18       Q.    And did your job involve -- I think we already

19   talked about this a little bit, but did your job involve

20   climbing stairs?

21       A.    To get to the office, yes.

22            To get here today, I took a train from Mount

23   Prospect to the -- to the Metra station at Madison

24   Street not the Union Station the other one.



1     Q.   Ogilvie?

2     A.   And from there, I walked here.  So I don't

3  know where this is going with the word -- I was able to

4  get around cars that were blocking the -- the streets

5  here coming here, buses, and so forth.  So I guess you

6  consider that moving equipment.

7     MR. BRENNEMAN:   40.

8                    (Rascher Deposition Exhibit No. 40

9                     marked as requested.)

10  BY MR. BRENNEMAN:

11     Q.   I'm going to shift gears a little bit,

12  Mr. Rascher, and start asking you some questions about

13  some documents that are policies at S&C.

14          You've been handed what's been marked as

15  Exhibit No. 40 which runs from S&C 459 to 461.

16          Is this the company's Equal Employment

17  Opportunity policy that was in place when you were

18  employed?

19     A.   I did not have access to a policy bulletin

20  book.  That was only by managers, so I do not know what

21  was in the policy bulletin book.

22     Q.   Did you have access to the company's intranet,

23  source one?

24     A.   When I was not at S&C or before I was --



1    Q.   All right.  Let's look specifically right now

2    at MetLife 127.  You see in the top third, I would say,

3    there's -- list any medications prescribed and then

4    somebody wrote Tramadol 50-milligram tablets.  Do you

5    see that?

6    A.   Yes.

7    Q.   Were you taking Tramadol in August of 2015 for

8    pain?

9    A.   No, I was not.

10   Q.   Were you ever taking Tramadol --

11   A.   No.

12   Q.   -- or prescribed Tramadol?

13   MR. BRENNEMAN:  Did you get an answer?

14   BY THE WITNESS:

15   A.   I might have been prescribed it, but -- that's

16   not the word -- I did not see any results from pain

17   medicine.  Even in the hospital after the operation, I

18   did not see any -- they gave me some other stuff that's

19   supposed to put you in la-la land or something and pain

20   medicine doesn't help me.

21   Q.   All right.  So it sounds like you were

22   prescribed some pain medicine, you did take some pain

23   medicine, but you didn't experience very good results

24   with it; is that correct?



 1          A.    Yes.

 2          Q.    And was that the case in, let's say, July and

 3   August of 2015?

 4          A.    It -- It says on here date, February 20th of

 5   2015 -- 2015.

 6          Q.    Well, that's for the date of your surgery, I

 7   believe.

 8          A.    I'm looking for the date that this form was

 9   filled out.

10          Q.    Yeah.  Let's turn to the next page and I think

11   we can help you out on that.  Do you see the middle part

12   of page MetLife 128 where it looks like a physician's

13   signature block and somebody wrote in 8/11/2015.

14                Correct?

15          A.    I'm looking for it.  Oh, there, I see it.

16   Yes.

17          Q.    So do you have any reason to -- Strike that.

18                I want to turn back to the prior page, 127.

19   Was it your understanding that as of August 11, 2015

20   Dr. Jiminez had written out these restrictions for you

21   that included sitting only two hours intermittently?

22          A.    Referring to, it says no lifting, no carrying,

23   is that -- pushing, pulling, walk, and sitting as ...

24          Q.    I'm not sure you're on the same page I am.



1      Q.    All right.

2      A.    How would I know that?

3      Q.    Was one of your PT providers, Crystal?

4      A.    Yes.

5      Q.    All right.  Do you ever recall telling Crystal

6    on or about August 12, 2015 that you were in pain and

7    the pain medication wasn't helping?

8      A.    If that's what I told her, then it must be

9    true.  But I have told you that pain medicine does not

10   work on me so I don't take pa- -- pain medicine.  I

11   don't --

12     MS. DORAN:  Richard, it's only what you recall.

13   Okay?  That's what he's asking you, if you recall these

14   statements.  That's the simple question.

15   BY MR. BRENNEMAN:

16     Q.    Do you recall telling Crystal -- again, the

17   same physical therapist -- on August 21st, 2015 that you

18   were in more pain in the lower back region than you had

19   previously?  Do you recall anything like that?

20     A.    I don't recall.

21     Q.    Is it -- Do you recall telling Crystal on

22   August 21, 2015 -- and this is a quote from her

23   record -- "the pain medication doesn't even take the

24   edge off"?  Is that a quote or is that a statement you



```
 1              Was he older than you?

 2       A.   I believe he is.  He doesn't look older than

 3   me.  He looks very young.

 4       Q.   That's because he's working at S&C.

 5       MR. FIORITO:  Can we get a check on the time?

 6       MS. DORAN:  How long are we at?

 7   BY MR. BRENNEMAN:

 8       Q.   Do you know if he's still employed at S&C?

 9       A.   No, I do not know.

10       MR. BRENNEMAN:  Okay.  How much time do we have?

11       THE COURT REPORTER:  It's about -- I have 3:54.  So

12   3:54 and 3:07, we're right at it.

13                   (Discussion off the record.)

14       MR. BRENNEMAN:  No further questions.

15       MS. DORAN:  Okay.  I'm going to make a statement on

16   the record.

17          I have no questions, but on behalf Mr. Rascher

18   pursuant to the agreed protective confidentiality order

19   entered in the case, I'm going to designate this

20   deposition as confidential and subject to the protective

21   order.

22          And we will waive signature.

23       MR. BRENNEMAN:  Waive?

24       MS. DORAN:  Yes.
```



1             Okay.

2          THE VIDEOGRAPHER:   The time is 5:41.   We're now

3    going off the record.   This concludes today's

4    deposition.

5                        (Witness excused.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

```
U.S. EQUAL EMPLOYMENT         )
OPPORTUNITY COMMISSION,       )
                              )
            Plaintiff,        )
                              )
       vs.                    ) No. 17-cv-06753
                              )
S&C ELECTRIC CO.,             )
                              )
            Defendant.        )
```

The deposition of CHRISTOPHER ROMAN, called by

the Plaintiff for examination, taken pursuant to notice

and pursuant to the Federal Rules of Civil Procedure for

the United States District Courts pertaining to the

taking of depositions, taken before Bridget L. Stone,

Certified Shorthand Reporter, at 500 West Madison

Street, Suite 2000, Chicago, Illinois, commencing at

10:00 a.m. on the 19th day of March, A.D., 2019.

```
                                                        Page  2
 1   APPEARANCES:

 2        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
          MR. BRADLEY FIORITO
 3        MS. JOETTE DORAN
          MR. ETHAN COHEN
 4        500 West Madison Street
          Suite 2000
 5        Chicago, Illinois 60661
          Phone:  (312) 869-8000
 6
                On behalf of the Plaintiff;
 7
          FOX, SWIBEL, LEVIN & CARROLL, LLP
 8        MR. STEVEN L. BRENNEMAN
          200 West Madison Street
 9        Suite 3000
          Chicago, Illinois 60606
10        Phone:  (312) 224-1200
          E-Mail:  sbrenneman@foxswibel.com
11
                On behalf of the Defendant.
12
     ALSO PRESENT:
13
          Ms. Donna Baggett, S&C Electric
14
                      *    *    *    *    *    *
15

16

17

18

19

20

21

22

23

24
```

Page 4

1                    (Witness sworn.)
2    WHEREUPON:
3                    CHRISTOPHER ROMAN,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6                    EXAMINATION
7    BY MR. COHEN:
8        Q.   Could you please state your full name for the
9    record.
10       A.   Christopher Dean Roman.
11       Q.   Mr. Rowan, have you ever given a deposition
12   before?
13       A.   I have not.
14       Q.   Okay.  And are you represented by counsel
15   today?  Do you have your own lawyer?
16       A.   No, I do not.
17       Q.   Okay.  Let me tell you a little bit about just
18   some of the logistics of how depositions work then.
19            We have a court reporter here today.  She's
20   going to be taking down everything that we say.  So it's
21   important that all of your answers be out loud and
22   verbal.  Please try not to answer with gestures or nods
23   of the head because that's something that will be hard
24   for her to take down and could cause some confusion on

Page 52

1      Q.   All right.  And did you ever have to go to

2   building 12 or 12A in your work as a designer?

3      A.   Yes.

4      Q.   Okay.  And did the other designers in your

5   department ever have to go to buildings 12 or 12A?

6      A.   Yes.

7      Q.   Was there a particular place in buildings 12

8   and 12A that they would go to do their designer work?

9      MR. BRENNEMAN:  Objection to the form.

10  BY THE WITNESS:

11     A.   The -- just the physical location of the

12  building where the product lines were manufactured --

13     Q.   Okay.

14     A.   -- as there were other product lines that were

15  also assembled in those buildings, but we did not

16  support.

17     Q.   Okay.  The locations in -- Was it multiple

18  locations in those buildings where your products were

19  manufactured?

20     A.   Yes.

21     Q.   Okay.  And if you think about the time period

22  of 2013 to 2015, did those locations where your products

23  were being developed -- or I'm sorry, manufactured stay

24  the same or did they move from time to time?

Page 53

1      A.    They were relatively static.

2      Q.    Okay.  And why would you need to go into

3  buildings 12 and 12A?

4      A.    To support the product line manufacturing

5  operation.

6      Q.    Okay.  What sorts of things would you do in

7  those buildings?

8      A.    Primarily go down and talk with assemblers of

9  the products and/or their supervisors to address any

10  sort of problems, questions, that they would have with

11  the special design as it was being fabricated.

12      Q.    And is that -- Let me ask that a slightly

13  different way.

14            The designers in your department, is that the

15  work that they would do if they were going to buildings

16  12 and 12A?

17      A.    That would be one of the reasons they would go

18  into building -- especially building 12 because there

19  was vending machine area and that kind of stuff.  So

20  I'm --

21      Q.    Oh, okay.

22            So --

23      A.    You know, but they -- they would need to go to

24  various parts of the buildings to support the products.

```
 1              You mentioned earlier in the deposition that
 2    you remembered from review of -- of policy handbooks and
 3    the like that you would have to have a release to return
 4    to work, if you had been off on medical leave.
 5              Is -- did -- Am I remembering that right?
 6         A.   Yes.
 7         Q.   All right.  So do you have any recollection,
 8    just from your familiarity with company policies, that
 9    there was any policy that prohibited working while on --
10    on prescription painkillers?
11         A.   I don't recall that specifically, no.
12         Q.   Okay.  So let's talk a little bit about
13    Richard Rascher.
14              So he worked for you from 1993 until he went
15    on his leave of absence; is that right?
16         A.   Yes.
17         Q.   Okay.  And how would you describe him as an
18    employee?
19         A.   Very good to exceptional.
20         Q.   What were his main job duties?
21         A.   He would work on what we would refer to as the
22    front end of the business, reviewing paperwork and --
23    and other details, such as blueprints potentially that
24    we -- would be submitted in support of our efforts to
```

Page 142

1          Thank you very much for coming in today.

2       THE WITNESS:  You're welcome.

3       MR. COHEN:  Before we let you go, there is one last

4   thing we want to ask you.

5          The court reporter has been taking down what

6   we said today.  You have the right, if you want to, to

7   review the transcript and correct any errors that

8   have -- may have occurred in the transcription.

9          It's not meant to be an opportunity to revise

10  your testimony but just to, sort of, check the work of

11  the court reporter and that's called reserving

12  signature.

13         And if you don't care to do that, you're not

14  obligated to do, that that's called waiving signature

15  and you just, sort of, accept the transcript as it is

16  prepared.

17         What would you like to do?

18      THE WITNESS:  I should reserve it.

19      MR. BRENNEMAN:  Yeah.

20      THE WITNESS:  Okay.  I'll reserve it.

21      MR. COHEN:  Okay.  Thank you very much.

22               (Witness excused.)

23

24

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT | ) | Civil Action |
| OPPORTUNITY COMMISSION, | ) | No. |
| Plaintiff, and RICHARD RASCHER, | ) | 1:17-cv-06753 |
| Plaintiff-Intervenor, | ) | |
| | ) | Judge Robert |
|     vs. | ) | W. Gettleman |
| | ) | |
| S&C ELECTRIC COMPANY, | ) | Magistrate |
| | ) | Judge Maria |
|     Defendant. | ) | Valdez |

The deposition of DOUG DIETZEN, called for

examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Layli Phillips, Certified Shorthand

Reporter of the State of Illinois, at 500 West

Madison Street, Suite 2000, Chicago, Illinois, on

March 15, 2019, at 9:55 a.m.

Reported by:  Layli Phillips, CSR, RPR, CRR

License No.:  084.003900

Page 2

1   APPEARANCES:

2   For the Plaintiff:
         U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
3        MR. BRADLEY S. FIORITO
         MS. DIANE I. SMASON
4        500 West Madison Street, Suite 2000
         Chicago, Illinois 60661
5        (312) 869-8071
         bradley.fiorito@eeoc.gov
6        diane.smason@eeoc.gov

7

    For the Plaintiff-Intervenor Richard Rascher:
8        JOETTE S. DORAN & ASSOCIATES, P.C.
         MS. JOETTE S. DORAN
9        2300 Barrington Road, #400
         Hoffman Estates, Illinois 60169
10       (847) 490-5309
         joette@joettedoran.com

11

12  For the Defendant:
         FOX, SWIBEL, LEVIN & CARROLL, LLP
13       MR. STEVEN L. BRENNEMAN
         200 West Madison Street, Suite 3000
14       Chicago, Illinois  60606
         (312) 224-1200
15       sbrenneman@foxswibel.com

16

    ALSO PRESENT: Donna Baggett, S&C Electric Company
17

18

19

20

21

22

23

24

Page 4

                        DOUG DIETZEN

1
2            the deponent herein, called as a

3    witness, after having been first duly sworn, was

4    examined and testified as follows:

5                        EXAMINATION

6    BY MR. FIORITO:

7        Q.    Good morning.  Could you state and spell

8    your name for the record.

9        A.    Doug Dietzen, D-o-u-g D-i-e-t-z-e-n.

10       Q.    Thank you, Mr. Dietzen.

11             My name is Brad Fiorito.  I'm an

12   attorney for the EEOC, and I'll be taking your

13   deposition today in this matter.

14             Have you been deposed before?

15       A.    No, I have not.

16       Q.    Okay.  Then let me tell you a little bit

17   about how things will go today.

18             It's very simple.  I'll be asking a

19   bunch of questions.  The other attorneys on this

20   side of the table may have some questions after I

21   ask mine.  I'll just ask you to answer the

22   questions.

23             To -- for the -- to keep the record

24   clean, we need to speak one at a time, and so if

Page 51

1    designer could use to make their job, one, make it

2    more efficient, be more productive, and have a

3    good starting point.

4        Q.    Okay.  That was very clear.  Thank you.

5              He was good at that?

6        A.    He was very good at that.

7        Q.    Did he do -- did he do any direct

8    communication with customers?

9        A.    I don't know for sure.  I imagine it

10   wouldn't be out of the realm.  He was -- primarily

11   would have been talking to the product specialist

12   and to our outside sales team, but it would be

13   within his scope of responsibilities if a customer

14   was on a call that he would participate in that

15   and communicate directly with the customer.

16       Q.    But the customers had other primary

17   contacts within S&C?

18       A.    Yes.  Their primary would be the outside

19   sales or the product specialist.

20             Rick would also be involved if -- once

21   we had the order and the customer wanted to change

22   something, there would be work orders that were

23   processed to describe what that change was, and he

24   would, again, be in the middle of that because he

1    would look at the feasibility of the change, the

2    scope of the change, if it affected our bills of

3    material, if it affected our drawings, if it could

4    potentially impact our lead time and the schedule

5    date; he would be involved in that.

6        Q.    Did he do any assembly of the product?

7        A.    Not direct assembly, no.

8        Q.    What do you mean by "not direct

9    assembly"?  Was there indirect assembly he was

10   doing?  I'm not quite understanding.

11       A.    No.  He would not be part of the

12   assembly process.

13            In his role, he may have to go to the

14   shop floor if there was a question from the shop

15   that came up and say they are really having

16   trouble building this unit or something doesn't

17   look right, Rick might go down to the floor, and

18   he might either -- he might get hands on with it,

19   but it would be more in an indirect role, he might

20   guide somebody to do it.

21            So that's what I meant by he wouldn't be

22   part of the typical assembly operation.

23       Q.    Okay.  So he's not inserting Tab A into

24   Slot B?

Page 64

1      A.    Concrete.

2      Q.    Concrete floor.  Okay.

3            And what would have been the distance

4   from Rich's desk to the production floor?

5            MR. BRENNEMAN:  Objection to the form.

6   BY MR. FIORITO:

7      Q.    You can answer.

8      A.    There would be stairs immediate -- you

9   know, within close proximity to the exit from his

10  office.  That would lead into building -- the

11  production area of Building 12.

12           And then to get to 12A, it's probably

13  another 150 feet to the north to enter Building

14  12A.  And then 12A is a large manufacturing

15  building.

16     Q.    And what is the distance between

17  Richard's desk at that time and the staircase that

18  you're thinking of?

19     A.    So the -- you'd have to pass the

20  stairway to get to the restroom, so it's less than

21  50 feet.

22     Q.    Okay.  Do you know how often Rich had to

23  visit the production floor as part of his job?

24     A.    I don't know on a -- I can't give you a

Page 65

1  figure.  It would have been somewhat routine.

2  With his position as being an experienced

3  designer, if the assembly area was having

4  difficulty with anything that was going through

5  the shop, he would have been a primary contact,

6  and since the gear -- the equipment that we're

7  talking about is large, it's not something that

8  can be brought into an office area, it would

9  require that the design and engineering team goes

10 down to provide that consultation.

11         So, again, I don't know how -- I can't

12 give you a number, but it would have been routine,

13 my guess several times a week.

14     Q.    Okay.  But not daily?

15     A.    Could be daily.  Depends upon how -- it

16 depends.

17     Q.    Sure.

18     A.    There's no set schedule.  But if they

19 have problems, it could be multiple times a day.

20     Q.    And problems aren't predictable.  Okay.

21     A.    No.

22     Q.    When Richard did visit the production

23 floor for the circumstances you're describing,

24 about how long would he stay there?

Page 74

```
1        A.    Or anybody else.

2        Q.    Okay.  Were there parts of Rick's job

3   that could have been performed at his home?

4        A.    Rick's primary role, as I described

5   earlier, was direct communication with the

6   production specialists, the designers, and the

7   shop floor personnel.  It often involved looking

8   at specific documents, drawings, physical parts,

9   so it would be to me not practical that he could

10  perform his job from anywhere but the office area.

11       Q.    What parts of what you described just

12  now would be only performable at the work site as

13  opposed to home?

14            MR. BRENNEMAN:  Can you read that back.

15                 (Whereupon, record was read as

16                  requested.)

17       A.    Specifically he would not be able to

18  look at production gear that's being built on the

19  floor.  That would not be possible.

20       Q.    What else?

21       A.    He could not look at a designer's work

22  station or the drawings that are in front of them

23  to provide comment.

24            He could not look at the product
```

1    resources reach out to you in that regard?

2         A.    Again, I don't have any specific

3    incidence when that happened.

4              If you're asking me could it happen, I

5    wouldn't find it out of the ordinary if HR called

6    me and asked me for my opinion on something that's

7    a direct report.

8         Q.    Okay.

9         A.    I don't recall any specific instances of

10   that.

11        Q.    And you don't recall any with respect to

12   Mr. Rascher?  In fact, I think you mentioned you

13   weren't contacted by human resources with respect

14   to Mr. Rascher, correct?

15        A.    Not to my recollection.

16             MS. DORAN:  Okay.  All right.  I think

17   that's all I have.

18             MR. BRENNEMAN:  We'll reserve.

19             THE REPORTER:  Do you want to order?

20             MR. FIORITO:  Yeah, we'll order it now.

21             THE REPORTER:  Do you want a copy?

22             MR. BRENNEMAN:  Yes.

23                      (Whereupon the deposition

24                       adjourned.)

Exhibit E

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

U.S. EQUAL EMPLOYMENT          )
OPPORTUNITY COMMISSION,        )
                              )
            Plaintiff,         )
                              )
        vs.                    ) No. 17-cv-06753
                              )
S&C ELECTRIC CO.,              )
                              )
            Defendant.         )

            The deposition of ANTHONY SAVINO, called by

the Plaintiff for examination, taken pursuant to notice

and pursuant to the Federal Rules of Civil Procedure for

the United States District Courts pertaining to the

taking of depositions, taken before Bridget L. Stone,

Certified Shorthand Reporter, at 500 West Madison

Street, Suite 2000, Chicago, Illinois, commencing at

2:30 p.m. on the 19th day of March, A.D., 2019.

```
                                                            Page  2
 1    APPEARANCES:

 2          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
            MR. BRADLEY FIORITO
 3          MS. JOETTE DORAN
            MR. ETHAN COHEN
 4          500 West Madison Street
            Suite 2000
 5          Chicago, Illinois 60661
            Phone:  (312) 869-8000
 6
                On behalf of the Plaintiff;
 7
            FOX, SWIBEL, LEVIN & CARROLL, LLP
 8          MR. STEVEN L. BRENNEMAN
            200 West Madison Street
 9          Suite 3000
            Chicago, Illinois 60606
10          Phone:  (312) 224-1200
            E-Mail:  sbrenneman@foxswibel.com
11
                On behalf of the Defendant.
12
      ALSO PRESENT:
13
            Ms. Donna Baggett, S&C Electric
14
                         *    *    *    *    *    *
15

16

17

18

19

20

21

22

23

24
```

Page  4

1                      (Witness sworn.)

2    WHEREUPON:

3                          ANTHONY SAVINO,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                          EXAMINATION

7    BY MR. FIORITO:

8         Q.   Hi.

9              Can you please state and spell your name for

10   the record.

11        A.   My name is Anthony Joseph Savino.  It's

12   A N T H O N Y Joseph, S A V I N O, Savino.

13        Q.   Okay.  Mr. Savino, my name is Brad Fioritto.

14   I'm an attorney for the EEOC.

15        A.   Okay.

16        Q.   And I'll be taking your deposition today.

17             Have you ever had your deposition taken

18   before?

19        A.   I -- I think so once before, maybe a while --

20   some -- sometime ago but --

21        Q.   Okay.  What was the -- that matter?

22        A.   That was a -- a medical issue.

23        Q.   Was it your medical issue or someone else's?

24        A.   Someone else's.

Page 27

1 Q. That's pretty much it.

2   There's either --

3 A. Well, yeah.

4 Q. Okay.

5 A. If there's -- if you're in the aisle, you're

6 in a better safe zone than you are in the work zones.

7 Q. Are there occasions that Rick Rascher would

8 have come down from his workplace to the production

9 floor where the reverse could have happened, that people

10 from the production floor had gone and talked to Richard

11 instead?

12 A. No.

13 Q. Why not?

14 A. Because he has to see his designs sitting on

15 the floor.

16 Q. And they can't be moved out of the production

17 area, none of them?

18 A. The structure's twice the size of this room.

19 Q. Well, that's one structure you're picturing.

20   Are all the structures that are created so

21 large that they can't be moved?

22 A. Yes.  These are huge items that we make.

23 Q. Always, 100 percent of them are?

24 A. 100 percent of them are.

1          Q.    Okay.  What's the smallest, for example?

2          A.    A little more than this room size.  Three

3     times these tables.

4          Q.    Okay.

5          A.    And a weight of anywhere between 6- to 7,000

6     pounds.

7          Q.    So that's getting up on the --

8          A.    No, we're not carrying that upstairs.  Sorry.

9          Q.    Okay.

10          MR. BRENNEMAN:  Come on, Tony.  Get on it.

11     BY MR. FIORITO:

12          Q.    Have you ever seen anyone in any of the

13     production areas that you supervise using technology

14     like an iPhone or an iPad or some sort of video

15     equipment to videotape a problem so that somebody else

16     could see it?

17          A.    No.

18          Q.    Would that be feasible?

19          A.    I wouldn't know.  It's never been done.  I

20     wouldn't know.

21          Q.    Okay.  Have you ever investigated whether

22     something like that would be feasible?

23          A.    Nope, no.

24          Q.    Are you familiar with anything in the industry

Page 59

1    down Ridge all the time.

2    BY THE WITNESS:

3        A.   Yeah.  We -- we have an outside area -- a tree

4    service company comes in and does it.

5        MS. DORAN:  Someday I'll have to stop by and see it

6    myself.

7        MR. BRENNEMAN:  And for the record, they're holiday

8    lights.

9        MS. DORAN:  Oh, okay.

10           All right.  Well, I think that is all we have,

11   Mr. Savino.

12       MR. BRENNEMAN:  We are done.  No questions.

13           Reserve signature.

14                   (Witness excused.)

15

16

17

18

19

20

21

22

23

24

Exhibit F

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. EQUAL EMPLOYMENT          )
OPPORTUNITY COMMISSION,        )
                              )
          Plaintiff,          )
                              )
          -vs-                ) No. 1:17-cv-06753
                              )
S & C Electric COMPANY,        )
                              )
          Defendant.          )


          The deposition of MARK LANGE, called

by the Plaintiff for examination, taken

pursuant to the Federal Rules of Civil

Procedure of the United States District Courts

pertaining to the taking of depositions before

MAUREEN A. WOODMAN, a notary public within and

for the County of Cook and State of Illinois,

at Suite 2000, 500 West Madison, Chicago,

Illinois, on the 7th day of June, 2019, at the

hour of 10:30 o'clock a.m.

```
                                                         Page  2
 1    APPEARANCES:

 2        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
          BY:  MR. BRADLEY FIORITO
 3               MS. DIANE SMASON
                 500 West Madison Street
 4               Suite 2000
                 Chicago, Illinois  60661
 5               312.869.8098
                 Bradley.fiorito@eeoc.gov,
 6               Diane.smason@eeoc.gov,

 7                    Appearing on behalf of the
                      Plaintiff;
 8

 9         JOETTE S. DORAN & ASSOCIATES, P.C.
          BY:  MS. JOETTE S. DORAN
10               2300 North Barrington Road
                 Suite 400
11               Hoffman Estates, Illinois  60169
                 847.462.5993
12               Joette@joettedoran.com,

13                    Appearing on behalf of the
                      Plaintiff-Intervenor,
14                    Richard Rascher;

15        FOX SWIBEL
          BY:  MR. STEVEN BRENNEMAN
16               200 West Madison Street
                 Suite 3000
17               Chicago, Illinois 60606
                 312.224.1200
18               Sbrenneman@foxswibel.com,

19                    Appearing on behalf of the
                      Defendant.
20

21
      ALSO PRESENT:
22        Ms. Donna Baggett

23

24
```

```
                                                        Page  3
1                      I N D E X

2   WITNESS                                    PAGE

3   MARK LANGE

4         Examination by Mr. Fiorito.......... 4-72
          Examination by Ms. Doran...........72-85
5
              - - - - - - - - - - - - - - - - -
6

7                    E X H I B I T S

8   DEPOSITION EXHIBIT                         PAGE

9       Exhibit 1 ......................... 19
        Exhibit 2 ......................... 20
10      Exhibit 3 ......................... 35
        Exhibit 4 ......................... 41
11                    (ATTACHED)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

1              (Witness was duly

2              sworn.)

3                    MARK LANGE,

4  called as a witness herein, after having been

5  first duly sworn, was examined and testified as

6  follows:

7                    EXAMINATION

8  BY MR. FIORITO:

9      Q.   Could you please state your name for

10  the record.

11     A.   Mark Lange.  L-A-N-G-E.

12     Q.   Have you been deposed before,

13  Mr. Lange?

14     A.   Yes, but it's been a long time ago.

15     Q.   How many times have you been deposed

16  before?

17     A.   One time.

18     Q.   What was the occasion of that?

19     A.   Discharge case.

20     Q.   Was it with your employment at S & C

21  or somewhere else?

22     A.   Somewhere else.

23     Q.   How long ago was that?

24     A.   Over fifteen years ago.

Page 35

1      A.   Yes.

2      Q.   Are all of the important safety

3  policies at S & C in writing?

4      MR. BRENNEMAN:  Objection to form.

5  BY MR. FIORITO:

6      Q.   You can answer.

7      A.   I would say yes.

8      MR. FIORITO:  Mark this as Exhibit No. 3.

9                      (WHEREUPON, said

10                     document was marked as

11                     Lange Deposition Exhibit

12                     No. 3 for

13                     Identification.)

14 BY MR. FIORITO:

15     Q.   You've been handed Exhibit No. 3.  Can

16 you please flip through each page of this and

17 let me know when you're done flipping through

18 if you're familiar with this document.

19     A.   Okay.

20                     (Brief pause.)

21 BY MR. FIORITO:

22     Q.   Are you familiar with the document?

23     A.   Yes.

24     Q.   Is this one of the documents you

Page 48

```
 1       Q.    What's her position?
 2       A.    Safety and environmental engineer.
 3  She is in my group.
 4       Q.    What happened to Deb?
 5       A.    As far as -- she had a knee
 6  replacement.
 7       Q.    And when did she return to work?
 8       A.    I don't know the specific date, but
 9  it's been within the last month.
10       Q.    Does Deb's work take her into the
11  manufacturing areas of S & C?
12       A.    Not with the cane.
13       Q.    Why not?
14       A.    Did not allow her on the shop floor.
15       Q.    Why not?
16       A.    Because that's an expectation that we
17  don't allow people on the shop floor with
18  canes, crutches, any medical walking assistive
19  device.
20       Q.    Why not?
21       A.    Because in my 38 years of
22  manufacturing, I've never seen that.  My
23  previous employer, we never did that.  Never
24  allowed it.  Too many risks, too many hazards,
```

Page 49

1    too many slips, trips and falls potential.  And

2    we would not allow her out on the shop floor.

3        Q.   Why is the person with an assistive

4    device more of a fall risk than anybody else

5    without an assistive device?

6        A.   There's forklift trucks running that

7    are 5,000-pound pieces of equipment, as you saw

8    in that one presentation.  We have many of

9    those in operation across the facility, campus.

10   We have other carts that are transport carts

11   handling and managing materials, heavy

12   materials.  We have overhead cranes, three-ton,

13   two-ton, one-ton cranes that lift, move

14   materials from point A to point B.  We have

15   hand trucks, powered hand trucks.  We have

16   dollies.  We have a lot of inherit risks that

17   even on the floor there might be some uneven

18   pieces of floor, depending on what areas you go

19   into.  There could be other materials

20   potentially causing a trip-and-fall hazard,

21   cords, things like that.

22       Q.   So why are those potential risks

23   greater for someone using an assistive device

24   to mobilize versus someone who doesn't use one?

Page 51

```
 1   limitation on assistive devices in the
 2   production environment?
 3        A.   Just it is a high safety risk.
 4        Q.   Are there any studies that you've
 5   pointed to about the use of assistive devices
 6   in production facilities that informs your
 7   decision around that?
 8        A.   In both -- in all of my manufacturing
 9   experience, slips, trips and falls is either
10   the number two or number three safety-related
11   incident on a manufacturing site.  And that
12   holds true for all my experience with Energizer
13   and with S & C.
14        Q.   So does S & C conduct any sort of
15   individualized assessment when a person
16   presents with an assistive device and wants to
17   return to work?
18        MR. BRENNEMAN:  Objection.  Form.
19        THE WITNESS:  Through health services.
20   BY MR. FIORITO:
21        Q.   What happens through health services?
22        A.   Person brings in their restrictions
23   and health services works with them to either
24   accommodate or not.
```

1      A.   It's just a standing policy that we've

2    always had.  I know it's not written, but it's

3    a standing policy.  We don't allow assistive

4    devices in our manufacturing facility.

5      Q.   How is that standard policy

6    communicated to people so they know that --

7      A.   Verbally.

8      Q.   When?

9      A.   I don't know.

10      Q.   When was it told to you?

11      A.   When was it told to me?

12      Q.   Yes.

13      A.   I don't know specifically when.

14      Q.   Was it told to you?

15      A.   I was informed of the policy, yes.

16      Q.   By whom?

17      A.   Probably my HSE team.

18      Q.   Just to clarify, you do allow visitors

19    to use the aisles in the production areas to

20    visit the production -- to visit the production

21    building?

22      A.   Yes.

23      Q.   Are there circumstances where visitors

24    or customers will go beyond those lines?

Page 69

1      Q.   There's not some sort of routine tour
2   that goes on?
3      A.   No.
4      Q.   Do any of those tours happen to go to
5   12-A or 12?
6      A.   I don't know.
7      Q.   Have you been on one of those tours
8   with a tour group?
9      A.   Not with, no.
10     Q.   Okay.  And --
11     A.   I've been on the AME tour group.
12     Q.   Okay.  Any others that you remember
13  besides that one?
14     A.   No.
15     Q.   Okay.  Do the policies with respect to
16  assistive devices that apply to these tour
17  groups, are they the same policies that would
18  apply to employees and customers?
19     A.   Yes.
20     Q.   Any differences?
21     A.   No.
22     Q.   The S & C has some motorized carts
23  that people can ride on, correct?
24     A.   Yes.

Page 70

1      Q.   Are those permitted in the

2  manufacturing environment?

3      A.   In the aisleways.

4      Q.   Why aren't they allowed past the

5  aisleways?

6      A.   Because you have overhead cranes, you

7  have hoists, you have equipment running.

8  They're not allowed into the -- well, really

9  outside of the --

10      Q.   Outside the lines, as people say?

11      A.   Yes.

12      Q.   Are other motorized vehicles permitted

13  outside the lines?  Are forklifts outside the

14  line?

15      A.   Forklifts sometimes move material

16  inside of the lines, yes.

17      Q.   Are there any other kinds of motorized

18  vehicles?

19      A.   Hand trucks, pull-behind.  There's

20  tuggers that have carts that they pull through

21  the aisleways with materials.

22      Q.   But we're not talking just within the

23  aisles.  These examples you are talking about

24  right now are also going outside the aisles,

Page 71

```
 1   correct?
 2        A.   Hand trucks could go out -- well, when
 3   you say outside the aisles, I mean inside the
 4   work zone.  Outside of the aisle, correct.  So
 5   we have powered industrial vehicles that are
 6   hand trucks, hand operated.  We have just
 7   little trolleys, hand trolleys, non-motorized
 8   that would get pushed -- materials get staged,
 9   moved in and out of the work zones.
10        Q.   So these motorized carts stay within
11   the aisles.  Would a person with an assistive
12   device be permitted to go on one of the
13   motorized carts into the facility?
14        A.   No.
15        Q.   Why not?
16        A.   I've never seen it.  I've never
17   experienced it.  I would not say that this is a
18   safe practice.
19        Q.   What could happen?
20        A.   They could fall out of the cart.
21        Q.   Like, for example, the person that you
22   saw wearing a boot, you wouldn't allow that
23   person to get into the motorized cart?
24        A.   We don't allow assistive devices on
```

```
                                                    Page 85
1    what safety has wanted to happen with regard to

2    a particular employee?

3         A.   No.

4         MS. DORAN:  That's all I have.

5         MR. BRENNEMAN:  Reserve.

6         THE COURT REPORTER:  Do you want this

7    written up?

8         MR. FIORITO:  Can you give us a cost

9    estimate?

10                      (WHEREUPON, the deposition

11                       was adjourned at 12:18 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Exhibit G

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION


U.S. EQUAL EMPLOYMENT          )
OPPORTUNITY COMMISSION, Plaintiff,)
and RICHARD RASCHER, Plaintiff-  )
Intervenor,                    )
                               )
           Plaintiff,          )
                               )
     -vs-                      )  No. 1:17-cv-06753
                               )
S&C ELECTRIC COMPANY,          )
                               )
           Defendant.          )
                               )
```

The discovery deposition of DONNA BAGGETT, called by the Plaintiffs for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, taken before Kelly Ann Potts, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 500 West Madison Street, Suite 2000, Chicago, Illinois, on the 26th day of March, 2019, at 10:08 a.m.

Page 2

```
 1   A P P E A R A N C E S:

 2

 3        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by
          MR. BRADLEY S. FIORITO
 4        500 West Madison Street, Suite 2800
          Chicago, Illinois  60661
 5        (312) 869-8109
          bradley.fiorito@eeoc.gov
 6
                  Appeared on behalf of the
 7                Plaintiff, Equal Employment
                  Opportunity Commission;
 8

 9

10        JOETTE S. DORAN & ASSOCIATES, by
          MS. JOETTE S. DORAN
11        2300 North Barrington Road, Suite 400
          Hoffman Estates, Illinois  60169
12        (847) 462-5993
          joette@joettedoran.com
13
                  Appeared on behalf of the
14                Plaintiff-Intervenor, Richard Rascher;

15

16        FOX SWIBEL, by
          MR. STEVEN L. BRENNEMAN
17        200 West Madison Street, Suite 3000
          Chicago, Illinois  60606
18        (312) 224-1206
          sbrenneman@foxswibel.com
19
                  Appeared on behalf of the
20                Defendant.

21

22

23            *          *          *

24
```

Page 5

1   (Witness sworn.)

2             MS. DORAN:  Will you please state your

3   full name for the record and spell your last name?

4             THE WITNESS:  Donna Baggett,

5   B-a-g-g-e-t-t.

6             MS. DORAN:  Let the record reflect

7   this is the deposition of Donna Baggett taken

8   pursuant to notice on today's date by agreement of

9   the parties.

10            Ms. Baggett, I'm going to be

11  asking you some questions today.  If at any time

12  you don't understand me, please let me know.  If

13  you don't do so, I'm going to assume that you

14  understood my question and that you're answering in

15  response.  Fair enough?

16            THE WITNESS:  Yes.

17  WHEREUPON:

18                  DONNA BAGGETT

19  called as a witness herein, having been first duly

20  sworn, was examined upon oral interrogatories and

21  testified as follows:

22                  EXAMINATION

23                By Ms. Doran:

24

Page 46

1      Q      Did you ask her to seek out any
2  further information with respect to Mr. Rascher?
3      A      No.
4      Q      Did you contact Mr. Rascher's
5  supervisor to discuss this issue with him?
6      A      No.
7      Q      Did you contact anybody else to
8  discuss your conversation with Ms. Clawson?
9      A      No.
10      Q      What was the next thing that
11  transpired that you heard of with respect to
12  Mr. Rascher wanting to return to work?
13      A      I learned that Mr. Rascher was asking
14  for the company to consider -- to reconsider,
15  essentially, the decision that he wasn't able to
16  return to work and that he was providing or wanted
17  to provide some doctors' statements.  I don't
18  remember who told me that.
19      Q      Do you recall when that was?
20      A      I don't recall independently, but it
21  had to be around that September 4th through the 8th
22  time period.
23      Q      And you don't recall who specifically
24  contacted you in that regard?

```
1        A       No, I don't.

2        Q       What was your response?

3        A       That we would do what we always do

4    when an employee comes forward in such a manner

5    after a decision has been made, that we would treat

6    it like an appeal, and we would take his

7    information and see if the decision should stand or

8    not.

9        Q       What was the next thing you had heard

10   with regard to Mr. Rascher wanting to return to

11   work?

12       A       I don't recall.  I know I had more

13   conversation with Kathleen.  I don't recall when it

14   was.

15       Q       Did you have a conversation with

16   Kathleen after the doctors' notes releasing

17   Mr. Rascher to return to work --

18       A       Yes.

19       Q       -- were tendered by him?

20       A       Yes.

21       Q       And what was that conversation with

22   Kathleen?

23       A       I recall that she felt the doctors'

24   notes didn't address the deficiencies that she had
```

Page 67

1    that correct, that relates to his long-term

2    disability?  It doesn't go to S&C; it goes to

3    MetLife?

4              MR. BRENNEMAN:  Objection to form.

5    BY THE WITNESS:

6         A    I believe the medical documentation

7    supporting the need for continuing long-term

8    disability goes to MetLife and not to S&C.

9    BY MS. DORAN:

10        Q    So MetLife may have a right, pursuant

11   to whatever Mr. Rascher agreed to with MetLife, to

12   obtain his medical records, but that does not

13   relate to S&C?

14        A    MetLife may have had the right to do

15   that, and I don't know whether S&C had a release or

16   not at that point.

17        Q    If S&C did have a release, what form

18   would that take?

19        A    A document that Mr. Rascher would have

20   signed.

21        Q    Have you seen any such document in

22   this case?

23        A    I think there were documents to that

24   effect in the Health Services file.

Page 68

1      Q     What were they?

2      A     The short-term disability paperwork, I

3  believe, included a release.  There was a packet of

4  information, and I think a release was part of

5  that.

6      Q     For short-term disability, that's

7  still while Mr. Rascher is an employee, correct?

8      A     Yes.  He would have been an employee

9  at that time, but I don't know if the release was

10  specific to short-term disability administration or

11  if it was a time bound -- you know, some release

12  for a year or something like that.  I don't recall.

13      Q     Were, again, all the documents that

14  you saw in the Health Services file produced in

15  this case?

16      A     Yes.

17      Q     And if I've seen no such document,

18  does that mean it doesn't exist in your file?

19              MR. BRENNEMAN:  Objection to form.

20  BY THE WITNESS:

21      A     I think it does exist because our

22  Health Services team self-administers our

23  short-term disability policy, and they do

24  communicate with the doctors.  So I do believe they

```
 1      A      I don't think his desire to come back
 2 to work spoke at all to his ability to come back to
 3 work.
 4      Q      At that point, there's an issue with
 5 respect to whether he can or can't, correct?
 6      A      He felt that he could.
 7      Q      Okay.  At that point, you had no
 8 information medically whether Mr. Rascher couldn't
 9 or could return to work?
10      A      At that point, our medical information
11 was that he could not, that he was totally
12 disabled.
13      Q      And where does that come from?  What
14 does that understanding come from?
15      A      The six months of STD verification of
16 disability, his submission to the LTD carrier that
17 he was totally disabled, and the fact that the LTD
18 carrier was still treating him as completely
19 disabled.
20      Q      Okay.  So that was based upon what was
21 happening with respect to his long-term disability?
22      A      The information that we had was, yes,
23 he was totally disabled, and he had been for a
24 year.
```

Thompson Court Reporters, Inc
thompsonreporters.com

1          Q       What was his date of termination?

2          A       The termination date was August 29

3    because that was his one-year anniversary, but he

4    wasn't terminated -- in fact, the nurse,

5    Sophia Quang reassured him when she called him,

6    "You can come in and see Dr. Khanna.  We won't

7    proceed with the termination until you've seen Dr.

8    Khanna.  He wasn't terminated until August 31, the

9    date of termination.  The effective date was 8/29

10   because that was the one-year anniversary per our

11   policy.

12         Q       So that's kind of a backdating of his

13   actual termination date?

14         A       Yes.  The effective date used was used

15   in accordance with our policy which says that if a

16   person cannot return to work after being off for

17   disability for a full year, then the person will be

18   separated from the payroll.

19         Q       But you're saying, in reality, he

20   wasn't actually terminated until after August 29th?

21         A       He was effectively -- He was

22   terminated and told he was being terminated

23   August 31st.

24         Q       And, again, if he's terminated and

Page 139

1    orientation, national origin, disability, veteran

2    status, or marital status," correct?

3         A     Yes.

4         Q     And on the second page of the

5    document, it indicates that "S&C provides

6    reasonable accommodations to qualified individuals

7    with disabilities, unless doing so would result in

8    undo hardship to the company."  Is that correct?

9         A     Correct.

10        Q     Is there any contention here that

11   providing Mr. Rascher with a reasonable

12   accommodation would cause undue hardship to the

13   company?

14             MR. BRENNEMAN:  Objection to the form.

15   BY THE WITNESS:

16        A     Well, he was accommodated with a

17   year's worth of time off, you know, the first six

18   months at full pay, the second six months per the

19   long-term disability.  So he was accommodated

20   through that one-year absence.

21   BY MS. DORAN:

22        Q     And so that was not a hardship,

23   correct?

24        A     Correct.

Page 172

1    that we use when people ask to come back to work,

2    when we're returning people to work and they're on

3    narcotics.

4                         (Whereupon, Mr. Ethan Cohen

5                          entered the conference room.)

6    BY MR. FIORITO:

7         Q      Were you familiar with this practice

8    before you read it in her e-mail?

9         A      Somewhat familiar.

10        Q      What were you familiar with before?

11        A      Well, I knew that short-term use of

12   narcotics in acute situations, we would wait until

13   the person didn't have that need anymore.  You

14   know, if there was an arthroscopic knee surgery or

15   something and the person was taking narcotics for

16   the first several days, we would wait until that

17   period expired before they came back.

18        Q      What period?

19        A      The period when they were reliant on

20   those narcotics to get through the acute phase.

21        Q      And how would you know whether they

22   were reliant on it?

23        A      The doctors would release them after a

24   certain period of time.

Page 173

1          Q       So do you require proof from employees

2     that they're off narcotic -- narcotic medication?

3          A       We require a release from the doctor.

4          Q       So you're saying that no S&C employee

5     is allowed to work and take narcotic medication

6     that's prescribed?

7                   MR. BRENNEMAN:  Object to the form.

8     BY THE WITNESS:

9          A       No.

10    BY MR. FIORITO:

11         Q       Under what circumstances can a person

12    at S&C work with -- while on narcotic medication?

13         A       If they're taking their medication

14    prior to four hours, if they've been off of it for

15    four hours before starting work, they're not using

16    narcotics during work, and the expectation is that

17    narcotic medication would not be an ongoing and

18    continuous medical regimen.

19         Q       And this applies to -- The four-hour,

20    for example, window, that applies to all narcotics?

21         A       I don't know -- Prescription narcotics

22    is what I know.

23         Q       Does it apply to all prescription

24    narcotics as the policy or the practice?

Page 203

1   have done that --

2          Q      Could have?

3          A      -- by phone or something, yeah.

4          Q      The next one is interaction with

5   production personnel on the plant floor to answer

6   production inquiries and oversee and troubleshoot

7   issues and problems.

8                  What about that one?

9          A      That one was a problem in terms of,

10  you know, the need to be able to be on the floor in

11  those production areas working with the product.

12         Q      And with respect to those production

13  areas, is there a specific policy that S&C

14  maintains with respect to assistive devices in

15  those areas?

16         A      My understanding is there's not a

17  policy about it, but that the health, safety, and

18  environmental group does not permit people to be on

19  the production floor with canes or crutches or

20  boots.

21         Q      And why?

22         A      A person who needs a cane or a crutch

23  or a boot has some independence need that has to be

24  supplemented.  And to supplement weightbearing or

Page 204

1    balance or strength with a device like that puts

2    you at risk when you are walking on a production

3    floor that has obstacles.  There are -- Despite the

4    best efforts to keep the floors clean, the floors

5    can be slippery.  You know, a cane -- use of a cane

6    with a single point bearing weight can slip.

7                        There's traffic, forklift

8    traffic.  There's, you know, even bicycles.  We

9    have some people that use bicycles to transport

10   materials.  There's a lot of cross traffic and

11   intersections.

12                        There's overhead cranes carrying

13   materials, so anything that impedes your ability to

14   be able to manage your own safety walking through

15   or to see or visualize what's happening and

16   anticipating what's coming would be an issue.

17        Q    And where did you get the information

18   that you just shared with me that using these

19   assistive devices would result in the calamities

20   that you're describing?

21        A    I got the information that I just

22   described from talking with Kathleen and the

23   health, safety, and environmental people.

24        Q    When was that conversation, or was it

Page 224

1   time that Mr. Rascher was on short-term disability

2   that also covered, for example, things like

3   reasonable accommodations?

4        A     Yes.  There were multiple

5   communications that way.

6              MR. BRENNEMAN:  That's all the

7   questions I have.

8              MS. DORAN:  Just one follow-up.

9                  FURTHER EXAMINATION

10                 By Ms. Doran:

11

12       Q     And those communications were limited

13  to the time where he was on his short-term

14  disability leave?

15       A     Well, they weren't limited to that

16  time.  They took place during the time when he was

17  on his short-term.

18       Q     So those communications to Mr. Rascher

19  would have been during the period of time that he

20  was on short-term disability?

21       A     Correct.

22             MS. DORAN:  That's all I have.

23             MR. FIORITO:  I have no questions.

24             MR. BRENNEMAN:  Reserved.

Exhibit H



**S&C ELECTRIC COMPANY**
Excellence Through Innovation

6601 North Ridge Boulevard
Chicago, Illinois 60626-3997
Telephone (773) 338-1000
Fax (773) 338-3657

July 30, 2015

Richard Rascher
605 S. George
Mount Prospect, IL 60056

**Re: Long-Term Disability and Your Employment Status**

Dear Richard:

As you know, your last day of work at your regular job was August 29, 2014 and you are currently on a medical leave of absence and receiving long-term disability benefits. The S&C leave policy provides for a maximum time off of one year. If after one year of leave an employee is unable return to work, with or without reasonable accommodation, the employee will be separated from the S&C payroll.

Richard, you are approaching the end of this one-year period. However, prior to separating you from the S&C payroll, it is important to evaluate your current status. Since you have not returned to work as of the date of this letter, we are concluding that you presently remain disabled from your position at S&C. Therefore, I am writing to inquire specifically whether there is any reasonable accommodation that would allow you to return to work within the foreseeable future. If there is a reasonable accommodation S&C could consider that would enable you to return to work, please contact us as soon as possible and provide information about the accommodation, so your request can be considered.

If I do not hear back from you by **August 21, 2015**, Richard, we will proceed with your separation from the active payroll effective August 29, 2015. Of course, should you remain disabled at the time of your separation from the payroll, you may continue to be eligible for long-term disability pay in accordance with the terms of the S&C Long-Term Disability Insurance Plan.

If you have any further questions or concerns regarding the status of your leave of absence, please feel free to contact me at 773 338-1000, extension 2325.

Yours very truly,
S&C ELECTRIC COMPANY

*Marcia R. Burton*

Marcia R. Burton
Sr. Benefit Services Administrator

S&C000264



**S&C ELECTRIC COMPANY**
Excellence Through Innovation

6601 North Ridge Boulevard
Chicago, Illinois 60626-3997
Telephone (773) 338-1000
Fax (773) 338-3657

March 11, 2015

Richard L. Rascher
605 S. George St.
Mount Prospect, IL 60056

Dear Richard,

This letter is to confirm your benefits as an S&C team member applying for long-term disability benefits. You will note that this letter is written in sections according to the specific benefit being explained and covers some of the same information provided to you in an earlier letter dated January 21, 2015. We urge you to keep this letter with your other important papers.

## PAYROLL STATUS

Richard, you recently completed 6-months of short-term disability leave and the Short-Term Disability Pay period that ran concurrent with your medical leave has ended as of March 2, 2015. You have now been placed on an unpaid medical leave of absence while you make application for benefits under the S&C Long-Term Disability Insurance Plan. You may remain on this extended medical leave of absence until August 29, 2015, one year from your last day worked, as long as documentation provided to S&C Health Services continues to support the need for a medical leave of absence.

If you are not able to return to work prior to August 29, 2015, your employment will end as of that date due to being absent for one year for reasons of Long-Term Disability. Should you return to work, with or without accommodation, before August 29, 2015, your employment status with S&C would remain unchanged.

## S&C HEALTH AND WELLNESS BENEFITS

The S&C Health and Wellness Plan, S&C Dental Assistance Plan, and S&C Voluntary Vision Plan team-member only coverage's you elected for a January 1, 2015 effective date may continue up to your separation from the Active Payroll on August 29, 2015 as long as you remain on an approved medical leave of absence. This period of extended coverage is 100% paid for by S&C Electric Company.

Following your separation from the S&C Active Payroll, your coverage may continue for up to 29 months under the **Consolidated Omnibus Budget Reconciliation Act or** COBRA. S&C will pay the cost of your COBRA for the plans in which you are enrolled at the time of your separation from the active payroll for up to 18 months or the termination of your approved long-term disability benefit period, whichever occurs sooner.

Richard L. Rascher
March 11, 2015

Page 2 of 3

## Special Provisions Regarding Medical Plan Coordination with Medicare

While in effect, S&C's health care plan will remain primary to your Medicare coverage; however, the plan will coordinate with Medicare Part A and will assume Medicare Part B coverage when processing claims. This means that if you do not obtain Medicare Part B, you will be responsible for a larger portion of the medical claim costs.

You are Medicare eligible and if you have not already registered, you must register for your Part A coverage (free under Medicare) and it is recommended that you also obtain Medicare Part B (there is a premium associated with Part B coverage). You should make application for this coverage prior to your separation date of August 29, 2015. **Please notify Benefit Services at S&C Electric Company when you completed your Medicare enrollment process.**

At the end of the Company paid COBRA coverage **(March 2, 2016)**, you will have the option to continue your COBRA coverage by paying the COBRA premium for the balance of the 29-month COBRA coverage period remaining. <u>If</u> you elect continuation coverage for yourself Medicare will become primary on **(March 3, 2016)**, and the S&C health plan will become secondary to Medicare.

Your coverage's as an S&C team member on an extended medical leave of absence or under COBRA are the same coverage's you would have had were you still at work. Medical bills should be submitted to Blue Cross and Blue Shield of Illinois, Dental bills should be submitted to MetLife and Vision bills should be submitted to EyeMed. Please note that any changes in the S&C Health and Wellness Plan, the S&C Dental Assistance Plan and the S&C Voluntary Vision Plan that affect active S&C team members will also affect your coverage's.

## S&C LONG-TERM DISABILITY INSURANCE PLAN

**Should your application for long-term disability benefits be approved** under the S&C Long-Term Disability Insurance Plan, you will be eligible for a "Basic Payment" equal to 66.67% of the monthly equivalent of your pay rate when you were last actively at work. This Basic Payment benefit will be reduced if you receive income from certain other sources (Social Security, any other disability or retirement benefits, etc.). Please note that the disability payments you are receiving are considered **taxable** income to you. We suggest you consult with a tax advisor regarding this matter.

S&C Long-Term Disability Insurance Plan checks can continue as long as you are disabled, under the definition of the plan, for a limited payment period for **a maximum of 12 months** from your Long-Term Disability date of **March 3, 2015 through March 2, 2016**. MetLife will determine your continued disability by consulting with your physician and by requesting updated medical information on you. Approximately once every three months, MetLife will send forms for you and your doctor to complete. Once the new forms are completed, you may return them to MetLife. If you and your doctor do not complete the forms in a timely manner, your checks from MetLife may stop until the forms are received.

S&C000275

Richard L. Rascher
March 11, 2015

Page 3 of 3

**S&C LIFE INSURANCE PLAN**

As long as you remain qualified for disability benefits through MetLife as an eligible participant under the S&C Long-Term Disability Insurance Plan, your coverage under the S&C Life Insurance Plan does not change because of your long-term disability status. Your current S&C Life Insurance Plan coverage totals $108,000 and will stay in effect for a <u>maximum of 12 months</u> from your Long-Term Disability date of **March 3, 2015 through March 2, 2016**.

**S&C 401(k) RETIREMENT SAVINGS & TEAM MEMBER STOCK OWNERSHIP PLAN**

Richard, if you do not return to work prior to August 29, 2015, S&C will ask you to make a decision with regard to your S&C 401(k) Retirement Savings and Employee Stock Ownership Plan balance. We will send you the paperwork in a separate mailing.

**CONCLUSION**

We hope all the information contained in this letter has been presented in a clear and understandable manner. If not, please let me know if you have any questions. The subject of benefits can be very complicated and we want to make sure you understand everything to your complete satisfaction.

Yours very truly,
S&C ELECTRIC COMPANY

*Marcia R. Burton*

Marcia R. Burton
Sr. Benefit Services Administrator

mrb/

### Section 4: Employee's Job Description

Name of Employee: _Richard L. Rascher_  Usual Days Worked _5_ /per week

Employee's Job Title: _Senior Designer_  Hours Worked _45_ /per week

Social Security Number: _____  Claim Number: _____

This section should be completed by someone who is familiar with the employee's job functions (e.g. manager or supervisor). Complete all sections. This section must be completed AND you must also attach a copy of your company's job description for the employee.

Name of Person Completing This Section:

_Chris Penny_  Title: _MANAGER - Custom ENGINEERING_

Signature: _Chris Penny_  Date: _1/23/15_

Place an X in each of the appropriate boxes to describe the extent of the specific activity performed by this employee.

| | | Number of hours per work shift | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1-2 | 3-4 | 5-6 | 7-8+ |
| 1. | Sitting | | | | X | |
| 2. | Standing | | X | | | |
| 3. | Walking | X | | | | |
| 4. | Bending Over | X | | | | |
| 5. | Twisting | X | | | | |
| 6. | Climbing (stairs) | X | | | | |
| 7. | Reaching Above Shoulder Level | X | | | | |
| 8. | Crouching/Stooping | X | | | | |
| 9. | Kneeling | X | | | | |
| 10. | Balancing | X | | | | |
| 11. | Pushing and Pulling (file cabinet, drawer) | X | | | | |
| 12. | Repetitive Use of Foot Control | | | | | |
| A. | Right Foot Only | X | | | | |
| B. | Left Foot Only | X | | | | |
| C. | Both Feet | X | | | | |
| 13. | Repetitive Use of Hands | | | | | |
| A. | Right Hand Only | X | | | | |
| B. | Left Hand Only | X | | | | |
| C. | Both Hands | X | | | | |

| | | Number of hours per work shift | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1-2 | 3-4 | 5-6 | 7-8+ |
| 14. | Grasping | | | | | |
| A. | Simple/Light | | | | | |
| 1. | Right Hand Only | X | | | | |
| 2. | Left Hand Only | X | | | | |
| 3. | Both Hands | X | | | | |
| B. | Firm/Strong | | | | | |
| 1. | Right Hand Only | X | | | | |
| 2. | Left Hand Only | X | | | | |
| 3. | Both Hands | X | | | | |
| 15. | Fine Finger Dexterity | | | | | |
| A. | Right Hand Only | X | | | | |
| B. | Left Hand Only | X | | | | |
| C. | Both Hands | X | | | | |
| 16. | Use of Head and Neck in: | | | | | |
| A. | Static Position | X | | | | |
| B. | Twisting | X | | | | |
| C. | Looking Up | X | | | | |
| D. | Looking Down | X | | | | |

| | Never 0% Of Time | Occasionally 1-33% Of Time | Frequently 34-66% Of Time | Continually 67-100% Of Time |
|---|---|---|---|---|
| 17. Lifting or carrying | | | | |
| A. Up to 10 lbs | | X | | |
| B. 11 – 20 lbs | | X | | |
| C. 21 – 50 lbs | | X ~1% | | |
| D. 51 – 100 lbs | X | | | |
| E. 100 + lbs | X | | | |
| 18. Frequency of Interpersonal Relationships Necessary to Perform the Job | | X ~33% | | |
| 19. Frequency of Stressful Situations Necessary to Perform the Job | | X | | |

In the course of performing the job, the employee is required to:

| | | Yes | No |
|---|---|---|---|
| 20. | Drive cars, trucks, forklifts and/or other equipment | | X |
| 21. | Be around moving equipment and/or machinery | X | |
| 22. | Walk on uneven ground | | X |

| | | Yes | No |
|---|---|---|---|
| 23. | Be exposed to dust, gas, or fumes | | X |
| | if yes, are respirators required | | X |
| 24. | Be exposed to marked changes in temperature or humidity | | X |
| 25. | Is overtime required on a routine basis | X | |

Page 2 of 4

**Continued on following page**

ERS LTD 5317 (01/13) Fs

S&C000282



**S&C ELECTRIC COMPANY**
Excellence Through Innovation

6601 North Ridge Boulevard
Chicago, Illinois 60626-3997
Telephone (773) 338-1000
Fax (773) 338-3657

January 21, 2015


Richard L. Rascher
605 S. George St.
Mount Prospect, IL

**Subject:   Applying for S&C Long-Term Disability Insurance Plan Benefits**

Dear Richard,

You may already be aware that S&C Electric Company offers two disability-related benefits that provide income during an extended absence related to a severe illness or injury; S&C Short-Term Disability (STD) Pay and the S&C Long-Term Disability Insurance Plan.  We understand that you are experiencing an extended absence due to a disability and are now currently accessing benefits under the S&C Short-Term Disability Pay provisions.

In the event your Short-Term Disability Pay period, the first 182 calendar days (six months) of a medically authorized absence related to a specific disability, comes to an end before you are able to return to work, it is important for you to understand the next steps.  This letter contains information about your current status and what you need to do to apply for further income protection in the event your disability extends beyond the end of your Short-Term Disability Pay period.  Following a review of this letter, please feel free to contact me at 773-338-1000 extension 2535 with any questions.

**YOUR CURRENT STATUS**
You have been on a Leave of Absence for Medical Reasons and you are receiving short-term disability pay.  Your current disability leave and STD pay is being administered through Health Services.  Under short-term disability pay provisions, the first 182 calendar days (six months) of a medically authorized absence related to a specific disability is known as the "qualifying period."  During this "qualifying period," an employee may receive short-term disability pay if they are medically authorized off work and remain in compliance with all S&C Short-Term Disability Pay provisions.  At the end of the six-month period, short-term disability pay ends.

Richard, let's look at the dates relative to your particular situation.  Your Short-Term Disability period started on August 29, 2014 and will end on **March 2, 2015**.  Health Services has placed you on a Leave of Absence while you are on Short-Term Disability.

**ENDING OF SHORT-TERM DISABILITY PERIOD AND PAY**
If your absence extends beyond **March 2, 2015**, it is important that we start the Long-Term Disability Insurance application process to provide you with income protection

S&C000298

January 21, 2015
Richard L. Rascher

Page 2 of 3

beyond the end of your Short-Term Disability Pay period. The long-term disability application process takes time and it's always better to be proactive and get the application process started early. If you are able to return to work before your Long-Term Disability Insurance benefit date (**March 3, 2015**), this application does not impact your eligibility for Long-Term Disability benefits if you ever need to apply again in the future.

**APPLYING FOR S&C LONG-TERM DISABILITY BENEFITS**

It is important to complete an application for LTD benefits before your STD pay ends in an effort to avoid, or minimize, a break in income while you remain disabled. It is also important to note that applying for benefits under the S&C Long-Term Disability Insurance Plan **does** **not** guarantee benefits. The Metropolitan Life Insurance Company (MetLife) is the insurance company that administers S&C's Long-Term Disability Insurance Plan. MetLife may require additional information to review your application before making a decision on whether your disability qualifies for benefits under the plan.

Under the S&C Long-Term Disability Insurance Plan, should your application for long-term disability benefits be approved, you will be eligible for a "Basic Payment" equal to 66.67% of the monthly equivalent of your pay rate when you were last actively at work. This Basic Payment benefit will be reduced if you receive income from certain other sources (Social Security, any other disability or retirement benefits, etc.). Please note that the disability payments you receive are considered **taxable** income to you. We suggest you consult with a tax advisor regarding this matter.

Richard, I have taken the liberty of including a partially completed application for S&C Long-Term Disability Insurance Plan benefits.

To apply for benefits there are three steps:

1. Complete your section of the application (areas are highlighted).

2. Have your treating physician complete the appropriate sections.
   (Please also remember to sign the top of the Attending Physicians Statement).

3. **Return the all of the completed documents as soon as possible by mail, fax or e-mail to Marcia Burton**.

   S&C Electric Company
   Attention: Marcia Burton
   6601 N. Ridge Blvd.
   Chicago, IL 60626-3997
   Phone Number: (773) 338-1000 Ext. # 2535
   Fax Number: (773) 381-4987
   E-mail: marcia.burton@sandc.com

January 21, 2015
Richard L. Rascher

Page 3 of 3

When Benefit Services receives your completed application, your application will be submitted to MetLife for processing.

Upon completion of the review process, MetLife will inform you of the status of your application. In the event you are approved for the LTD benefit, your benefit will be retroactive to the date your Short-Term Disability Pay ended. In the event your application is denied, you have the right to appeal.

Again, if you have any questions, please contact me at 773-338-1000, extension 2535.

Very truly yours,

**S&C ELECTRIC COMPANY**

*Marcia Burton*

Marcia Burton
Senior Benefit Services Administrator

MRB/Enclosures:    LTD Claim Form – Employee Statement
                   Attending Physician Statement

S&C000300



**S&C ELECTRIC COMPANY**
Excellence Through Innovation

September 10, 2014

Richard Rascher
605 S George St
Mount Prospect, Illinois, United States, 60056

RE: Approval of Medical Leave of Absence and Short Term Disability Salary Pay
Provisions

Dear Richard,

Health Services has received the necessary medical documentation from Dr. John
Park, MD. Based on the information received, we have approved your initial
disability and medical leave of absence leave until Monday 10/6/14.

Please have your provider complete the FMLA/Short Term Disability paperwork that
was given to you in Health Services on 9/8/14. This paperwork should be completed
and faxed back to Health Services confidential fax 773-338-6013 as soon as
possible. The completed paperwork is required to substantiate your continued
medical leave of absence and eligibility for Short Term Disability pay.

Health Services utilizes National Medical Disability guidelines when determining
disability durations. Medical treatment that goes beyond guidelines must be
supported by objective clinical data submitted by your provider.

It is the employee's responsibility to ensure that updated medical information is
provided to Health Services in a timely manner. Failure to do so may result in the
discontinuation of your authorized medical leave of absence and could also result in
a lapse in pay. Health Services will work directly with you when updated medical
information is needed throughout your disability leave. In addition, it is also your
responsibility to keep your supervisor informed on your anticipated return to work
date throughout your absence. Please note that per HIPAA regulations, you are not
required to share any personal health information with your supervisor.

You may contact me in Health Services at 773-338-1000  extension 2082 should you
have any questions or concerns.


Sophia Quang, RN, MSN, COHN-S

Health Services

S&C Electric Company

6601 North Ridge Blvd. Chicago IL, 60626-3997

Telephone: (773) 381-2394        Fax: (773) 338-6013

S&C000333



**S&C ELECTRIC COMPANY**
Excellence Through Innovation

December 1, 2014

Richard Rascher
605 S George St
Mount Prospect, Illinois, United States, 60056

RE: Extension of Medical Leave of Absence

Dear Richard,

Health Services received the requested updated medical documentation from Dr. John Park, MD dated 11/26/14. Based on the information received, we have approved an extension of your medical leave of absence and Short Term Disability (STD) Pay or salary continuance until 3/3/15.

If you are able to return to work before then, please have your provider complete the Release to Return to Work form. You must have a written release from your provider along with any restrictions that might be medically necessary. This information must be presented to Health Services prior to your return to work. Please note that in the event that an employee is not able to return to full duty, every attempt is made to provide work to accommodate an employee's restrictions. Health Services, Human Resources and Supervision will work together to find a temporary work assignment should this be necessary.

Health Services utilizes National Medical Disability guidelines when determining disability durations. Medical treatment that goes beyond guidelines must be supported by objective clinical data submitted by your provider.

It is the employee's responsibility to ensure that updated medical information is provided to Health Services in a timely manner. Failure to do so may result in the discontinuation of your authorized medical leave of absence and could also result in a lapse in pay. Health Services will work directly with you when updated medical information is needed throughout your disability leave. In addition, it is also your responsibility to keep your supervisor informed on your anticipated return to work date throughout your absence. Please note that per HIPAA regulations, you are not required to share any personal health information with your

supervisor.

You may contact me in Health Services at 773-338-1000 extension 2082 should you have any questions or concerns.

Sincerely,


Sophia Quang, RN, MSN, COHN-S
Health Services
S&C Electric Company
6601 North Ridge Blvd. Chicago IL, 60626-3997
Telephone: (773) 381-2394    Fax: (773) 338-6013

S&C000337



ILLINOIS
BONE & JOINT
INSTITUTE®
Move better. Live better.

# Re-evaluation

Illinois Bone & Joint Institute Rehabilitation Services
Des Plaines
900 Rand Road
Suite 110
Des Plaines, IL 60016
tel: 847-954-7646
fax: 847-954-7648

**Patient:** Richard Rascher (**MRN #** P828861)

**Gender:** M

**DOB:** 06/01/1941

**Visit #10:** 08/26/2015
**Evaluation Date:** 07/27/2015
**Injury Date:** n/a
**Onset Date:** n/a

**Supervising Provider:** Ann Phelps PT, DPT, OCS
**Therapist of Record:** Ann Phelps PT, DPT, OCS
**Referring Practitioner:** MATTHEW JIMENEZ MD

**Provider:** Crystal Smuk PTA  **Account #:** ACVMP
**Provider Email:**
csmuk@ibji.com

| # Medical Diagnoses | ICD9 | # | Treating Diagnoses | ICD9 |
|---|---|---|---|---|
| 1) Aftercare for healing traumatic fracture of hip | V54.13 | 1) | Difficulty in walking | 719.7 |

## Reason For Referral

Patient states that since beginning physical therapy he is better, relying more on the cane than on the walker. Patient reports walking short distance in the kitchen without an assistive device. Patient's main complaint is left lumbar spine / lower extremity pain that is worse in the morning and with prolonged sitting. Patient continues to have trouble sleeping due to pain. Patient hasn't return back to work.

Functional limitations: standing for greater than 5 minutes, sitting for greater than 5 minutes, stairs, getting up from a chair, work related activities.

## Medical History

**Prior & Existing Conditions:** Cancer, Fractures

**Surgical History:** Right Hip in February 2015

**Fall History:** Patient has **not** been injured by a fall in the past year. Patient has **not** had two or more falls in the past year. Patient is **not** at risk for falls.

**Medications:**
Medications scanned into patient's file.

## Measures

The following measures were identified for the patient's **Hip And Thigh** condition:

| Measure | Initial (07/27/2015) | Current (08/26/2015) | Target |
|---|---|---|---|
| **Patient Specific Functional Scale (PSFS) - most important activity** Score on the Patient-Specific Functional Scale (PSFS) for the most important activity limitation | Moderate activity limitation: PSFS score 7 low transfers | Moderate activity limitation: PSFS score 7 low transfers | *No activity limitation (able to perform activity at pre-injury level): PSFS score of 10* |
| **Patient Specific Functional Scale (PSFS) - 2nd most important activity** Score on the Patient-Specific Functional Scale (PSFS) for the 2nd important activity limitation | Moderate activity limitation: PSFS score 6 walking | Moderate activity limitation: PSFS score 4-5 walking | *No activity limitation (able to perform activity at pre-injury level): PSFS score of 10* |

S&C000342

| Measure | Initial (07/27/2015) | Current (08/26/2015) | Target |
|---|---|---|---|
| **Patient Specific Functional Scale (PSFS) – 3rd most important activity** Score on the Patient-Specific Functional Scale (PSFS) for the 3rd important activity limitation | Severe activity limitation: PSFS score 4 bending over | Severe activity limitation: PSFS score 5 bending over | *No activity limitation (able to perform activity at pre-injury level): PSFS score of 10* |
| **Pain (at rest)** Current level of pain | Moderate pain: 5/10 | No pain: 0/10 | *No pain: 0/10* |
| **Pain (at worst)** Highest level of pain during the last 24 hours | Severe pain: 8/10 | Severe pain: 8/10 | *No pain: 0/10* |
| **Walking short distances (capacity)** Walking around rooms and through hallways for short distances | Low participation: Able to walk (1 to 10) yards | Medium participation: Able to walk (11 to 100) yards | *Full participation: Able to walk > 500 yards* |
| **Walking short distances (symptoms)** Walking short distances without symptoms | Severe problem: Can walk only (1 to 10) yards without symptoms | Moderate problem: Can walk (11 to 100) yards without symptoms | *No problem: Able to walk > 500 yards without symptoms* |
| **Stair Ascending** Ascending stairs | Severe difficulty: Requires assistive devices or rails using a single step strategy | Severe difficulty: Requires assistive devices or rails using a single step strategy | *No difficulty: Can ascend using a normal step over step strategy* |
| **Stair Descending** Descending stairs | Severe difficulty: Requires assistive devices or rails using a single step strategy | Severe difficulty: Requires assistive devices or rails using a single step strategy | *No difficulty: Can descend using a normal step over step strategy* |
| **Strength (hip abductors/ gluteus medius)** Gluteus medius muscle test grade | seated 4+/5 RL | seated 4/5 R/L | *Normal: 5/5 strength* |
| **Strength (hip flexion)** Psoas / iliacus muscle test grade | seated 3+/5 RL | seated 4/5 R/L | *Normal: 5/5 strength* |
| **Strength (knee extension / quadriceps)** Quadriceps femoris with manual muscle testing | seated 4/5 RL | seated 4+/5 R/L | *Normal: 5/5 strength* |

**Additional Evaluative Findings**
  Patient ambulated into the clinic with the use of a rolling walker with flexed posture and had a step to gait pattern with his right lower extremity.

**Assessment**
  Patient has been seen in physical therapy for a total of 10 visits for lower extremity weakness and deconditioning due to recent surgeries. Patient demonstrates improved lower extremity endurance as he is able to walk >300 feet with a quad cane without becoming short of breath. Patient continues to displays balance deficits which will affect his ability to ambulate without an assistive device. Patient remains challenged with sit to stand transfers requiring bilateral upper extremity assistance due to a combination of lower extremity weakness and left sided low back and lower extremity pain. Patient would benefit from additional lower extremity gait and balance training with initiation of lower extremity strengthening to allow him to return prior level of function

  Prognosis: Good with continued compliance with physical therapy and his home exercise program.

| Functional Goal | Patient Progress |
|---|---|

| | |
|---|---|
| Patient will be independent with home exercise program to assist with improving strength and range of motion in the hip to assist with returning to prior level of function. 4-6 weeks | Ongoing. |
| Patient will be able to ascend a 6 in step 10 times safely with minimal upper extremity support to assist with stairs in his home. 4-6 weeks | Mr. Rascher has made moderate progress toward meeting this goal, as evidenced by being able to ascend a 4" step with minimal upper extremity assistance. |
| Patient will be able to walk 50 ft with a quad cane safely with good posture to assist with community ambulation. 4-6 weeks | Ongoing. Although patient is able to walk 50 ft safely, he continues to have a forward flexed posture. |

## Plan of Care: Hip and thigh

### Intervention Strategy
#### Hip and Thigh
*Neuromuscular Reeducation, Therapeutic Activities, Therapeutic Exercise, Self-care / Home Management Training, Electrical Stimulation - Unattended 97014, Hot/Cold Pack*

### Recommendations
Mr. Rascher will be seen for therapy as described at the following frequency and duration: 2 visits per week for 6 weeks will reassess as needed.
Per payer requirements, please sign this Progress Report form, certifying this physical therapy plan of care and return the form to our office. Thank you.

The patient was actively involved in the development of the Therapy Plan of Care and understands it and is in agreement with it.

## Treatment Provided Today

The following interventions were performed for the patient's hip and thigh condition:

*Therapeutic Exercise (97110):* 45 min
Recumbent Bicycle - L 4 U/LE 10 min for gait retraining
long arc quad - 3x10 RL 1.5lb
sit to stand - 2x10 table 23.5" high UE required VC needed for standing straight for gait
balance - NBOS 15 sec x 2 ea
gait training - x350' with quad cane
standing HR - 3x10
standing marching - 2x10 RL to assist with reciprocal movements when walking
Hip Extension / Gluteus Maximus Strengthening: Standing reverse leg raises - 2x10 RL to assist with hip extension during ambulation
Forward Step Ups - R/L 2x10 on each 4" box

*Therapeutic Activities (97530):* 0 min

*Neuromuscular Reeducation (97112):* 6 min
weight shifting on MT - x20 (anterior-posterior and right-left)
modified tandem stance with c/s rotation - 30 seconds x2 R/L
tandem stance - 1x30sec

*Self-care / Home Management Training (97535):* 0 min

*Hot/Cold Pack (97010):* 15 min
Cold pack applied to the involved region - to lumbar spine and left hip x15 minutes after.

*Electrical Stimulation - Unattended 97014 (97014):* 0 min

## Provider Interactions With Patient During Visit
Verbal cueing on proper performance of the prescribed exercises.

## Treatment Time
51 minutes direct contact (timed) with patient.
66 minutes total treatment time.

## Therapist Signature(s)

Electronically signed by Ann Phelps PT, DPT, OCS at 08/28/2015 01:01 PM CDT

S&C000345

Rascher. Richard - Visit Date: 08/26/15          08/28/2015 01:01 PM CDT          Page 4 of 4

RICHARD RASCHER   D.O.B. 6/1/41                              8/31/15

___

Pt. states he has been off work since 9/14. Sx began in 4/14 when he was dx'd c̄ Rectal cancer. Had colon surgery + chemo/radiation. Worked on and off until 9/14. Had a colostomy bag, so he was taken off work beginning 9/20/14. Also treated for "facial cancer" (melanoma). Had it removed ~ 6/14. Was kept off work because of the colostomy bag and that he may need more chemo. Was "re-connected" on 12/20/14. Developed a complication (hernia) so he had a hernia repair at the end of 12/14.

Also developed problems c̄ his gout and developed pain from his "knees to his ankles". Treated c̄ Prednisone. Had trouble walking/getting out of bed in 1/15. Had a @ hip replacement on 2/25/15, followed by rehab for ~ 12 weeks, then began wt. bearing. Now uses a cane for ambulation and still doing rehab.

___

occ Hx:  Worked @ S&C x 52 years. Currently a Senior Product Designer

MEDS:- Baby ASA, Iron tablet, gout tablet, Water pill, Pain pill; Cannot remember any pill names

PE:  Poor memory recall.
      Ambulates c̄ a four prong cane

___

Seeing: Dr. Brian Clay @ IBJI for interventional pain management
        Richard Higgins, Internal Medicine

Imp:- S/P Rectal Ca
      S/P Hip replacement

REC:- ① Pt. appears to have poor memory recall. May have trouble performing cognitive functions of his job.

      ② Pt. will not be able to walk without a cane and cannot do any lifting per his job description

      ③ I do not believe he is capable to perform the essential functions of his job Full-Time now.

      ④ Do not anticipate that he will progress from Restricted   R. Thewnanness
         work to Full Time in a REASONABLE PERIOD OF TIME.

                                                              S&C000346

# S&C Long-Term Disability Insurance Plan

**Applicable to S&C–U.S. Team Members Only**



## Table of Contents

S&C Long-Term Disability Insurance Plan—An Introduction . . . . . .1

The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Payment Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Procedures for Filing a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Your ERISA Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

This August 2014 edition of the S&C Long-Term Disability Insurance Plan booklet supersedes the August 2012 edition and includes revisions effective January 1, 2014.

S&C000393

S&C000394

# S&C Long-Term Disability Insurance Plan—
# An Introduction

Long-term disability. We don't like to think about it. Severe illnesses or injuries that keep us off the job for nine months, a year, five years, the rest of our lives . . . such disabilities happen only to "other" people.

But just suppose *you* are stricken with a long-term disability. Could you meet the continuing expenses of day-to-day life if month after month you had no income?

S&C Electric Company *has* thought about long-term disability. In fact, S&C was one of the first companies in the Chicago area to institute a comprehensive long-term disability insurance plan to provide team members● with an income during disability due to illness or injury.

Coverage under the S&C Long-Term Disability Insurance Plan is free to you as an S&C team member and is provided under a contract with the designated long-term disability insurance carrier.▲

Details of the S&C Long-Term Disability Insurance Plan are explained on the following pages. We urge you to read this Summary Plan Description carefully and bring any questions you may have to Benefit Services (S&C Extension 2535) in Human Resources at S&C Chicago.

The S&C Long-Term Disability Insurance Plan stands ready to provide earnings protection . . . when you need it most.

In the event of any discrepancies between this summary plan description and the Plan's Group Contract the terms and conditions of the Group Contract will prevail.

---

● At S&C Electric Company, we believe the contribution of each team member is critical to the success of our company. In legal terms we are an "employee-owned" company. However, we refer to each other as "team members" not "employees" because we depend upon each other to achieve our vision. You will find we refer to ourselves as team members throughout this document except in instances where the term "employee" is necessary.

▲ The designated long-term disability insurance company is the company selected by S&C Electric Company to provide the benefits available under the S&C Long-Term Disability Insurance Plan to eligible S&C employees or their designated beneficiaries. At the time of publication of this booklet, the designated insurance company is Metropolitan Life Insurance Company.

S&C000395

# The Basics

The S&C Long-Term Disability Insurance Plan provides earnings protection, at no cost to a team member during periods of illness or injury lasting longer than 182 calendar days. (During the first 182 calendar days, known as the "qualifying period," earnings protection may be provided through other components of the S&C employee benefits package.)

**Definition of "Disability"**

Under the S&C Long-Term Disability Insurance Plan, a team member is considered to be disabled if:

1. During the first 24 months following the qualifying period, the team member is limited from performing the material and substantial duties of his or her occupation due to a non-occupational or occupational illness or injury and if the individual has a 20% or more loss in the monthly equivalent of their pay rate due to the same illness or injury.

2. After the qualifying period plus the next 24-month period, the team member is unable to perform the duties of *any* gainful occupation for which he or she is reasonably fitted by education, training, or experience.

3. The team member is under continuing medical supervision and treatment considered satisfactory by the designated insurance carrier. (The designated insurance carrier retains the right to require that a disabled participant submit to a physical examination by a physician of its choice.)

**Eligibility**

Subject to the plan's pre-existing condition exclusion explained on page 3, an S&C team member is eligible for coverage under the S&C Long-Term Disability Insurance Plan if he or she is assigned to one of the following S&C classifications: full-time or part-time working 30 or more hours per week. Co-op, interns, on-call employees, and dependents of team members are *not* eligible.

**Effective Date of Coverage**

S&C Long-Term Disability Insurance Plan coverage becomes effective on the day the team member begins work.

S&C000396

**Pre-Existing Condition Exclusion**

Coverage for a pre-existing condition is excluded. A team member has a pre-existing condition if he or she received medical treatment, consultation, care, or services including diagnostic measures, or took prescribed drugs or medicines in the 30 days just prior to the effective date of coverage; or had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 30 days just prior to the effective date of coverage; *and* if his or her disability begins in the first five days after the effective date of coverage and results from, or is related to, the medical condition or symptoms experienced during the 3 months prior to coverage.

**Plan Administration**

The administrator of the S&C Long-Term Disability Insurance Plan is S&C Electric Company. All claims are initiated by Benefit Services in Human Resources at S&C Chicago pursuant to claim instructions set forth by the designated insurance carrier. Final decisions regarding claims are made by the designated insurance carrier. The contract year and plan year are both the calendar year.

**No Contract of Employment**

This plan is not intended to be, and shall not be construed as constituting, a contract of employment or other arrangement between any employee and the company.

S&C000397

# Payment Provisions

**Payment Accrual**

Payments under the S&C Long-Term Disability Insurance Plan accrue from the 183rd day of disability. Checks are issued monthly by the designated insurance carrier.

**Maximum Payment Period**

Once disability payments begin prior to age 60, these payments may continue as long as a team member is disabled up to age 65. If a team member's disability is not permanent and he or she recovers before age 65, disability payments will be discontinued. If disability payments begin at age 60 or older, the maximum payment period is based on the following schedule:

| Age at Time Disability Payments Begin | Maximum Duration of Payments |
|---|---|
| Under age 60 | To age 65 |
| Age 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

**Disabilities with a Limited Payment Period**

There are several disabilities noted below that have lifetime maximum and/or limited payment periods of up to 24 months (or the maximum period of payment, whichever comes first); they are:

- **Disability Due to Mental or Nervous Disorders or Diseases**
  For disability due to a mental or nervous disorder or disease, disability benefits will be limited to a lifetime maximum of up to 24 months (or the maximum period of payment, whichever comes first).

  Mental or nervous disorder or disease means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders as of the date of the team member's disability. A condition may be classified as a mental or nervous disorder or disease regardless of its cause. This limitation does not apply to a disability resulting from schizophrenia, dementia, or organic brain disease.

- **Disability Due to Alcohol, Drug or Substance Abuse or Addiction**
  For disability due to alcohol, drug or substance abuse or addiction, disability benefits are limited to one period of disability during a team member's lifetime. During the period of disability, the team member is

S&C000398

required to participate in an alcohol, drug or substance abuse or addiction recovery program recommended by a physician.  Disability benefit payments will end at the earliest of the date the team member receives 24 months of disability benefit payments, the date he or she refuses to participate in the recovery program referred to above; or the date the team member completes such recovery program.

- **Disability due to Chronic Fatigue Syndrome and Related Conditions**
  Disability benefits are limited to a lifetime maximum equal to the lesser of 24 months (or the Maximum Benefit Period, whichever comes first).

- **Disability Due to Neuromuscular, Musculoskeletal or Soft Tissue Disorder**
  Disability benefits are limited to a lifetime maximum equal to the lesser of 24 months (or the Maximum Benefit Period, whichever comes first).

  Neuromuscular, musculoskeletal or soft tissue disorder means, but is not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the disability has objective evidence of seropositive arthritis, spinal tumors, malignancy, or vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis or myopathies.

**Amount of Payment**

Without having all the details relating to a particular individual's case, this summary plan description cannot specify precisely how much money that person would receive per month if qualified for payments under the S&C Long-Term Disability Insurance Plan. However, the formula used to calculate the plan's monthly payments (except in the case of employment during disability explained on pages 7 and 8) is as follows:

The Basic Payment is based upon 66.67% of the team member's monthly pay rate★. However, this payment will be reduced by the sum of the following other sources of income◆ as defined within the group contract, including but not limited to (1) payments from any other group disability or retirement plan (*excluding* the S&C 401(k) Retirement Savings and Employee Stock Ownership or other company provided stock plans), (2) disability or retirement payments from Social Security or any similar plan or act, (3) salary continuance, (4) payments from the Veterans

---

★ "Pay rate" is the team member's base compensation plus shift premium, if applicable, when last actively at work. "Pay rate" does not include overtime pay, travel or other field premiums such as engineering, procurement, construction (EPC) and after regular hours (ARH), retroactive pay increases, referral bonuses, special payouts, KPI and AIP payments, seniority cash awards, perfect attendance awards, patent awards, imputed income, or similar compensation.

◆ Only income which commences coincident with or subsequent to the inception of the disability will apply.

S&C000399

Administration, and (5) payments from any state disability program including workers' compensation.

**Note:** If a team member receives any such income in the form of a single sum payment, he or she must, within 10 days after receipt of such payment, give written proof satisfactory to the carrier of: the amount of the single sum payment, the amount to be attributed to income replacement, and the time period for which the payment applies. When such proof is received, the carrier will adjust the amount of the disability benefit. Lump sum payments attributable to income replacement are converted to monthly amounts for the purposes of the 66.67% limit test.

If the sum total of the other eligible sources of income exceeds 66.67% of the participant's monthly pay rate, a minimum monthly benefit of $100 will be paid as the Basic Payment.

In no event will payments under the plan be less than $100 per month and effective March 1, 2014 the new maximum monthly benefit is no more than $18,000 per month.

**Benefit Payments Under the Plan Are Taxable**

Long-term disability payments provided under the plan are considered taxable income and are subject to federal tax and may be subject to state taxes.

**Social Security Payment Increases**

Increases in Social Security payments occurring *after* completion of the 182-day qualifying period and designation of the initial Social Security award will not affect payments under the plan.

**Social Security Payments for Dependents**

When calculating the Disability Benefit, a family's *total* Social Security payments are considered—the team member's Social Security disability or retirement payment *plus* the related spouse's and children's payments. Once a spouse's or child's payment is discontinued, however, the 66.67% limit is subject to recalculation.

**Social Security Payment Application**

If a team member is or may be eligible to receive Social Security disability or retirement payments, he or she *must* apply for those payments within six months of the date of disability.   Proof of application must be sent to the carrier. When the amount of the payments is known or when the claim is denied, a copy of the Social Security Award Certificate or denial letter must be given to Benefit Services in Human Resources at S&C Chicago and the designated insurance carrier as soon as possible.

S&C000400

**Rehabilitation Incentives**

If a team member participates in a rehabilitation program, the carrier will increase the monthly benefit by an amount equal to 10% of the monthly benefit.  This will be done before the monthly benefit is reduced by any other income (see Employment During Disability section).

A rehabilitation program is a program approved by the carrier and S&C for the purpose of helping a team member return to work.  It may include, but is not limited to participation in one or more of the following activities:

- return to work on a modified basis with the goal of resuming full-time employment for which the team member is reasonably qualified by training, education, experience and past earnings;

- on-site job analysis;

- job modification/accommodation;

- training to improve job-seeking skills;

- vocational assessment and/or training;

- short-term skills enhancement; or

- restorative therapies to improve functional capacity to return to work.

**Employment During Disability**

While disabled, a team member is encouraged to work, as his/her health permits. If, during the first 24 months that a disabled team member receives payments under the S&C Long-Term Disability Insurance Plan, he/she becomes re-employed at S&C in any occupation or is employed elsewhere in an occupation that is considered appropriate by the designated insurance carrier, the team member's monthly benefit will be adjusted as follows:

- the monthly benefit will be increased by the Rehabilitation Incentive, if any; and

- reduced by any income earned working while disabled.  This includes, but is not limited to salary, commissions, overtime pay, bonus or other extra pay arrangements from any source.

1. During the first 12 months when a disabled team member is working, his or her disability payment will not be reduced as long as the team member's earnings plus the gross (before tax) disability payment do not exceed 100% of his/her pay rate.★

2. Beyond 12 months of disability payments, when a disabled team member is working, the team member will receive disability payments based on

---

★ "Pay rate" is the team member's base compensation plus shift premium, if applicable, when last actively at work. "Pay rate" does not include overtime pay, travel or other field premiums such as engineering, procurement, construction (EPC) and after regular hours (ARH), retroactive pay increases, referral bonuses, special payouts, KPI and AIP payments, seniority cash awards, perfect attendance awards, patent awards, imputed income, or similar compensation.

S&C000401

the percentage of income being lost due to disability. The percentage of loss is applied to the previous disability payment. For example, a 50% loss of income would mean the disabled person would receive 50% of the disability payment. This payment is in addition to the earnings from work.

3. During the first 24 months of disability payments, if a team member's earnings exceed 80% of former pay rate, the designated insurance carrier will no longer consider the individual disabled and payments will cease.

   Beyond 24 months of disability payments, if an individual's earnings exceed 60% of former pay rate, the designated insurance carrier will no longer consider the team member disabled and payments will cease.

In no event will payments under the plan be less than $100 per month or more than $18,000 per month.

If, at any time during disability, a disabled team member is engaged in any occupation that is not considered appropriate by the designated insurance carrier for rehabilitation, disability payments will cease.

**S&C Benefit Services is to be contacted as soon as possible in the event an individual is released to return to modified work prior to his or her separation from employment with S&C Electric Company.**

**Continuing Proof of Disability**

Upon request from the designated insurance carrier, a recipient of payments under the S&C Long-Term Disability Insurance Plan must, within 30 calendar days, provide continuing proof of disability.

**Recurrent Disability**

If a team member returns to full-duty work from a disability leave before the end of the 182-day qualifying period, and then becomes disabled again due to the same or related sickness or accidental injury before working for a period of 30 days, a new qualifying period will not be required. Those disability days will be counted toward the original qualifying period. If a team member returns to work for more than 30 days, and then becomes disabled again, a new 182-day qualifying period will be required.

If a team member becomes disabled, and returns to work after the end of the 182-day qualifying period, and becomes disabled again due to the same or related sickness or accidental injury, the employee must fulfill the qualifying period again (182 calendar days), *unless* the second period of disability begins less than 6 months after the end of the first period of disability. Under such circumstances, the recurrent disability is considered to be a part of the original disability and payments during the second period

S&C000402

of disability will be calculated using the same pay rate that was used when calculations were made for the first period of disability. If a team member returns to work for more than 6 months, and then becomes disabled again, a new 182-day qualifying period will be required.

**Discontinuation of Payments**

S&C Long-Term Disability Insurance Plan payments will discontinue in the following instances:

1. If, in the opinion of the designated insurance carrier, the team member ceases to be disabled as defined by the plan.

2. If, as required by the designated insurance carrier, the team member fails to furnish proof of continuing disability.

3. If, as required, the team member fails to submit to a medical examination by a physician chosen by the designated insurance carrier.

4. If, during the first 24 months of payments, the team member is able to work in his or her regular occupation on a part-time basis, but chooses not to.

5. If the team member reaches the end of the maximum period of payment.

6. If the team member's disability earnings exceed the amount allowed under the plan.

7. If the team member dies.

**Ineligible Causes of Disability**

No payments will be made for disabilities resulting directly or indirectly from:

1. War or any act of war

2. Service in the armed forces of any country

3. Any attempt at suicide or intentionally self-inflicted injury while sane or insane

4. Participation in a riot

5. Engaging in a criminal act

6. A pre-existing condition as defined by the plan.

**NOTE:** A team member is not eligible for payments for any period of disability during which he or she is incarcerated.

S&C000403

***Coverage During a Leave of Absence or Layoff***

During a leave of absence for occupational or non-occupational illness or injury, a team member's S&C Long-Term Disability Insurance Plan coverage is continued at S&C's expense for up to 12 months. During other kinds of leaves and during a layoff, a team member's coverage is discontinued.

***Termination of Employment***

If employment terminates, a team member's S&C Long-Term Disability Insurance Plan coverage ceases immediately. However, if the individual is disabled and is fulfilling the 182-calendar-day qualifying period at the time of termination, payments under this plan may commence at the end of the qualifying period and may continue as long as the individual remains disabled up to the maximum payment period.

A team member who is absent from work for a period of twelve consecutive months due to a disability will be separated from the active payroll. Prior to separation from the active payroll, the team member will be contacted to update the status of his or her disability and to determine if a reasonable accommodation consideration is appropriate. Individuals are asked to contact Benefit Services in Human Resources at S&C Chicago with any questions regarding this plan or the treatment of other S&C benefits when disabled.

***Survivor Benefit***

If an S&C team member is receiving or is eligible to receive monthly benefits under the S&C Long-Term Disability Insurance Plan and if that team member dies, the Plan will pay the additional monthly benefit described in this section to the team member's designated beneficiary(ies).

- **Benefit Amount**
  The additional monthly benefit will be equal to 100% of the lesser of:
  - the monthly benefit the team member receives for the calendar month immediately preceding his/her death;
  - the monthly benefit due and payable in the month death occurs, if death occurs during the first month the monthly benefits are payable.

- **Benefit Payment**
  The Plan will pay this additional benefit monthly for a period of 3 months. Payments will begin one month after the date of the last monthly benefit payment before the participant's death.

S&C000404

# Procedures for Filing a Claim

When a team member has been unable to work because of an illness or injury for an extended period of time (normally 150 calendar days) and it is reasonable to believe he or she will remain off work a minimum of an additional 32-days (thereby fulfilling the 182-calendar-day qualifying period), a claim for S&C Long Term Disability Insurance benefits should be started. Benefit Services in Human Resources at S&C Chicago will provide a Long-Term Disability Claim form along with instructions on how to complete the form to the disabled team member.

**The completed employee-portion and physician-portion of the form must be returned to Benefit Services for transmittal to the designated insurance carrier.**

Failure to complete the forms in a timely manner will delay the processing of the claim and may result in a delay of any available benefits under the plan. A delay in payment of benefits under this plan for which the team member is eligible will disrupt his or her income stream.

During application periods that extend beyond the 182-day qualifying period, the team member will be placed on an unpaid occupational or non-occupational leave for a period not to exceed 90 days.  Failure to submit application for long-term disability payments within this 90-day period may result in the team member's separation of employment.

The designated insurance carrier will require thorough and complete medical information before payments are approved. To obtain such information, if the claim forms do not contain sufficient data, the designated insurance carrier may ask health care providers to release copies of the individual's medical records. (In applying for payments, the team member authorizes release of such information on the "Claimant's Authorization" portion of the designated insurance carrier form.) The designated insurance carrier may also ask the individual to undergo a physical examination conducted by a physician chosen by the designated insurance carrier. The designated insurance carrier must also be shown that the person is under the regular care of a doctor.

***Time Limit for Submitting Claims***

A team member must submit a claim for benefits within the 90-calendar-day period following the qualifying period. If it is not possible to give proof within 90 calendar days, it must be given no later than one year after the time proof would otherwise be required except in the absence of legal capacity.

Legal action regarding a claim can be filed 60 calendar days after proof of claim has been given and up to three years from the time proof of claim is required, unless otherwise provided under federal law.

S&C000405

| | |
|---|---|
| ***Appeal of Denied Claim*** | If a claim is denied, the designated insurance carrier will send the individual written notification of the reason(s) for the denial of the claim. The team member may appeal the denial within 180 calendar days after receiving the written notification. The team member should submit a written appeal, requesting a review, and stating the reason(s) why he or she believes the claim was improperly denied, to the designated insurance carrier. Within 45 calendar days after submitting an appeal, the individual will be notified in writing of the appeal decision and the reason(s) for the decision. If special circumstances require an extension of time for processing, the team member will be notified of the reasons for the extension, and a decision shall be made no later than 90 calendar days following receipt of the request for review. |

**Claim Overpayment**

The designated insurance carrier has the right to recover overpayments due to:

- Fraud
- Any error the designated insurance carrier makes in processing a claim
- A team member's receipt of deductible sources of income.

**Special Note of Caution**

It is a crime for any person to knowingly and with intent to injure, defraud, or deceive the designated insurance carrier, or provide any information, including filing a claim that contains any false, incomplete, or misleading information. These actions, as well as submission of materially false information, will result in denial of the claim and the individual is subject to prosecution and punishment to the full extent under state and/or federal law. The designated insurance carrier will pursue all appropriate legal remedies in the event of insurance fraud.

Additionally, if the team member is still on the active payroll and is proven to have knowingly provided false, incomplete, or misleading information to the designated insurance carrier with the intent to access benefits for which they are not entitled, the team member will be separated from employment with S&C Electric Company.

**Designated Insurance Carrier**

Effective January 1, 2013, the designated insurance carrier selected by S&C Electric Company to administer benefits under the plan for eligible employees and their designated beneficiaries is:

Metropolitan Life Insurance Company
200 Park Avenue
New York, NY 10166
1-800-300-4296

Group Contract No. 308286-1-G

S&C000406

# Your ERISA Rights

*S&C has always administered its employee benefit plans prudently and in the best interests of team members and dependents.*

*Printed below is a statement of your rights taken from Chapter 29, Code of Federal Regulations, Part 2520.102-3(t)(2), U.S. Department of Labor.*

"As a participant in the S&C Long-Term Disability Insurance Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

***Receive Information About Your Plan and Benefits***

"Examine, without charge, in the S&C Benefit Services Office in Human Resources at S&C Chicago, all documents governing the Plan, including insurance contracts and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor.

"Obtain, upon written request to the Director—Benefit Services, copies of documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. S&C may make a reasonable charge for the copies.

"Receive a summary of the Plan's annual financial report. S&C is required by law to furnish each participant with a copy of this Summary Annual Report."

***Prudent Actions by Plan Fiduciaries***

"In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA."

S&C000407

**Enforce Your Rights**

"If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

"Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such case, the court may require S&C to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of S&C.

"If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in a Federal court.

"If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous."

**Assistance with Your Questions**

If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from S&C, you should contact the nearest Regional or District Office of the Employee Benefits Security Administration (EBSA), U.S. Department of Labor, listed in your telephone directory or visit the EBSA website at **www.dol.gov/ebsa.** (Address and phone numbers of the Regional and District EBSA offices are available thought the EBSA's website.) You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hot line of the Pension and Welfare Benefits Administration.

S&C000408

**Additional Information**

This Summary Plan Description has attempted to answer most of your questions about the S&C Long-Term Disability Insurance Plan. However, if you have additional questions, you are urged to bring them to Benefit Services in Human Resources at S&C Chicago.

The contents of this S&C Long-Term Disability Insurance Summary Plan Description are intended to be as complete and correct as possible and to explain in simple language the essential features of the plan. However, this information does not constitute the Group Policy and is not a contract of insurance. In the event of any conflict between this summary plan description and Group Policy, the provisions of the group policy will control.

S&C expects the S&C Long-Term Disability Insurance Plan to be permanent, but since future conditions affecting S&C cannot be anticipated or foreseen, S&C must necessarily and does hereby reserve the right to modify, amend, or terminate this plan at any time at its sole discretion. In the event of termination of the plan, coverage thereunder will cease immediately. Individuals whose disabilities commenced prior to plan termination will be eligible to receive payment for such disability, subject to the terms and conditions of the plan.

Should anyone have reason to file a lawsuit involving the S&C Long-Term Disability Insurance Plan, legal process should be directed to the Corporate Secretary, S&C Electric Company, 6601 North Ridge Boulevard, Chicago, Illinois 60626-3997.

S&C Electric Company
6601 North Ridge Boulevard
Chicago, Illinois 60626-3997

Employer Identification Number: 36-1747665

S&C Long-Term Disability Insurance Plan: Plan Number 502

S&C000409

S&C000410

S&C000411

S&C000412

S&C000413

Printed in U.S.A

S&C000414

# S&C
# Short-Term Disability Pay

**Applicable to S&C–U.S. Employees Only**



## Table of Contents

S&C Short-Term Disability Pay—An Introduction . . . . . . . . . . . . . . .1

The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Payment Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

S&C Short-Term Disability Pay Documentation Requirements . . . .9

Additional Help and Information . . . . . . . . . . . . . . . . . . . . . . . . . .11

This August 2012 edition of the S&C Short-Term Disability Pay booklet supersedes the January 2004 edition.

S&C000415

# S&C Short-Term Disability Pay—
# An Introduction

The medical care costs of an injury or illness can be enormously expensive. Fortunately for eligible employees, the major portion of those expenses can be met through the S&C Health and Wellness Care Plan. But the financial pressures become even greater when a non-occupational injury or illness results in an employee being absent from work. Continuing expenses must be met with no regular pay to meet them. The purpose of S&C Short-Term Disability (STD) Pay is to provide income to help bridge this financial gap.

Short-Term Disability Pay is not a leave policy, it is a company pay practice for which eligible employees may qualify. S&C Electric Company retains the right to amend, modify, or terminate this pay practice and the associated provisions at any time.

This description should answer most of the questions you have about S&C's Short-Term Disability Pay practice. However, if you need additional information, please contact Health Services (S&C Ext. 2391) in Human Resources at S&C Chicago.

S&C000416

# The Basics

S&C Short-Term Disability Pay can provide financial protection should an employee be off work for an extended period of time due to a non-occupational injury or illness.

**Eligibility**

An Hourly, Monthly, and Annual Pay Group employee is eligible for S&C Short-Term Disability Pay if he or she is assigned to one of the following S&C classifications: full-time or part-time working 30 or more hours per week. Eligible employees may apply for Short-Term Disability Pay when they are unable to work because of an injury or illness not covered by Workers' Compensation or a similar law. In addition, eligibility requires that:

- The employee and his or her physician provide sufficient medical information to support the inability to work that includes at a minimum, a diagnosis, prognosis, and treatment plan
- The employee is under the continuing care of a physician
- The employee is complying with recommended medical care
- The employee's medical care is considered appropriate and valid by S&C Health Services. **NOTE:** S&C Health Services utilizes the National Medical Disability Guidelines to establish optimal disability durations for absences due to injury or illness
- The amount of time off is in compliance with the National Medical Disability Guidelines utilized by S&C Health Services.

**Keeping Supervision Informed**

Whenever an employee is off work, the employee's supervisor must be notified about the absence. Even though an employee is in contact with Health Services in Human Resources at S&C Chicago, that does not mean the employee is relieved of the obligation to keep supervision informed regarding the length of an absence and plans for returning to work. Supervision can establish the frequency of such contracts.

**Keeping Health Services Informed**

Supervision and the employee are to notify Health Services in Human Resources at S&C Chicago of any medical-related absence of over five or more work days. This notification should be provided as soon as possible. Members of the Health Services team will provide the appropriate forms to the employee for completion by the employee and the employee's physician. If the employee is unable to contact Health Services, a member of the employee's immediate family may notify Health Services of the absence.

S&C000417

| | |
|---|---|
| **Return to Work Release** | **After any non-occupational absence for injury or illness of over five days or more or after any outpatient or inpatient surgery, a Return to Work Release providing sufficient medical documentation and completed by the treating physician must be personally returned to Health Services before an employee may report to work. Health Services must agree that the employee is fit to resume the essential functions of their job and may require further medical clearance prior to releasing the employee to return to work.** |
| | Non-Chicago-based employees are expected to work with S&C Health Services in Chicago and their location contacts to ensure the proper release is on file before returning to work. |
| **Coordination with Company Leave Policies** | Short-Term Disability Pay is not a leave policy, it is a company pay practice. Time away from work due to a non-occupational illness or injury is addressed under the company's leave policies, including S&C Policy Bulletin 101 titled "S&C's Family Medical Leave Act (FMLA)—All Pay Groups" and S&C Policy Bulletins 51 and 61 which address leaves of absences for Hourly Pay Group and Monthly and Annual Pay Group employees, respectively. |
| **Coordination of STD Pay with Other Sources of Income** | Short-Term Disability Pay coordinates with other sources of disability income, such as state disability pay or Illness Days available to Hourly Pay Group employees. |
| | In the event that an overpayment of STD pay occurs, the employee is responsible for reimbursing S&C the amount of any overpayment. Overpayments of STD pay may also be recovered from the employee's regular pay. |
| **No Contract of Employment** | This pay practice is not intended to be, and shall not be construed as constituting, a contract of employment or other arrangement between any employee and the company. |

S&C000418

# Payment Provisions

**When Pay Is Issued**

**Hourly Pay Group Employees:** After Health Services receives sufficient medical documentation which includes, at a minimum, a diagnosis, prognosis, and treatment plan and subject to the provisions described under "Denial of S&C Short-Term Disability Pay," on page 7, S&C Short-Term Disability payments for Hourly Pay Group employees can be made from the *fourth* scheduled working day of disability due to non-occupational injury or illness. When a disability lasts *more than 10 scheduled working days*, S&C Short-Term Disability Pay can be retroactively granted for the first three days of absence as well.

**NOTE:** Prior to the issuance of S&C Short-Term Disability Pay, the employee must utilize any unused "Illness Days," as described in Policy Bulletin No. 51 titled "Excused Absences and Leaves of Absence—Hourly Pay Group."

In addition, because S&C Short-Term Disability Pay is intended to replace *lost* pay, S&C Short-Term Disability Pay will not be granted for the same days that holiday pay or pay for Holiday Shutdown Days is issued.

S&C Short-Term Disability Pay for Hourly Pay Group employees is issued on Fridays through direct deposit and covers the eligible period of disability from the previous Sunday through Saturday. Properly completed forms submitted by Monday of the week following the week of absence can be processed in time to provide a payment the week following the absence. Forms submitted after that time will result in retroactive payment.

Payments continue as long as an eligible disability persists, up to a maximum of 26 weeks (182 calendar days) for each period of disability. (See the S&C Long-Term Disability Insurance Plan booklet for details on payments after 26 weeks.)

**Monthly and Annual Pay Group Employees:** Subject to the restrictions described under "Denial of S&C Short-Term Disability Pay," a Monthly or Annual Pay Group employee's base salary continues automatically for a continuous absence of one month or less due to a non-occupational injury or illness. As noted previously, any medical-related absence of over five days or more is to be reported to Health Services as soon as possible.

S&C Short-Term Disability Pay for Monthly and Annual Pay Group employees, is referred to as "salary continuance." If a Monthly or Annual Pay Group employee is absent due to such an injury or illness for more than one month (30 days), salary continues only after receipt by Health Services in Human Resources at S&C Chicago of sufficient medical documentation.

S&C000419

Salary continuance payments for **Monthly Pay Group** employees of either 100% or 60% of pay are issued semimonthly as long as an eligible disability persists, up to a maximum of six months for each period of disability. (See the chart on page 6 for the Monthly Pay Group Short-Term Disability payment schedule.)

For **Annual Pay Group** employees, monthly salary continuance payments, equal to 100% of the employee's annual base salary divided by 12, are issued as long as an eligible disability persists, up to a maximum of six months for each period of disability.

**Continuing Period of Disability**

If one period of disability is followed by a second period of disability for the same illness or injury and occurs within 30 working days or less after the employee was able to return to work, then the second period of disability is considered to be a continuation of the first period of disability. Disabilities due to different causes are considered different periods of disability even if 30 working days or less separate the two periods of disability. Disabilities due to the same cause but separated by more than 30 consecutive working days of a return to work are considered separate periods of disability. When an employee returns to work while still experiencing the need for time away from work for covered continued treatments, Health Services will monitor these intermittent or reduced scheduled absences.

**Sufficient Medical Documentation**

S&C Form 758, S&C Electric Certification of Health Care Provider for Employee's Own Serious Health Condition FMLA (Family Medical Leave Act) and/or STD (Short-Term Disability Pay) is available in S&C Health Services and may be used to meet the documentation requirements for STD consideration. This form, when completed correctly, provides sufficient medical information for the review of STD pay and also provides information to support the application of specific provisions under the company's medical-related leave policies. Employees are encouraged to ask their treating physician to complete the S&C form whenever possible.

When sufficient medical documentation is provided in a format other than the S&C Form 758 and is accepted by Health Services, the provided documentation will also be accepted for the initiation of the relevant leave provisions under the Company's applicable leave policies (i.e. Policy Bulletin 101 titled "S&C Family Medical Leave Act (FMLA)—All Pay Groups" and S&C Policy Bulletins 51 and 61, which address leaves of absences for Hourly Pay Group Employees and Monthly and Annual Pay Group Employees respectively.)

S&C000420

**Calculation of S&C Short-Term Disability Pay**

**Hourly Pay Group Employees:** S&C Short-Term Disability Pay for Hourly Pay Group employees is equal to 60 percent of the employee's pay rate▲ at the time of disability less the normal deductions. Payments are typically calculated for full days and/or full weeks of absence. Employees released for work for four hours a day or less are paid at short-term disability rates for the remaining hours in their standard work schedule. A partial payment is also made if an employee uses remaining illness hours and a partial day of pay results. In that situation, S&C Short-Term Disability Pay will be issued based on the remaining hours.

*Monthly Pay Group Employees:* The salary continuation schedule for Monthly Pay Group employees is:

| Employee's Length of Continuous Service | Months of Salary Continuation | |
|---|---|---|
| | 100% of Pay Rate | 60% of Pay Rate |
| Less than 2 years | 1 | 5 |
| 2 years, but less than 5 years | 2 | 4 |
| 5 years, but less than 10 years | 3 | 3 |
| 10 years, but less than 15 years | 5 | 1 |
| 15 years and over | 6 | 0 |

**Annual Pay Group Employees:** Annual Pay Group employees are eligible for up to six months of salary continuation at 100% of their pay rate.

**California Employees**

State of California employees absent for more than seven calendar days are expected to apply for California state disability benefits. Proof of state disability payments are to be provided to Payroll at S&C Chicago so that any additional amount due the employee to meet the short-term disability pay level can be paid.

In the event S&C Short-Term Disability Pay has been provided for days covered under state disability benefits, the employee is responsible for reimbursing S&C the amount of any overpayments.

---

▲ "Pay rate" is the employee's base compensation plus shift premium, if applicable, when last actively at work. "Pay rate" does *not* include overtime pay, travel or other field premiums, retroactive pay increases, referral bonuses, special payouts, Seniority Cash Awards, Perfect Attendance Awards, patent awards, imputed income, or similar compensation.

S&C000421

**Denial of S&C Short-Term Disability Pay**

S&C Short-Term Disability Pay *will not be granted if:*

1. The employee is not in one of the eligible classifications, either a full-time employee or a part-time employee who works 30 or more hours per week

2. The proper medical documentation and S&C forms are not provided to Health Services

3. The employee is not under the continuing care of a physician

4. The employee is not complying with recommended medical care

5. The employee's medical care is not considered appropriate and valid by S&C Health Services

6. The amount of time off exceeds what S&C Health Services considers to be reasonable based on the National Medical Disability Guidelines

7. The employee does not report to work when work within the employee's medical restrictions is available

8. The employee is receiving Total Temporary Disability payments under Workers' Compensation.

S&C Short-Term Disability Pay will not be granted to Hourly Pay Group employees for the same days that holiday pay or pay for Holiday Shutdown Days is issued.

If a Monthly Pay Group or Annual Pay Group employee is eligible for salary continuation then holiday pay and pay for Holiday Shutdown Days (at 100% or 60%) are considered to be included in that pay.

**Pregnancy and S&C Short-Term Disability Pay**

Time off due to pregnancy qualifies for S&C Short-Term Disability Pay *only* when a physician considers the employee physically disabled, that is, unable to work. In other words, pregnancy itself is not reason to qualify for Short-Term Disability Pay; the condition must be "disabling" before payments can begin.

**Vacation Pay and S&C Short-Term Disability Pay**

When an employee is off work and is receiving S&C Short-Term Disability Pay, the employee may also request pay for any unused vacation. This option may be particularly helpful when an employee wants to minimize the time away from work or wants to make up for some portion of "lost" pay during the absence. Employees should contact their supervisors to request vacation pay in addition to S&C Short-Term Disability Pay.

S&C000422

**S&C Short-Term Disability Pay and Layoffs and Leaves of Absence**

During a layoff, S&C Short-Term Disability Pay eligibility would cease. Upon an employee's return to work following a layoff, S&C Short-Term Disability Pay eligibility would be reinstated as of the day of return to work. Should a disability have commenced during the layoff, S&C Short-Term Disability Pay may, if the disability persists, commences on the first day after expiration of the layoff.

During a leave of absence for reasons other than non-occupational injury or illness, S&C Short-Term Disability Pay coverage would cease. Should a disability commence during the leave, S&C Short-Term Disability Pay may, if the disability persists, commence on the first day after expiration of the leave.

**S&C Short-Term Disability Pay and Termination of Employment**

Upon termination of employment, S&C Short-Term Disability Pay eligibility ends. However, if an employee is receiving S&C Short-Term Disability Pay at the time of termination, payments for time off due to that specific disabling condition can continue as long as sufficient medical documentation is provided supporting a continued period of disability, but not longer than 26 weeks (6 months) from the onset of the disability. Proof of continued disability is required through regular submission to Health Services of sufficient medical documentation.

S&C000423

# S&C Short-Term Disability Pay
# Documentation Requirements

**Required
Supporting
Documentation**

**Hourly Pay Group Employees:** As emphasized earlier, to receive S&C Short-Term Disability Pay, an Hourly Pay Group employee is required to submit sufficient medical documentation. The appropriate information must be provided by the employee and the attending physician. The S&C forms for this purpose are available from Health Services in Human Resources at S&C Chicago and may be obtained in person or by mail. The sooner sufficient medical documentation is completed and returned to Health Services, the sooner S&C Short-Term Disability Pay can begin.

**Monthly and Annual Pay Group Employees:** Monthly and Annual Pay Group employees are also required to submit sufficient medical documentation for any absences of over five or more days. For a continuous absence of one month or less due to non-occupational injury or illness, a Monthly or Annual Pay Group employee's salary (based on pay rate) continues automatically while paperwork is being processed.

In the event sufficient medical documentation is not received within the first 30 days of an absence, pay will cease until paperwork is provided.

**NOTE:** S&C Form 758, S&C Electric Certification of Health Care Provider for Employee's Own Serious Health Condition FMLA (Family Medical Leave Act) and/or STD (Short-Term Disability Pay) is available in S&C Health Services and may be used to meet the documentation requirements for STD consideration. This form, when completed correctly, provides sufficient medical information for the review of STD pay and also provides information to support the application of specific provisions under the company's medical-related leave policies. Employees are encouraged to ask their treating physician to complete the S&C form whenever possible.

When sufficient medical documentation is provided in a format other than the S&C Form 758 and is accepted by Health Services, the provided documentation will also be accepted for the initiation of the relevant leave provisions under the Company's applicable leave policies (i.e. Policy Bulletin 101, titled "S&C Family Medical Leave Act [FMLA]—All Pay Groups" and S&C Policy Bulletins 51 and 61, which address leaves of absences for Hourly Pay Group Employees and Monthly and Annual Pay Group Employees respectively.)

**Prolonged
Absences
or Medical
Extensions**

For a prolonged absence, or when a period of absence is extended due to medical reasons, the employee will be required to submit updated supporting documentation to Health Services in Human Resources at S&C Chicago certifying to the continued disability as requested by S&C Health Services.

S&C000424

**Leave of Absence Notification**

A member of the staff in Health Services will generate the "Medical-Related Leave of Absence Notification" for medical-related absences coordinated through Health Services.

**Return from Medical Absence**

Upon return from a leave of absence due to non-occupational injury or illness of over five days or more or after an outpatient or inpatient surgery, the attending physician must provide sufficient medical documentation to support a "Return to Work Release." The employee is responsible for providing a complete "Return to Work Release" to Health Services in Human Resources at S&C Chicago.

Health Services will review all "Return to Work Release" information and determine if the resumption of normal work duties is appropriate or if a reasonable accommodation is required.

A member of the staff in Health Services will generate the "Return from Leave of Absence Notification" for medical-related absences coordinated through Health Services.

**Appeal of Denied Claim**

If a request for Short-Term Disability Pay is denied, Health Services in Human Resources at S&C Chicago will notify the employee of the reason(s) for the denial of the claim. The employee may appeal the denial within 15 calendar days after receiving notification. The employee should submit a written appeal, requesting a review, and stating the reason(s) why the employee believes the request was improperly denied, to the Director—Benefit Services at S&C Chicago, who will review the appeal. Within 45 calendar days after submitting an appeal, the employee will be notified of the appeal decision and the reason(s) for the decision. If special circumstances require an extension of time for processing, the employee will be notified of the reason(s) for the extension, and a decision shall be made no later than 90 calendar days following receipt of the request for review.

The Director—Benefit Services has the discretionary authority to interpret and administer the provisions of the pay practice and to make factual determinations as to whether any individual is eligible to receive pay under this pay practice.

S&C000425

# Additional Help and Information

Health Services' aim is to provide information, services, and referrals to support a healthy and productive workforce. When an individual experiences an extended absence due to a non-occupational illness or injury, Health Services' goal is to partner with that individual, in conjunction with their health care providers, to ensure a speedy recovery and a safe return to work. Even when there may be medical restrictions, Health Services can often arrange a transitional or part-time assignment for a medically restricted employee until they are back "up to 100%."

Please feel free to contact Health Services (S&C Ext. 2391) in Human Resources at S&C Chicago should you have any medical-related questions about your injury or illness, or should you need help with finding a physician.

**Important Phone Number:**
**S&C Health Services—Chicago 773-338-1000 Ext. 2391**

S&C Electric Company

6601 N. Ridge Boulevard

Chicago, Illinois 60626-3997

S&C000426

# RETIREMENT CHECKLIST

**Date of Discussion/Meeting:** _August 20, 2015_

| Employee Name: | RICHARD RASCHER | Dept # | 712 | Marital Status | Single |
|---|---|---|---|---|---|
| Emp ID # | 1749 | Date of Retirement: | 8-29-15 | Spouse Name | |
| Date Of Hire | 11-19-1962 | Yrs of Service: | 52 yrs, 9 mos | Spouse DOB | |
| Date of Birth | 6-1-1941 | AGE | 74 | Spouse AGE | |

## *Verify Benefit Coverage's*

☑ **Medical Coverage**
- ○ ✓ YES
- ○ NO
- ○ Coverage Level - ☐ Employee ☐ Emp + 1 ☐ Family

☑ **Dental Coverage**
- ○ ✓ YES
- ○ NO
- ○ Coverage Level - ☐ Employee ☐ Emp + 1 ☐ Family

☐ **Vision Coverage**
- ○ YES
- ○ NO
- ○ Coverage Level - ☐ Employee ☐ Emp + 1 ☐ Family

☑ **Eligible for Health Plan Coverage Continuation**
- ○ YES - Provide Early Retiree Continuation Coverage Form
  - ☐ **Retiree Coverage Continuation Form Returned**
- ○ NOT Eligible
- ✓ NO – Over 65, need to go to Medicare

☑ **Medicare Eligible –**
- ✗ YES – Complete Provide Proof of Medical Coverage document ▭  *↳provided document for Medicare*
- ○ NO

☑ **COBRA – provide information & election form**
- ○ Yes
- ○ No
- ○ Employee ⊗ mo.     Spouse/ Dependent _____
  29 mo.

S&C000503

# RETIREMENT CHECKLIST

☐ **Transit Benefit Participant**
- ○ YES - **Terminating employees may** submit a request for a transit check prior to their termination date, up to the maximum monthly amount of $230. Otherwise the funds will be forfeited.
- ✗ NO

☐ **YMCA Membership –**
- ○ YES
- ✗ NO

☐ **Verify Effective Date of Retirement**
- ○ _8-29-2015_ (LTD Retirement)

☐ **Last Day Worked**
- ○ _8-27-2014_

☐ **Supervisor Name** _CHRIS ROMAN_
- ○ **Notification sent to Supervisor**

→ Not sure, need to see if he can return w. Restrictions?

☐ **Cake & Coffee (55 and 3yrs. service)** DATE _____
- ○ YES
- ○ NO

☐ **Luncheon (55 and 3yrs. service)** DATE _____
- ○ YES
- ○ NO

☐ **Company Store Items – up to $100 in merchandise**

☐ **Charitable Donation - $100 - Provide Donation election form**
- ○ **Misericordia Heart of Mercy**
- ○ **United Way**
- ○ **Community Health Charities**

☐ **Picture for Volts & Jolts**
- ○ Employee needs to schedule a date & time with Linda Lee to have photo taken.

☐ **Provide Linda Lee with retirement date for Calendar of Events**

☐ **Retirement Blue Binder / Proclamation Statement**
- ○ Contact Supervisor
- ○ Send Supervisor sample invitation.

# RETIREMENT CHECKLIST

☑ **V & J Mailing**
- ☒ YES
- ○ NO
- ○ Yes – Electronic Version
    - ☐ E-Mail Address information _____

☑ **Quarter Century Club Member**
- ☒ YES
- ○ NO

☐ **Gary Tagtmeier – Financial Services**
- ○ Inform Employee that they can meet with Gary Tagtmeier for 1 hr. session for up to 1 year from Retirement Date for Financial Advice.
- ○ Provide them with Gary Tagtmeier's contact information.

☐ **Create Retiree Index Card for File**

☐ **Update Enterprise with Retirement/Termination Dates**

### *401k / KSOP DOCUMENTS*

- ☐ 401k Former Participant Letter
- ☐ Special Tax Notice
- ☐ Vanguard Statement
- ☐ Vanguard Loan
    - ○ YES - Provide Loan Waiver
- ☐ Vanguard ESOP Distribution Form
- ☐ Vanguard Non-ESOP Distribution Form
- ☐ Vanguard Direct Rollover Authorization

*Forms & information Provided on 8. 20-15*

### Why are you Retiring now and what are your plans for Retirement?

- ☒ Provide Retiring Team Member information Form –
- ☐ Send form to Jane Seiberling for V&J

S&C000505

Provided Rich all information regarding Separation

- Informed him that he has to be cleared By Health Services to Return to Work.

- If he is not cleared to Return then we will proceed with termination and it will Be an LTD Retirement.

Discussed with Rich that this is our policy regarding Separation that if an employee is out for 1 year and they are not able to Return at that point they are Separated.

S&C000506

# S&C Long-Term Disability Insurance Plan

**Applicable to S&C–U.S. Employees Only**



<span style="color:red">**Printed copies are available from Benefit Services.**</span>

<span style="color:red">**Click here to request a paper copy.**</span>

## Table of Contents

S&C Long-Term Disability Insurance Plan—An Introduction . . . . . .1

The Basics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Payment Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Procedures for Filing a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Your ERISA Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

This August 2012 edition of the S&C Long-Term Disability Insurance Plan booklet supersedes the January 2004 edition and includes revisions effective January 1, 2011.

S&C000630

# S&C Long-Term Disability Insurance Plan— An Introduction

Long-term disability. We don't like to think about it. Severe illnesses or injuries that keep us off the job for nine months, a year, five years, the rest of our lives . . . such disabilities happen only to "other" people.

But just suppose *you* are stricken with a long-term disability. Could you meet the continuing expenses of day-to-day life if month after month you had no income?

S&C Electric Company *has* thought about long-term disability. In fact, S&C was one of the first companies in the Chicago area to institute a comprehensive long-term disability insurance plan to provide employees with an income during disability due to illness or injury. S&C's long-term disability payments are among the most generous anywhere.

Coverage under the S&C Long-Term Disability Insurance Plan is free to you as an S&C employee and is provided under a contract with the designated long-term disability insurance carrier.▲

Details of the S&C Long-Term Disability Insurance Plan are explained on the following pages. We urge you to read this Summary Plan Description carefully and bring any questions you may have to Benefit Services (S&C Extension 2535) in Human Resources at S&C Chicago.

The S&C Long-Term Disability Insurance Plan stands ready to provide earnings protection . . . when you need it most.

In the event of any discrepancies between this summary plan description and the Plan's Group Contract the terms and conditions of the Group Contract will prevail.

▲  The designated long-term disability insurance company is the company selected by S&C Electric Company to provide the benefits available under the S&C Long-Term Disability Insurance Plan to eligible S&C employees or their designated beneficiaries. At the time of publication of this booklet, the designated insurance company is The Prudential Insurance Company of America.

S&C000631

# The Basics

The S&C Long-Term Disability Insurance Plan provides earnings protection for an employee during periods of illness or injury lasting longer than 182 calendar days. (During the first 182 calendar days, known as the "qualifying period," earnings protection is provided through other components of the S&C Employee Benefits Package.)

**Definition of "Disability"**

Under the S&C Long-Term Disability Insurance Plan, an employee is considered to be disabled if:

1. During the first 24 months following the qualifying period, the employee is limited from performing the material and substantial duties of his or her occupation due to a non-occupational or occupational illness or injury and if the employee has a 20% or more loss in the monthly equivalent of their pay rate due to the same illness or injury.

2. After the qualifying period plus the next 24-month period, the employee is unable to perform the duties of *any* gainful occupation for which the employee is reasonably fitted by education, training, or experience.

3. The employee is under continuing medical supervision and treatment considered satisfactory by the designated insurance carrier. (The designated insurance carrier retains the right to require that a disabled employee submit to a physical examination by a physician of its choice.)

**Eligibility**

Subject to the plan's pre-existing condition exclusion explained on page 3, an S&C employee is eligible for coverage under the S&C Long-Term Disability Insurance Plan if he or she is assigned to one of the following S&C classifications: full-time or part-time working 30 or more hours per week. Dependents are *not* eligible.

**Employee Enrollment**

On the day the employee begins work, he or she is asked to sign S&C Form 210, "S&C Benefits Enrollment Card." Completion of this card enrolls the employee in the S&C Long-Term Disability Insurance Plan.

**Effective Date of Coverage**

S&C Long-Term Disability Insurance Plan coverage becomes effective on the day the employee begins work.

**Ineligibility for Employee Coverage**

An employee is ineligible for S&C Long-Term Disability Insurance Plan coverage if he or she is not classified as a full-time S&C employee or a part-time employee who works 30 or more hours per week.

**Pre-existing Condition Exclusion**

Coverage for a pre-existing condition is excluded. An employee has a pre-existing condition if the employee received medical treatment, consultation, care, or services including diagnostic measures, or took prescribed drugs or medicines in the 30 days just prior to the effective date of coverage; or the employee had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 30 days prior to the effective date of coverage; *and if* the employee's disability begins in the first five days after the effective date of coverage and results from, or is related to, the medical condition or symptoms experienced during the 3 months prior to coverage.

**No Employee Cost for Coverage**

The S&C Long-Term Disability Insurance Plan is non-contributory for employees. Nothing is deducted from employee paychecks to cover the cost of coverage.

**Plan Administration**

The administrator of the S&C Long-Term Disability Insurance Plan is S&C Electric Company. All claims are initiated by Benefit Services in Human Resources at S&C Chicago pursuant to claim instructions set forth by the designated insurance carrier. Final decisions regarding claims are made by the designated insurance carrier. The contract year and plan year are both the calendar year.

**No Contract of Employment**

This plan is not intended to be, and shall not be construed as constituting, a contract of employment or other arrangement between any employee and the company.

S&C000632

# Payment Provisions

*Payment Accrual*

Payments under the S&C Long-Term Disability Insurance Plan accrue from the 183rd day of disability. Checks are issued monthly by the designated insurance carrier.

*Maximum Payment Period*

Once disability payments begin prior to age 60, these payments may continue as long as an employee is disabled up to age 65. If an employee's disability is not permanent and the employee recovers before age 65, disability payments will be discontinued. If an employee's disability payments begin at age 60 or older, the maximum payment period is based on the following schedule:

| Age at Time Disability Payments Begin | Maximum Duration of Payments |
| --- | --- |
| Under age 60 | To age 65 |
| Age 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

*Disabilities with a Limited Payment Period*

Disabilities due to mental illness have a limited payment period of up to 24 months (or the maximum period of payment, whichever comes first) unless the employee is confined to a hospital or institution for such illness.

Mental illness is defined as a psychiatric or psychological condition regardless of cause, such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders, or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

*Amount of Payment*

Without having all the details relating to a particular employee's case, this summary plan description cannot specify precisely how much money an employee would receive per month if qualified for payments under the S&C Long-Term Disability Insurance Plan. However, the formula used to calculate the plan's monthly payments (except in the case of employment during disability explained on page 6) is as follows:

The Basic Payment is based upon 60% of the employee's monthly pay rate*. However, this payment will be reduced if the sum of the following other sources of income♦, when added to the Basic Payment, exceeds 75% of the pay rate: (1) payments from any other group disability or retirement plan (*excluding* the S&C 401(k) Retirement Savings and Employee Stock Ownership or other company provided stock plans), (2) disability or retirement payments from Social Security or any similar plans or act, (3) salary continuance, (4) payments from the Veterans Administration, and (5) payments from any state disability program including workers' compensation. If this total does exceed 75% of the employee's monthly pay rate, the amount of the excess will be deducted from the Basic Payment.

In no event will payments under the plan be less than $100 per month or more than $10,000 per month.

NOTE: Lump-sum payments from workers' compensation are converted to monthly amounts for the purposes of the 75%-limit test.

*Benefit Payments Under the Plan Are Taxable*

Long-term disability payments provided under the plan are considered taxable income and are subject to federal tax and may be subject to state taxes.

*Social Security Payment Increases*

Increases in Social Security payments occurring *after* completion of the 182-day qualifying period and designation of the initial Social Security award will *not* affect payments under the plan.

*Social Security Payments for Dependents*

When calculating the 75% limit described previously, a family's *total* Social Security payments are considered—the employee's Social Security disability or retirement payment *plus* the related spouse's and children's payments. Once a spouse's or child's payment is discontinued, however, the 75% limit is subject to recalculation.

*Social Security Payment Application*

If an employee is or may be eligible to receive Social Security disability or retirement payments, the employee *must* apply for those payments. When the amount of the payments is known or when the claim is denied, the employee must give Benefit Services in Human Resources at S&C Chicago a copy of the Social Security Award Certificate or denial letter as soon as possible.

* "Pay rate" is the employee's base compensation plus shift premium, when last actively at work. "Pay rate" does not include overtime pay, travel or other field premiums, retroactive pay increases, referral bonuses, special payouts, Seniority Cash Awards, Perfect Attendance Awards, patent awards, imputed income, or similar compensation.

♦ Only income which commences coincident with or subsequent to the inception of the disability will apply.

S&C000633

**Employment During Disability**

If, during the first 21 months that a disabled employee receives payments under the S&C Long-Term Disability Insurance Plan, he or she becomes re-employed at S&C in any occupation or is employed elsewhere in an occupation that is considered appropriate for the designated insurance carrier, the disabled employee is entitled to a "Work Incentive Benefit" which is calculated as follows:

1. During the first 12 months when a disabled employee is working, the employee's disability payment will not be reduced as long as the employee's earnings plus the gross (before tax) disability payment do not exceed 100% of the employee's pay rate.▲

2. Beyond 12 months of disability payments, when a disabled employee is working, the employer will receive disability payments based on the percentage of income the employee is losing due to disability. The percentage of loss is applied to the previous disability payment. For example, a 50% loss of income would mean the disabled employee would receive 50% of the disability payment. This payment is in addition to the earnings from work.

3. During the first 21 months of disability payments, if an employee's earnings exceed 80% of former pay rate, the designated insurance carrier will no longer consider the employee disabled and payments will cease.

Beyond 24 months of disability payments, if an employee's earnings exceed 60% of former pay rate, the designated insurance carrier will no longer consider the employee disabled and payments will cease.

In no event will payments under the plan be less than $100 per month or more than $10,000 per month.

If, at any time during disability, a disabled employee is engaged in any occupation that is not considered appropriate by the designated insurance carrier for rehabilitation, disability payments will cease.

S&C Benefit Services is to be contacted as soon as possible in the event an employee is released to return to modified work prior to his or her separation from employment with S&C Electric Company.

**Continuing Proof of Disability**

Upon request from the designated insurance carrier, a recipient of payments under the S&C Long-Term Disability Insurance Plan must, within 30 calendar days, provide continuing proof of disability.

**Recurrent Disability**

If an employee becomes disabled, returns to work, and then becomes disabled again, the employee must fulfill the qualifying period again (182 calendar days), unless the second period of disability results from the same cause as the first period of disability and the second period of disability begins less than six months after the end of the first period of disability. If both of these conditions are met, the qualifying period for the second period of disability will be waived. Payments during the second period of disability will be calculated using the same pay rate that was used when calculations were made for the first period of disability.

**Discontinuation of Payments**

S&C Long-Term Disability Insurance Plan payments will discontinue in the following instances:

1. If, in the opinion of the designated insurance carrier, the employee ceases to be disabled as defined by the plan.

2. If, as required by the designated insurance carrier, the employee fails to furnish proof of continuing disability.

3. If, as required, the employee fails to submit to a medical examination by a physician chosen by the designated insurance carrier.

4. If, during the first 21 months of payments, the employee is able to work in his or her regular occupation on a part-time basis, but chooses not to.

5. If the employee reaches the end of the maximum period of payment.

6. If the employee's disability earnings exceed the amount allowed under the plan.

7. If the employee dies.

**Ineligible Causes of Disability**

No payments will be made for disabilities resulting directly or indirectly from:

1. War or any act of war

2. Service in the armed forces of any country

3. Any attempt at suicide or intentionally self-inflicted injury while sane or insane

▲ "Pay rate" is the employee's base compensation plus premium, if applicable, when last actively at work. "Pay rate" does not include overtime pay, travel or other field premiums, retroactive pay increases, referral bonuses, special payouts, Seniority Cash Awards, Perfect Attendance Awards, patent awards, imputed income, or similar compensation.

S&C000634

4. Participation in a riot

5. Engaging in a criminal act

6. A pre-existing condition as defined by the plan.

**NOTE:** An employee is not eligible for payments for any period of disability during which the employee is incarcerated.

***Coverage During a Leave of Absence or Layoff***

During a leave of absence for occupational or non-occupational illness or injury, an employee's S&C Long-Term Disability Insurance Plan coverage is continued at S&C's expense for up to 12 months. During other kinds of leaves and during a layoff, an employee's coverage is discontinued.

***Termination of Employment***

If employment terminates, an employee's S&C Long-Term Disability Insurance Plan coverage ceases immediately. However, if the employee is disabled and is fulfilling the 182-calendar-day qualifying period at the time of termination, payments under this plan may commence at the end of the qualifying period and may continue as long as the employee remains disabled up to the maximum payment period.

An employee who is absent from work for a period of twelve consecutive months due to a disability will be separated from the active payroll. Prior to separation from the active payroll, the employee will be contacted to update the status of his or her disability and to determine if a reasonable accommodation consideration is appropriate. Employees are asked to contact Benefit Services in Human Resources at S&C Chicago with any questions regarding this plan or the treatment of other S&C benefits when disabled.

***Survivor Benefit***

If an S&C employee is receiving or is eligible to receive benefits under the S&C Long-Term Disability Insurance Plan and if that employee dies, a lump sum death benefit equal to three months of the gross disability benefit will be paid to the employee's beneficiary(ies) as designated under the S&C Life Insurance Plan.

## Procedures for Filing a Claim

When an employee has been unable to work because of an illness or injury for an extended period of time (normally 150 calendar days) and it is reasonable to believe the employee will remain off work a minimum of an additional 182-days (thereby fulfilling the 182-calendar-day qualifying period), a claim for S&C Long-Term Disability Insurance benefits should be started. Benefit Services in Human Resources at S&C Chicago will provide a Long-Term Disability Claim form along with instructions on how to complete the form to the disabled employee.

**The completed employee-portion and physician-portion of the form must be returned to Benefit Services for transmittal to the designated insurance carrier.**

Failure to complete the forms in a timely manner will delay the processing of the claim and may result in a delay of any available benefits under the plan. A delay in payment of benefits under this plan for which the employee is eligible will disrupt the disabled employee's income stream.

The designated insurance carrier of course, will require thorough and complete medical information before payments are approved. To obtain such information, if the claim forms do not contain sufficient data, the designated insurance carrier may ask health care providers to release copies of the employee's medical records. (In applying for payments, the employee authorizes release of such information on the "Claimant's Authorization" portion of the designated insurance carrier form.) The designated insurance carrier may also ask the employee to undergo a physical examination conducted by a physician chosen by the designated insurance carrier. The designated insurance carrier must also be shown that the employee is under the regular care of a doctor.

***Time Limit for Submitting Claims***

An employee must submit a claim for benefits within the 90-calendar-day period following the qualifying period. If it is not possible to give proof within 90 calendar days, it must be given no later than one year after the time proof would otherwise be required except in the absence of legal capacity.

Legal action regarding a claim can be filed 60 calendar days after proof of claim has been given and up to three years from the time proof of claim is required, unless otherwise provided under federal law.

S&C000635

**Appeal of Denied Claim**

If a claim is denied, the designated insurance carrier will send the employee written notification of the reason(s) for the denial of the claim. The employee may appeal the denial within 182 calendar days after receiving the written notification. The employee should submit a written appeal, requesting a review, and stating the reason(s) why the employee believes the claim was improperly denied, to the Benefit Services Director at S&C Chicago who will forward the appeal to the designated insurance carrier. Within 45 calendar days after submitting an appeal, the employee will be notified in writing of the appeal decision and the reason(s) for the decision. If special circumstances require an extension of time for processing, the employee will be notified of the reasons for the extension, and a decision shall be made no later than 90 calendar days following receipt of the request for review.

**Claim Overpayment**

The designated insurance carrier has the right to recover overpayments due to:

- Fraud
- Any error the designated insurance carrier makes in processing a claim
- An employee's receipt of deductible sources of income.

**Special Note of Caution**

It is a crime for any person to knowingly and with intent to injure, defraud, or deceive the designated insurance carrier, or provide any information, including filing a claim that contains any false, incomplete, or misleading information, will result in denial of the claim and the individual is subject to prosecution and punishment to the full extent under state and/or federal law. The designated insurance carrier will pursue all appropriate legal remedies in the event of insurance fraud.

Additionally, if the employee is still on the active payroll and is proven to have knowingly provided false, incomplete, or misleading information to the designated insurance carrier with the intent to access benefits for which they are not entitled, the employee will be separated from employment with S&C Electric Company.

**Designated Insurance Carrier**

Effective February 1, 2008, the designated insurance carrier selected by S&C Electric Company to administer benefits under the plan for eligible employees and their designated beneficiaries is:

The Prudential Insurance Company of America
80 Livingston Avenue
Roseland, New Jersey 07068
1-866-489-0026

Group Contract No. G-45887-IL.

## Your ERISA Rights

S&C has always administered its employee benefit plans prudently and in the best interests of employees and dependents.

Printed below is a statement of your rights taken from Chapter 29, Code of Federal Regulations, Part 2520, 102-3(1)(2), U.S. Department of Labor.

**Receive Information About Your Plan and Benefits**

"As a participant in the S&C Long-Term Disability Insurance Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

"Examine, without charge, in the S&C Benefit Services Office or in Human Resources at S&C Chicago, all documents governing the Plan, including insurance contracts and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor.

"Obtain, upon written request to the Director—Benefit Services, copies of documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. S&C may make a reasonable charge for the copies.

"Receive a summary of the Plan's annual financial report. S&C is required by law to furnish each participant with a copy of this Summary Annual Report."

**Prudent Actions by Plan Fiduciaries**

"In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA."

S&C000636

### Enforce Your Rights

"If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

"Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such case, the court may require S&C to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of S&C.

"If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in a Federal court.

"If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous."

### Assistance with Your Questions

If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from S&C, you should contact the nearest Regional or District Office of the Employee Benefits Security Administration (EBSA), U.S. Department of Labor, listed in your telephone directory or visit the EBSA website at www.dol.gov/ebsa. (Address and phone numbers of the Regional and District EBSA offices are available thought the EBSA's website.) You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hot line of the Pension and Welfare Benefits Administration.

### Additional Information

This Summary Plan Description has attempted to answer most of your questions about the S&C Long-Term Disability Insurance Plan. However, if you have additional questions, you are urged to bring them to Benefit Services in Human Resources at S&C Chicago.

The contents of this S&C Long-Term Disability Insurance Summary Plan Description are intended to be as complete and correct as possible and to explain in simple language the essential features of the plan. However, this information does not constitute the Group Policy and is not a contract of insurance. In the event of any conflict between this summary plan description and Group Policy, the provisions of the group policy will control.

S&C expects the S&C Long-Term Disability Insurance Plan to be permanent, but since future conditions affecting S&C cannot be anticipated or foreseen, S&C must necessarily and does hereby reserve the right to modify, amend, or terminate this plan at any time at its sole discretion. In the event of termination of the plan, coverage thereunder will cease immediately. Individuals whose disabilities commenced prior to plan termination will be eligible to receive payment for such disability, subject to the terms and conditions of the plan.

Should anyone have reason to file a lawsuit involving the S&C Long-Term Disability Insurance Plan, legal process should be directed to the Corporate Secretary, S&C Electric Company, 6601 North Ridge Boulevard, Chicago, Illinois 60626-3997.

S&C Electric Company
6601 North Ridge Boulevard
Chicago, Illinois 60626-3997

Employer Identification Number: 36-1747505

S&C Long-Term Disability Insurance Plan: Plan Number 502

S&C000637

# Exhibit I

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
U.S. EQUAL EMPLOYMENT              )
OPPORTUNITY COMMISSION,            )
          Plaintiff,              )
RICHARD RASCHER,                   )
          Plaintiff-Intervenor,   ) Civil Action No.
                                   ) E1:17-CV-06753
     -vs-                          )
                                   )
S & C ELECTRIC COMPANY,            )
                                   )
          Defendant.              )
```

VOLUME I

         The deposition of KATHLEEN CLAWSON,

called for examination pursuant to notice and

the Rules of Civil Procedure for the United

States District Courts pertaining to the taking

of depositions, taken before Allison D. Weber,

CSR, a notary public within and for the County

of Cook and State of Illinois, at 500 West

Madison Street, Suite 2000, Chicago, Illinois,

on March 13, 2019, at the hour of 9:50 o'clock

a.m.

Reported by:  Allison D. Weber, CSR
License No.:  084-002238

Page 2

1   APPEARANCES:

2

3   EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    BY:  MS. DIANE I. SMASON and
4        MR. ETHAN M. COHEN
    500 West Madison Street, Suite 2000
5   Chicago, Illinois  60661
    (312) 869-8120
6   diane.smason@eeoc.gov
         Appearing on behalf of the Plaintiff;
7

8

    JOETTE S. DORAN & ASSOCIATES, P.C.
9   BY:  MS. JOETTE S. DORAN
    2300 North Barrington Road, Suite 400
10  Hoffman Estates, Illinois  60169
    (847) 462-5993
11  joette@joettedoran.com
         Appearing on behalf of the
12       Plaintiff-Intervenor,
         Richard Rascher;
13

14

    FOX SWIBEL LEVIN & CARROLL LLP
15  BY:  MR. STEVEN L. BRENNEMAN
    200 West Madison Street, Suite 3000
16  Chicago, Illinois  60606
    (312) 224-1200
17  sbrenneman@foxswibel.com
         Appearing on behalf of the Defendant,
18       S & C Electric Company.

19

20

21

22

23

24

```
 1                    (Witness sworn.)
 2                 KATHLEEN CLAWSON,
 3   called as a witness herein, having been first
 4   duly sworn, was examined and testified as
 5   follows:
 6                   EXAMINATION
 7   BY MS. DORAN:
 8       Q.   Okay.  Can you please state your full
 9   name for the record and spell your last name?
10       A.   It's Kathleen Clawson, C-l-a-w-s-o-n.
11            MS. DORAN:  Let the record reflect
12       this is the discovery deposition of
13       Kathleen Clawson taken pursuant to notice
14       on today's date by agreement of the
15       parties.
16   BY MS. DORAN:
17       Q.   Miss Clawson, I'm going to be asking
18   you a series of questions today.  If at any time
19   you don't understand me, please let me know,
20   otherwise I'm going to assume that you
21   understood my question that you're answering me
22   in response, okay?
23       A.   Sure.
24       Q.   And also have all your answers be
```

Thompson Court Reporters, Inc
thompsonreporters.com

Page 42

1       Q.   Who has access to the electronic

2   medical record system?

3       A.   The nurses, myself and the

4   administrator.

5       Q.   Before the appointment with

6   Dr. Khanna, could you go into that system and

7   review the medical information about

8   Mr. Rascher?

9       A.   No.

10      Q.   Why not?

11      A.   Because, number one, it was, like, six

12  years old, and what was current was not so much

13  the medical information, at least on that

14  particular day, but Mr. Rascher's functional

15  ability was what was in question at that point.

16      Q.   Could you explain that?

17      A.   Well, it's hard to say, I mean, what

18  could be causing all kinds of medical issues,

19  okay.  But what I observed on the day that

20  Mr. Rascher was sitting in the chair and was

21  not -- had difficulty getting up, he had a lot

22  of functional issues with that, strength.  He

23  looked very fragile, and his balance when he

24  walked, he was very unbalanced.

Page 53

1    much consider anything.

2         Q.   When you observed Mr. Rascher, how did

3    you observe him ambulating?  Was there any

4    assistive device?

5         A.   He had a cane.

6         Q.   And from your observation, what did

7    you notice as to how he was ambulating with the

8    cane?

9         A.   He was shuffling.  He was kind of

10   weaving a little bit side to side.  He was

11   walking extreme -- very, very slow.  The people

12   that were following him were staying close.

13             To kind of describe it a little

14   bit better, it's kind of my rehab background a

15   little bit, you can have people that can be

16   independent, they can be supervised, you can get

17   into where you're contact guard, and I would say

18   when he was walking he needed a contact guard

19   and he should have had a walker.  He would have

20   been much more stable with a walker.

21        Q.   Did you consider that Mr. Rascher

22   could return to work if he had a walker?

23        A.   Well, that was the reason for having

24   Dr. Khanna evaluate him.  But he wasn't -- even

Page 54

1   with a walker, he was very unsteady.  He

2   couldn't hardly get out of his chair.  It took,

3   like, three, four attempts.

4                   I was going to get him a

5   wheelchair.  And I was standing to the side, I

6   was just about ready to say can we get a

7   wheelchair and somebody in the group, they asked

8   him, because he couldn't get out of the chair,

9   they said, "Do you need some help?"  And he

10  said, "No, I'm fine."

11                  And so everybody kind of backed

12  off a little bit, okay.  But I saw everybody

13  walking with him.  And everybody was kind of

14  waiting, I think, to see if he was going to

15  start falling and they stayed close.  That's

16  what I observed.

17                  So even a walker he would have

18  been a little unsteady.  We also own the parking

19  lot, so people have to be able to get in from

20  our parking lot into the building, and you can't

21  get all the ice and snow out there, plus, you

22  know, even if he had a walker, you have to get

23  it out of the car.  He wasn't able to really

24  hold on to things, you know, and stand

Page 55

1    independently.  He was very unbalanced.

2        Q.    You mentioned a wheelchair.  Does

3    S & C have wheelchairs on the premises?

4        A.    I don't know if we do or not.  We may

5    have some.

6        Q.    You mentioned that you were thinking

7    of getting him a wheelchair.  Is that what you

8    stated?

9        A.    No, I didn't state that.  Oh, I did?

10   I didn't mean to say that.

11       Q.    Yes.

12       A.    But, no, we didn't -- he didn't ask

13   for a wheelchair.  If anything, he said he

14   wanted to walk by himself.  He didn't want

15   anything.  He never submitted anything to us for

16   that.

17       Q.    Could Mr. Rascher have been

18   accommodated to alleviate your concerns with

19   respect to his balance and function if he were

20   in a wheelchair?

21       A.    I don't know.  That would have to

22   be -- he never asked for that, and he would

23   still have to get out of his car into the

24   building.

Page 60

1      A.   We look at everybody individually

2   in -- on our return-to-work program.

3      Q.   Were you aware on August 20th of 2015

4   that Mr. Rascher came to visit Marcia Burton,

5   that he walked from Health Services to where he

6   worked to see Chris Roman, his supervisor?  Are

7   you aware of that?

8      A.   I was not aware of that at the time,

9   no.

10     Q.   Would that have been important for you

11  to know?

12     A.   Well, whether he did or whether he

13  should are two separate questions because he was

14  not stable enough to be in the plant, and, you

15  know, just because somebody does something

16  doesn't mean that it's okay or that it's right

17  or they're safe.

18     Q.   You keep referring to the plant.  What

19  are you referring to?

20     A.   Well, it's a manufacturing company, so

21  we have production areas, and then we have

22  office areas.

23          And so where Chris Roman's offices

24  are are up in a mezzanine there's concrete steps

Page 61

```
 1    that go all the way up.  There's maybe, I don't
 2    know how many steps, 20, 30, could be more, I
 3    don't know, it's quite a ways up, and in our
 4    production areas we have do not allow people to
 5    return to work with canes or boots, so they're
 6    not supposed to be in that area with assistive
 7    devices because of a fall risk.
 8                  And in addition to that, he was
 9    extremely unsteady, balance issues and going up
10    and down steps.
11       Q.   And that's all from your own
12    observation, there's no objective medical
13    information that you had?
14       A.   No, that's not correct.  Because when
15    I saw him on the 8th --
16       Q.   I'm not talking about the 8th.  I'm
17    talking on the 31st when he came in to see you,
18    actually.
19       A.   I wasn't aware that he -- I know he
20    went up after I explained to him it was a safety
21    issue.  I'm not sure what date he went.
22                  But I had a conversation with him
23    and told him that I had real concerns and he
24    shouldn't be in the plant.
```

Page 74

1          A.    I have no idea.

2          Q.    You don't know one way or the other?

3          A.    I do not.

4              MS. DORAN:  If you could mark this as

5        Deposition Exhibit No. 3?

6                        (Whereupon, Clawson Deposition

7                         Exhibit No. 3 was marked for

8                         Identification, 03/13/2019.)

9    BY MS. DORAN:

10         Q.    Miss Clawson, I'm going to show you

11   what we have marked as your Deposition

12   Exhibit No. 3.  It's a multi-page document.  If

13   you could take a look at this document?  Okay?

14         A.    Uh-hum.

15         Q.    Can you tell me which of these

16   documents that Richard Rascher dropped off to

17   you on September 8th of 2015?

18             MR. BRENNEMAN:  Object to the form.

19             THE WITNESS:  I am -- now that we have

20        them here, I know that what I have is --

21        there was doctors' notes.  There

22        was -- I'm not sure which one I got on

23        which date just looking at it here.  I also

24        had physical therapy notes, and these are

1    not here.

2  BY MS. DORAN:

3       Q.   Did Mr. Rascher bring you physical

4  therapy notes?

5       A.   I believe that he did.  I have them,

6  and I believe that he brought those in.

7                 The medical, when you pull up out

8  of our Medgate, the physical therapy notes come

9  up with the doctors' notes.

10      Q.   And what is Medgate?

11      A.   Electronic medical record system.

12      Q.   And how would these documents or the

13  releases and the physical therapy notes become

14  part of Medgate?

15      A.   They get uploaded.

16      Q.   And who does that?

17      A.   The person that receives them uploads

18  them.

19      Q.   Since you were the individual that

20  received these documents, would you have been

21  the person that would have uploaded them?

22           MR. BRENNEMAN:  What do you mean by

23      these documents?

24           THE WITNESS:  Well, I don't know if

Page 76

1          these are all the ones -- some of these

2          obviously were not because this is a letter

3          I wrote on the 14th.

4     BY MS. DORAN:

5          Q.    Correct, the final document.

6          A.    So I had the physical therapy notes.

7     It's possible the admin would have uploaded

8     some, but normally what happens is when somebody

9     comes in, you write your note, you upload the

10    documents, so I had his physical therapy notes.

11              The notes that we have for the --

12    that were the 8/28, they're not by fax,

13    they're -- I don't believe that they were mailed

14    in, so I -- we have them.  I believe Mr. Rascher

15    handed me those.  My recollection is that he

16    handed me those.

17         Q.    Do you know for sure if he did so?

18         A.    I'm pretty sure that he did.

19         Q.    That --

20         A.    Back to '15, but I'm pretty sure he

21    handed me the physical therapy notes.

22         Q.    Did anybody request that he bring in

23    physical therapy notes?

24         A.    No.

Page 77

1      Q.   According to the e-mail that we just
2   looked at, he was going to bring in a doctor's
3   release -- doctors' releases on September 8th;
4   is that correct?
5      A.   Well, it just said -- it said doctor
6   releases, but, you know, whatever he may
7   perceive I can't speak for him, but we were
8   given the physical therapy notes for the 28th.
9           We did not receive any other
10  physical therapy notes until later, but we had
11  the physical therapy notes at that point.
12     Q.   Is there a way of verifying through
13  your program the date the documents were
14  actually received?
15     A.   No.  But we had them before, and I
16  referred to them in an e-mail that was sent to
17  Dr. Khanna that we had the physical therapy
18  notes.  And I don't remember the date of that
19  e-mail, but it was around this time, so I had
20  them at that point.
21     Q.   In looking at Exhibit No. 3, can you
22  tell me which particular releases Mr. Rascher
23  brought in to you on September 8th of 2015?
24          MR. BRENNEMAN:  Object to form.

Page 78

1          THE WITNESS:  I can't with certainty

2      say which ones of these documents on that

3      date.  But we had them in the system.

4              And we only -- I only had contact

5      with Mr. Rascher three times, so these

6      were -- the documents were prior to the

7      9/14.

8  BY MS. DORAN:

9      Q.   What did you do when you received the

10  return-to-work authorizations from Mr. Rascher?

11      A.    What I did was I sent them to

12  Dr. Khanna, and, you know, asked him to look at

13  them.

14              And he basically said that he

15  still believed his assessment on that day was

16  that Mr. Rascher was not able to function

17  independently.  I don't know his exact wording.

18  You would have to read that.

19              And we had the physical therapy

20  notes which documented what I had seen and what

21  I believe Dr. Khanna had seen, that Mr. Rascher

22  was not functionally independent.  He had

23  balance issues.

24              And so we figured what -- what the

Page 79

1  determination was at that point was that we had

2  confirmation from his physical therapist and

3  Mr. Rascher's own statements within the therapy

4  notes of what he could or could not do, so --

5  Q.   Did you contact any of those doctors?

6  A.   No, I did not.

7  Q.   Did Dr. Khanna contact any of those

8  doctors?

9  A.   No, he did not.

10  MS. DORAN:  Could you mark this as

11  Clawson Deposition Exhibit No. 4, please?

12  (Whereupon, Clawson Deposition

13  Exhibit No. 4 was marked for

14  Identification, 03/13/2019.)

15  BY MS. DORAN:

16  Q.   Miss Clawson, if you could take a look

17  at what has been marked as your Deposition

18  Exhibit No. 4?  It's a multi-page document.  And

19  if you could take a brief look at that.

20  Do you recognize Deposition

21  Exhibit No. 4 as a Health Services document?

22  A.   I do.

23  Q.   In the first page it says, Health

24  Services sign-in sheet for Monday, 8/31/15; is

CONFIDENTIAL

Page 129

1   attached documentation from his PMD and

2   therapist to RTW."  Does that mean he submitted

3   documentation from his primary medical doctor?

4        A.   Correct.

5        Q.   And his therapist to return to work?

6        A.   Correct.

7        Q.   Looking at this e-mail, do you know

8   what attachments you sent to Dr. Khanna?

9        A.   I sent him the physician notes that he

10  submitted and the therapy notes.

11       Q.   And how do you know that you submitted

12  therapy notes?  Because this doesn't reference

13  therapy notes, it says therapist return to

14  work.

15       A.   Right.  He submitted documentation

16  from his personal medical doctor and therapist.

17  The only therapist is the PT notes.  That's the

18  therapist.

19       Q.   I'm going to have you take a look at

20  Exhibit No. 4 -- excuse me, Exhibit No. 3.

21  Let's go to page -- if you go to Exhibit No.

22  3.

23       A.   Okay.

24       Q.   If you'll take a look at page S & C

CONFIDENTIAL

Page 130

1  000353.  Do you see this return to work?

2       A.    It's a work status report, yes.

3       Q.    And it's from Dr. Matthew Jimenez?

4       A.    That's his personal medical doctor.

5       Q.    That is also his doctor that was

6  treating him with respect to his orthopedic

7  injuries, correct?

8       A.    Yes, correct.

9       Q.    Did Mr. Rascher submit this return to

10  work to you?

11      A.    I did receive this from him somewhere

12  in there.  I had it in my records, so I'm not

13  sure if Mr. Rascher submitted this.  There's

14  not the -- there's no fax on it.  If there's

15  not a fax, my assumption is that -- so I'm

16  assuming, yes, he submitted it on that date.

17      Q.    When Mr. Rascher submitted his

18  return-to-work authorizations, did he bring

19  them to you in hand or did he fax them?

20      A.    He brought them in hand.

21      Q.    So if he brought them in hand, there

22  would be no fax notations on the documents,

23  correct?

24      A.    Correct.  But I wouldn't have

CONFIDENTIAL

1  considered the doctor his therapist.  The

2  therapist would have been the physical

3  therapist.

4      Q.   I'm sorry?

5      A.   I wouldn't have considered the doctor

6  as a therapist.  He would have been one of the

7  personal medical doctors.  The therapist would

8  have been the therapy notes.

9      Q.   And with respect to the records that

10  your stating -- that regard his physical

11  therapy, are you stating emphatically 100

12  percent certain that Mr. Rascher brought those

13  records in to you?

14      A.   Yes.

15      Q.   You recall that specifically?

16      A.   I remember him handing me the packet.

17  And I remember the physical therapy notes in

18  part of that -- I remember him giving me the

19  physical therapy notes.

20      Q.   Is there anything internally through S

21  & C that can establish what attachments you

22  sent to Dr. Khanna?

23      A.   Not that I'm aware of.

24      Q.   Why not?

CONFIDENTIAL

Page 152

1    A.    Sometimes the clinic just gets busy

2    and I wasn't able to make a phone call.

3    Q.    It goes on to state, "I did review the

4    attachments, and although Mr. Rascher has

5    submitted these from his personal physicians,

6    based upon my examination last week, I feel

7    he's unstable and at risk to injure himself if

8    he was to return to work.  Do you have a formal

9    job description for his position?  If so,

10   perhaps we should request a formal FCE to be

11   done before allowing him to return to work.

12   Please call to discuss this.  Thanks."

13              You did not call him to discuss

14   that?

15   A.    No.

16   Q.    Why not?

17   A.    Because we had all the physical

18   therapy notes which documented everything he

19   could or couldn't do.  And to do a functional

20   capacity eval, that's why you would have it, to

21   see what somebody can do.  And he already

22   submitted the majority of that to us at this

23   point.

24   Q.    Dr. Khanna makes no reference to

CONFIDENTIAL

Page 153

1    physical therapy notes, does he?

2         A.    No, he did not.

3         Q.    He only makes reference to

4    return-to-work authorizations from his --

5    Mr. Rascher's physicians, correct?

6         A.    Correct.

7         Q.    He is asking if you have a formal job

8    description for his position.  You did not

9    respond to that, correct?

10        A.    Correct.

11        Q.    He also says, "Perhaps, we should

12   request a formal FCE to be done before allowing

13   him to return to work."  FCE is a functional

14   capacity exam; is that correct?

15        A.    Correct.

16        Q.    And you didn't respond to that either?

17        A.    No, I did, when I said -- first off,

18   he said he was unsafe.  That was the first

19   thing.  So if he's unsafe in the plant, can

20   injure himself.  Secondly, what I said was at

21   this time and his notes also substantiate his

22   current deficits and where he's at.  It showed

23   balance, strength.  It showed much of that.

24   And that -- at that point it wasn't necessary

CONFIDENTIAL

Page 154

1  to have an FCE.

2       Q.   Dr. Khanna makes no reference to his

3  physical therapy notes; is that correct?

4       MR. BRENNEMAN:  Asked and answered.

5       THE WITNESS:  You have to ask Dr. Khanna.

6  BY MS. DORAN:

7       Q.   I'm not asking that.  I'm saying is it

8  in this e-mail?

9       A.   It's not in the e-mail.

10       Q.   All he refers to is his physical

11  physician's return-to-work authorizations; is

12  that correct?

13       MR. BRENNEMAN:  Asked and answered.

14       THE WITNESS:  Correct.  Just an e-mail

15  conversation we are having regarding this case.

16  He did not state that, no.

17  BY MS. DORAN:

18       Q.   Dr. Khanna is proposing, perhaps, a

19  formal functional capacity exam should be done

20  before allowing him -- allowing him to return

21  to work.  So Dr. Khanna is making that

22  consideration despite the fact that he's saying

23  I still think he's unstable, but, hey, maybe we

24  should have a functional capacity exam?  That's

CONFIDENTIAL

Page 155

1   what he's saying to you, correct?

2       A.   He didn't say we should have one.  It

3   was a discussion should we have one.  When I

4   told him we have the PT notes to substantiate

5   it, he did not come back and tell me that this

6   is what we should do.  And so we already had

7   the notes.

8       Q.   By this e-mail, is he not presuming

9   that Mr. Rascher is going to return to work?

10      A.   Not necessarily, no.

11      Q.   He states, "We should request -- "If

12  so, we should request a formal functional

13  capacity exam to be done before allowing him to

14  return to work."  So he is considering the fact

15  as to whether Mr. Rascher can return to work

16  based upon his return-to-work authorizations,

17  correct?

18      A.   You'd have to ask Dr. Khanna that.

19      Q.   I would have liked to if I would have

20  had these e-mails.  That would have been very

21  nice.  So I'll state for the record, I did not

22  have these e-mails when we questioned Dr.

23  Khanna because they were not produced by S & C

24  Electric in this case, despite the fact that

CONFIDENTIAL

Page 156

1    they were asked the day and months before we

2    took the deposition.  And despite the fact that

3    there's a litigation hold, which we just talked

4    about.

5        MS. DORAN:     Mark this as Exhibit No. 8.

6                 (WHEREUPON, said

7                 document was marked as

8                 Deposition Exhibit No. 8

9                 for Identification.)

10   BY MS. DORAN:

11      Q.   Before we get to 8, let's go back to 6

12   for a second.  On the very first page of that

13   document, S & C 00252, on the bottom of the

14   document it's dated September 10th of 2015.  Is

15   that your response to Dr. Khanna in terms of

16   the e-mail of September 10th, 2015, at 11:29

17   a.m.?

18      A.   Yes.

19      Q.   Okay.  In that e-mail you state,

20   "Thanks, Dr. Khanna, I agree with your decision

21   that he's not able to return to work safely at

22   this time and his PT notes can also

23   substantiate current deficits."

24      MR. BRENNEMAN:  Just object.  You

CONFIDENTIAL

Page 157

1  mischaracterized what the e-mail says.  You

2  added a word.  You said can also.  It says PT

3  notes also substantiate.

4       MS. DORAN:  Okay.

5  BY MS. DORAN:

6       Q.  Is that what you stated to Dr. Khanna?

7       A.  Yes.

8       Q.  So the PT notes that you're referring

9  to were dated what?

10      A.  I believe it's 8/28.

11      Q.  So they were from his visit of 8/28 of

12  2015?

13      A.  I would have to look at it.  I'm not

14  sure of the actual date right now.  I know that

15  I believe it's 8/28.

16      Q.  You believe it's 8/28.  And you claim

17  you got these notes from Richard Rascher?

18      A.  Correct.

19      Q.  And if I told you Mr. Rascher did not

20  give you these notes, could you dispute that?

21      MR. BRENNEMAN:  Objection to the form.

22      THE WITNESS:  There's no way for me to -- I

23  mean how can I dispute that?  I'm telling you

24  he gave me the notes.

CONFIDENTIAL

Page 166

1  just -- I didn't move forward on this.

2      Q.   By this e-mail is Dr. Khanna concerned

3  that you may have a legal issue if you don't

4  clear it with -- and he wants to be sure that

5  you're going to clear it with Valerie or S &

6  C's legal team before you proceed?

7      MR. BRENNEMAN:  Objection to the form.

8      THE WITNESS:  You know, I can't speak to

9  what Valerie or S & C's legal team is going to

10  say.  Okay?  What Dr. Khanna is saying, at this

11  point, if we're not going to clear him, what is

12  the purpose of calling up the physicians and

13  what's -- what are they supposed to do at this

14  point, you know.  And I believe he was correct

15  in that.  If he feels he's unsafe and we have

16  the PT notes, we have everything, and we can't

17  clear him because he's not safe in the plant,

18  then why are we going to go forward and start

19  doing everything else.

20  BY MS. DORAN:

21      Q.   But he is not saying that?

22      MR. BRENNEMAN:  Objection to the form.

23  BY MS. DORAN:

24      Q.   He is saying however, correct?  He

CONFIDENTIAL

1  to go back and recall exactly, you know, but he

2  was talking to Sophia.  He was sitting in her

3  chair.  He went to get up and he -- it took him

4  five times, and we asked him do you need some

5  help, and he was like no.  And that particular

6  chair had a hard seat with, you know, side

7  rails where you could push on it to get up.

8      Q.   So you previously testified that you

9  observed him not seeming balanced, and I

10  believe that was on August 20th when he came --

11      A.   That was the first time, yes.

12      Q.   And that's when he came in to you with

13  Marcia Burton, but he first came in maybe

14  accidentally to health services; is that

15  correct?

16      A.   Well, he wasn't with Marcia.  He was

17  sitting in the office, and I guess he was

18  coming in to benefits, but he came into health

19  services by mistake.  I wasn't sure who the

20  people were, but they came down and saw him.  I

21  think they would have to identify who they

22  were, because I didn't speak.  I was standing

23  on the side watching.  And I watched him.  They

24  realized where he was supposed to go and they

Thompson Court Reporters, Inc
thompsonreporters.com

CONFIDENTIAL

Page 218

1   were going to take him there, and I started to

2   say, Do you need a wheelchair.  We can get you

3   a wheelchair.  Before I could say that, one of

4   the people that were standing there said, Can

5   we help you, because he was struggling to get

6   out of the chair.  And he said no.  And so at

7   that point I just kind of -- didn't ask him

8   about the wheelchair, and he did get up out of

9   the chair.  And he walked out -- he had a

10  couple of canes and he was very unbalanced.  As

11  he walked, he was shuffling.  Everybody was

12  kind of hovering around him.  Then I watched

13  him and the group leave health services.  And

14  then as you leave health services, you know,

15  they went off towards benefits.  And that's

16  all -- the only contact I had that day.  I

17  never spoke with him personally.

18      Q.   And then on August 31 when he came in

19  to have his meeting with Dr. Khanna, what did

20  you observe?

21      A.   You know, he still was not balanced

22  when he was walking.  He came in -- he still

23  had an assistive device, and I was in and out

24  of health services.  I had people in my office,

CONFIDENTIAL

Page 219

1    so I wasn't, you know, around the whole time or

2    observing.  I'm not sure that I saw him leave.

3    And that's all that I remember of 8/31.

4        Q.    Did you observe him trying to get up

5    out of a chair on that date?

6        A.    Again, part of my recollection going

7    back, that could have been the day he came in

8    that he was sitting in Sophia's office for the

9    appointment.  And so all I can say is that he

10   had difficulty on the 20th, or whatever when he

11   came in by mistake, and then on 9/8 he was

12   still having difficulty walking and getting out

13   of chairs.  He had to push on my desk.  He was

14   having some trouble getting up.

15       Q.    So at the time you observed him in

16   Sophia's office having a hard time getting up

17   and you said it took him five times, you're not

18   sure if that was on August 31st or on September

19   8th; is that right?

20       A.    The one in Sophia's office, correct.

21   He was in my office on the 9th, though, and

22   that he had trouble walking and getting up on

23   that date.

24       MS. DORAN:  On the 8th?

CONFIDENTIAL

Page 220

1        THE WITNESS:  Yes.

2   BY MS. SMASON:

3        Q.    And so is it your testimony that there

4   were two times you observed him having

5   difficulty getting out of his chair, one was on

6   August 20th and the other was September 8th

7   when he was in your office?

8        A.    Well, I saw him three times with

9   getting out of chairs.  Once was in the hallway

10  waiting on the 20th.  I can't say for sure

11  whether the second one in Sophia's office was

12  on the 31st or on the 8th, but I observed him

13  in that office.  Then he had trouble

14  getting -- at my desk, that chair on the 8th.

15       Q.    On August 20th you also observed him

16  having trouble getting out of a chair; is that

17  right?

18       A.    That was the first time that I saw

19  him, yes.

20       Q.    Okay.

21       A.    And walking.  That was the day he came

22  in and left with the group.

23       Q.    So did you see -- did you observe him

24  getting out of a chair three times then?

CONFIDENTIAL

1     A.   Three times total.

2     Q.   Once August 20th, once on -- maybe

3 August 31st or September 8th in Sophia's office

4 and then once in your office?

5     A.   Correct.

6     Q.   And from your observation, did he seem

7 to have the same level of difficulty getting

8 out of the chair from the first time you saw

9 him do that on August 20th versus the last time

10 you saw him on September 8th, either in your

11 office or in Sophia's office?

12     A.   Yes.  I didn't see a big change.

13     Q.   And what about in terms of your

14 observations of him walking over that same

15 period of time from August 20th until September

16 8th?

17     A.   He still had balance issues.  He was

18 still shuffling.  He was walking very slow.

19 There were times he would lose his balance and

20 catch himself.  I believe that's all I can say

21 for that.

22     Q.   Did you see any difference in his

23 ability to walk from the first time you saw him

24 until the last time?

CONFIDENTIAL

1    A.   I did not see a difference.  I believe

2 he was using -- I was told -- well, I shouldn't

3 say I was told.  I believe he switched from two

4 canes to one cane during that time period.  But

5 that would be -- other than that, he had

6 difficulty walking, still had a lot of balance

7 and functional issues.

8    Q.   I was going to ask you about the

9 assistive devices.  You said on August 20th you

10 saw a couple of canes, correct?

11    A.   Uh-huh.

12    Q.   And then on August 31st you said he

13 had an assistive device.  Do you know if that

14 was one or two canes or something else?

15    A.    I believe he had one cane.  My

16 recollection is a little foggy in that respect.

17    Q.   And then do you believe from what you

18 can recall that on September 8th he had one

19 cane also?

20    A.   Correct.

21    Q.   And you never asked Mr. Rascher if he

22 were to come back to work if he might be able

23 to get some help on his own getting in and out

24 of the building, if that was your concern,



Phone: 312-421-DEPS (3377)     1017 W. Washington Blvd.
www.thompsonreporters.com     Suite 2F Chicago, IL 60607

Re:     Depositions of **Kathleen Clawson Vol. I and Vol. II**
        03/13/2019
        EEOC v S&C

I wish to make changes for the following reasons:

Page   Line

 7    21   Change:   Address: 1003 to 1033
           Reason:   Transcription ERROR

28    6    Change:   Midwest in the Northeast to Midwest and the Northeast
           Reason:   Transcription ERROR

86    21   Change:   MORE to POOR
           Reason:   Transcription Error

93    22   Change:   Take their —— to take their pain
           Reason:   Transcription ERROR omission

___  ___   Change:   _____
           Reason:   _____

___  ___   Change:   _____
           Reason:   _____

___  ___   Change:   _____
           Reason:   _____

           Signed:   _Kathleen A. Clawson_

12842      Date:   4/22/19   Sheet 1 of 1

Exhibit J

Confidential – Subject to Protective Order

*ADVOCATE MEDICAL GROUP - ONCOLOGY*
*Previously*
*ONCOLOGY SPECIALISTS, SC*

**Patient: Richard Rascher**
**DOB:** Jun 01, 1941
**Date:** Jul 13, 2015

**Location:** Park Ridge
**Attending Physician:** Jacob Bitran, M.D.
**Note Type:** Progress Note

**Complaint/Presenting Problem:**
The patient is seen today for continuation of management regarding his rectal cancer. He is receiving physical therapy at home and he is status post right hip arthroplasty. He is somewhat frustrated at the place of his rehabilitation. To be following up with his orthopedist on Friday. Prior to the time it today's visit PET scan was performed to restaged his rectal cancer.

**HPI:**
Rectal Ca T3,N0,M0

**PMH:**
Mr. Rascher's medical history consists of Arthritis (knees).

**Current Medications:**
Aleve, Colchicine, Gabapentin, Hydrocodone-APAP, Potassium
Medications were reviewed and updated.

**Allergies:**
No Known Allergies.
Allergies were reviewed. No new allergies reported.

**Past Surgical History:**
Mr. Rascher's surgical/procedural history consists of appendectomy, Right hip arthroplasty in 2015, and Colonoscopy with biopsy in 2014.

**Family History:**
There is no family history of cancer. His sister had a stroke at age 59. He has two adult aged children who are in good physical health.

**Personal/Social History:**
Mr. Rascher is widowed and he is an electrical engineer. Mr. Rascher has never smoked. He drinks occasionally. Mr. Rascher reports no contact with hazardous material.
Mr. Rascher reports the following support systems: his family. he lives alone. His diet consists of regular meals. He indicates his activity level as: light exercise and walking the dog.

**Review of Systems:**

| | |
|---|---|
| Constitutional | Abnormal - Continued weight loss, poor appetite |
| ENMT | Normal - No problems with hearing, no sore throat, no sinus drainage. |
| Hematologic/Lymphatic | Normal - No easy bruising or bleeding. The patient denies any tender or palpable lymph nodes. |
| Breasts | Normal - No abnormal masses of breast, no nipple discharge or pain. |
| Respiratory | Normal - No dyspnea on exertion. chest pain, cough or hemoptysis. |
| Cardiovascular | Normal - No anginal chest pain, palpitations or orthopnea. |
| Gastrointestinal | Normal - No nausea, vomiting, diarrhea, GI bleeding, or constipation. No change in bowel habits, no heartburn or early satiety. |
| Genitourinary (M) | Normal - No hematuria, dysuria, increased frequency, urgency, hesitancy or incontinence. |
| Integumentary | Normal - No chronic rashes, inflammation, ulcerations or skin changes. |

Bitran000068

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Jul 13, 2015
Page: 2

| | |
|---|---|
| Neurologic | Normal - No headache, blurred vision, and no areas of focal weakness or numbness. Normal gait. No sensory problems. |
| Psychiatric | Normal - No insomnia, depression, mania or mood swings.  No psychotropic drugs. |

**Physical Examination:**
Performed on Jul 13, 2015 15:49
Height - 190.00 cms
Weight - 79.0 kg (HIGH)
BSA - 2.07 sq.m
BMI - 21.8800
Temperature - 98.4 F
Pulse - 78 /min
Respiration - 16 /min
BP - 132/65 mm(hg)
Pain - 4 right hip and both breast
1 - No physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g. office work, light house work). (ECOG)

| | |
|---|---|
| Constitutional | Alert, cooperative, oriented. Mood and affect appropriate. Appears close to chronological age. Thin |
| Head | Normocephalic; no scars. |
| ENMT |  No oral exudates, ulcers, masses, thrush or mucositis. Oropharynx clear.  Tongue normal. |
| Hematologic/Lymphatic | No petechiae or purpura.  No tender or palpable lymph nodes in the cervical, supraclavicular, axillary or inguinal area. |
| Respiratory | Lungs are clear to auscultation without rhonchi or wheezing. |
| Cardiovascular | Regular rate and rhythm of heart without murmurs, gallops or rubs. |
| Abdomen | Non-tender, non-distended, no masses, ascites or hepatosplenomegaly. Good bowel sounds. No guarding or rebound tenderness. No pulsatile masses. Healed  abdominal scars. |
| Extremities | No visible deformities, no cyanosis, clubbing or edema. Pulses 4+ and equal bilaterally. |
| Integumentary | No rashes, scars, or lesions suggestive of malignancy. |
| Neurologic | No sensory or motor deficits, normal cerebellar function, normal gait, cranial nerves intact. |
| Psychiatric | Alert and oriented times three. Coherent speech. Verbalizes understanding of our discussions today. |

**Pain Assessment Score:**
**Current Pain Management:**

**Counseling/Teaching (Time of counseling/Time of visit):**

**Impression:**
Rectal Cancer Stage IIB S/P neoadjuvant concurrent radiation therapy and Xeloda.
Reanastomosis
status post right hip arthroplasty

I spent 5 minutes of the 15 minute of is a reviewing the patient's PET scan and I indicated that there is no signs of any recurrent malignancy.

**Plan(Problem-oriented):**
follow up in 6 months.

Bitran000069

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Jul 13, 2015
Page: 3

**Return Appointment:**


**Electronically signed by:**
 Jacob Bitran, MD

**cc:**
Gabriel  Kibrit, M.D.
John J Park, M.D.

Bitran000070

Confidential – Subject to Protective Order

*ADVOCATE MEDICAL GROUP - ONCOLOGY*
*Previously*
*ONCOLOGY SPECIALISTS, SC*

**Patient: Richard Rascher**
**DOB:** Jun 01, 1941
**Date:** Mar 20, 2018

**Location:** Niles
**Attending Physician:** Jacob Bitran, M.D.
**Note Type:** Progress Note

**Complaint/Presenting Problem:**
The patient is seen today for continuation of management regarding his rectal cancer.

**HPI:**
Rectal Ca T3,N0,M0
September 26 8, 2016: The patient seen in follow up today for rectal cancer. Since the time of his last visit he developed significant lymphedema on the left and a trace lymphedema on the right. He is managing this with compression hose as well as sequential compression machine. He is somewhat depressed over the loss of his employment and is trying to deal now with the lymphedema.
January 18, 2017: Patient is not feeling well. He has noticed blood with wiping and thinks is related to irritation from all of the loose bowel movements he has had. Also has noticed a clear discharge from a "bubble." He has urinary incontinence, which is new for him. Also currently with a gout attack of his right wrist, on colchicine and indomethacin.
July 19, 2017: Seen in follow-up for rectal cancer. He is now approximately 3 years from the time of diagnosis. His complaints today are related to the fact that he is is debilitated because of osteoarthritis now involving his left hip and he indicates that he requires a left hip arthroplasty. The arthritis is making him less mobile and he is not doing the things that he used to do in the past which causes melancholy.
November 17, 2017: The patient is seen today on an urgent basis because of an acute left peroneal DVT. He underwent left hip arthroplasty on November 3. He was discharged to a rehab facility on prophylactic Xarelto, 10 mg daily. He saw his orthopedic surgeon, Dr. Matt Jimenez today where he was found to have a significantly swollen left leg. Stat Doppler studies documented an acute left peroneal DVT. He was then sent here for management. He denies any breathlessness.
November 21, 2017: Seen today in follow up for left leg DVT. He is currently on Xarelto with a loading dose of 15 mg twice a day and tolerating it well. He is of the opinion that his leg is slightly better.
November 29, 2017 seen today because of continued swelling of the left leg. He is on the Xarelto starter pack and otherwise tolerating it well. He is noted a significant improvement in the swelling of his right leg but is discouraged about the continued swelling of the left which is prompted today's visit.
December 7, 2017: He is seen today in follow-up for DVT and because of swelling of the left leg. He is currently on Xarelto 15 mg twice daily but in 2 days will start on the maintenance dose of 20 mg daily. Additionally he is on diuretics. He reports a significant improvement in the swelling of both legs.
December 27, 2017: Seen today in follow-up for DVT. Since the time of his last visit he was prescribed triamterene which has done absolutely nothing. He continues to complain of swelling in both legs and is currently on a maintenance dose of Xarelto, 20 mg daily. Additional complaints are related to urinary frequency. He is having 2 soft bowel movements per day and denies any diarrhea or hematochezia. He denies any pain.
January 29, 2018: Seen once again in follow-up for DVT. He remains on Xarelto 20 mg daily. He is continuing his diuretics. He still has significant edema involving his left leg. He is not participating in physical therapy and denies any pain.
March 1, 2018: Seen in follow-up for DVT, remains on Xarelto, and his only complaints are related to the fact that he was recently had an episode of gout and was treated with a Medrol Dosepak. The gout has resolved and he remains ambulatory.
3/13/2018: Seen in follow-up because of increasing edema following steriods; frustrated.
March 20, 2018: Seen in follow-up today for bilateral pedal edema. Currently taking 2 mg of Bumex in conjunction with 50 mg of Aldactone and there has been no resolution of the edema in his right leg and improvement in the left. Other complaints are related to urinary frequency and dribbling. Frustrated at the number of times he feels he has to urinate particularly with the augmented dose of diuretics. In addition complains of arthritis in his knee, he had a cortisone injection without any improvement.

**PMH:**
Mr. Rascher's medical history consists of Arthritis (knees).

Bitran000117

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Mar 20, 2018
Page: 2

**Current Medications:**
Bumetanide, Hydrocodone-Acetaminophen, Rivaroxaban, Rivaroxaban, Spironolactone, Allopurinol, AmLODIPine
Besylate, Aspirin, Calcium, Lisinopril
Medications were reviewed and updated.

**Allergies:**
No Known Allergies.
Allergies were reviewed. No new allergies reported.

**Past Surgical History:**
Mr. Rascher's surgical/procedural history consists of appendectomy, Kyphoplasty in 2016, Kyphoplasty in 2015, Right
hip arthroplasty in 2015, and Colonoscopy with biopsy in 2014.

**Family History:**
There is no family history of cancer. His sister had a stroke at age 59. He has two adult aged children who are in good
physical health.

**Personal/Social History:**
Mr. Rascher is widowed and he is an electrical engineer. Mr. Rascher has never smoked. He drinks occasionally. Mr.
Rascher reports no contact with hazardous material.
Mr. Rascher reports the following support systems: his family. he lives alone. His diet consists of regular meals. He
indicates his activity level as: light exercise and walking the dog.

**Review of Systems:**

| | |
|---|---|
| Constitutional | Normal - No fevers, chills, night sweats, excessive fatigue or weight loss. |
| ENMT | Normal - No problems with hearing, no sore throat, no sinus drainage. |
| Hematologic/Lymphatic | Normal - No easy bruising or bleeding. The patient denies any tender or palpable lymph nodes. |
| Breasts | Normal - No abnormal masses of breast, no nipple discharge or pain. |
| Respiratory | Normal - No dyspnea on exertion, chest pain, cough or hemoptysis. |
| Cardiovascular | Normal - No anginal chest pain, palpitations or orthopnea. |
| Gastrointestinal | Normal - No nausea, vomiting, diarrhea, GI bleeding, or constipation. No change in bowel habits, no heartburn or early satiety. |
| Genitourinary (M) | Abnormal - No hematuria, dysuria, urgency, hesitancy or incontinence. Frequency with episodes of dribbling. |
| Integumentary | Normal - No chronic rashes, inflammation, ulcerations or skin changes. |
| Neurologic | Normal - No headache, blurred vision, and no areas of focal weakness or numbness. Normal gait. No sensory problems. |
| Psychiatric | Normal - No insomnia, depression, mania or mood swings. No psychotropic drugs. |

**Physical Examination:**
Performed on Mar 20, 2018 15:30
Height - 190.00 cms
Weight - kg not done, knee pain
Temperature - 95 F (LOW)
Pulse - 80 /min
Respiration - 12 /min
BP - 127/67 mm(hg)
Pain - 7 knee, leg pain
1 - No physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g. office work, light
house work). (ECOG)

| | |
|---|---|
| Constitutional | Alert, cooperative, oriented. Mood and affect appropriate. Appears close to |

Bitran000118

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Mar 20, 2018
Page: 3

| | |
|---|---|
| | chronological age. Thin |
| Head | Normocephalic; no scars. |
| ENMT | No oral exudates, ulcers, masses, thrush or mucositis. Oropharynx clear. Tongue normal. |
| Hematologic/Lymphatic | No petechiae or purpura. No tender or palpable lymph nodes in the cervical, supraclavicular, axillary or inguinal area. |
| Respiratory | Lungs are clear to auscultation without rhonchi or wheezing. |
| Cardiovascular | Regular rate and rhythm of heart without murmurs, gallops or rubs. |
| Abdomen | Non-tender, non-distended, no masses, ascites or hepatosplenomegaly. Good bowel sounds. No guarding or rebound tenderness. No pulsatile masses. Healed abdominal scars. |
| Extremities | The right leg is no longer edematous. There is 2-3+ pedal and pretibial edema on the left |
| Integumentary | No rashes, scars, or lesions suggestive of malignancy. |
| Neurologic | No sensory or motor deficits, normal cerebellar function, normal gait, cranial nerves intact. |
| Psychiatric | Alert and oriented times three. Coherent speech. Verbalizes understanding of our discussions today. |

**Laboratory:**

**Radiology/Pathology Reports:**

**Pain Assessment Score: 4/10**
**Current Pain Management: cortisone injection**
**Effective: yes  or   nox**

**Counseling/Teaching (Time of counseling/Time of visit):**

**Impression:**
Rectal Cancer Stage IIB S/P neoadjuvant concurrent radiation therapy and Xeloda.
Reanastomosis
status post right hip arthroplasty
Rectal bleeding that is related to irritation from loose stool. Recommended to increase stool bulking.
Urinary incontinence, prostate gland size normal on exam. Recommend urology referral.

I advised that he decrease the Bumex to 1 mg and decrease the Aldactone to 25 mg. I asked to see him again in 3 weeks. I wrote a prescription for Norco to deal with his knee pain.

**Plan(Problem-oriented):**
Bumex 1 mg daily in conjunction with Aldactone 25 mg daily. Continue Xarelto 20 mg daily
Norco 5 mg was prescribed for his knee pain.

Return in 3 week

**Return Appointment:**

**Electronically signed by:**
 Jacob Bitran, MD

**cc:**
Gabriel  Kibrit, M.D.John J Park, M.D.

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Mar 20, 2018
Page: 4

Bitran000120

Confidential – Subject to Protective Order

*ADVOCATE MEDICAL GROUP - ONCOLOGY*
*Previously*
*ONCOLOGY SPECIALISTS, SC*


CT CHEST, ABDOMEN AN
Patient Name: RICHARD RASCHER
Accession #

CT-15-0034731

CT Chest, Abdomen, Pelvis

INDICATION:

INDICATION: Rectal carcinoma. Recurrence. Dehydration, weakness.

TECHNIQUE :

Oral and IV contrast utilized. 91 cc Omnipaque 300 utilized for the IV infusion.

COMPARISON:

No chest comparisons. Abdomen and pelvic CT compared to January 5, 2015..

CHEST:

MEDIASTINUM:

Thyroid normal.

Tracheobronchomegaly compatible with obstructive airway disease.

No mediastinal masses. No adenopathy in the mediastinum or in the hila. No axillary adenopathy.

LUNGS:

Marked hyper aeration of the lungs compatible with COPD.

Previously there were bilateral pleural effusions. Currently one on the right stable. On the left smaller compared to previous exam.

Triangular focus of infiltrate right lower lobe posteriorly. High density material centrally could represent hemorrhagic focus or enhancement of the nodule.

Lungs otherwise clear.

IMPRESSION:

Bilateral pleural effusions.

Infiltrate right lower lobe posteriorly with high density areas anteriorly. This could represent area of pneumonia. The high density material has differential considerations above. Location would raise the possibility of aspiration pneumonia.

COPD.

ABDOMEN and PELVIS
ABDOMEN:

Bitran000172

Confidential – Subject to Protective Order

Name: Rascher, Richard
Printed: Feb 16, 2015
Page: 2

A few tiny low-density lesions are present in the liver. These do not become isodense with liver on delayed images and probably represent small cysts. These were not present on the previous study but previous examination performed without IV contrast.

Gallbladder contracted. No obvious abnormalities. Pancreas, spleen and both kidneys normal. Normal excretion of contrast from the kidneys.

No ascites or aneurysm.

PELVIS:

Accession #

CT-15-0034731

In the pelvis fluid collection around the rectum. Suture line low on the right with some surrounding soft tissue. I cannot ascertain whether this represents an recurrence or postsurgical.

SKELETAL STRUCTURES:

Comminuted fracture right acetabulum with major fragment rotated medially. There is protrusio acetabula on involving the femoral head.

Fracture right inferior pubic ramus

On the left prominent degenerative arthritic change.

IMPRESSION:

Comminuted right acetabular fracture.

Degenerative arthritic change left hip.

Additional incidental findings above.

Patient's nurse Ashley notified of findings regarding the right hip by phone.

**** F I N A L ****

Transcribed By: TP
02/16/15 7:31 pm

Dictated By:      MCFADDEN-MD, JOHN

Electronically Reviewed and Approved By:      MCFADDEN-MD, JOHN  02/16/15 7:48 pm

Bitran000173

# Exhibit K

1    IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3
U.S. EQUAL EMPLOYMENT          )
4  OPPORTUNITY COMMISSION,      )
                      )
5          Plaintiff,      )
                      )
6    and              )
                      )
7  RICHARD RASCHER,          ) Civil Action No.
                      ) 1:17-cv-06753
8          Plaintiff-      )
         Intervenor,      ) Judge Robert W.
9                      ) Gettleman
    vs.              )
10                      ) Magistrate Judge
   S&C ELECTRIC COMPANY,        ) Maria Valdez
11                      )
          Defendant.      )
12

13        The confidential deposition of JACOB

14  BITRAN, M.D., taken in the above-entitled cause,

15  before Angela M. Ingham, a Notary Public within and

16  for the County of Cook and State of Illinois, and a

17  Certified Shorthand Reporter of said state, taken

18  pursuant to the Federal Rules of Civil Procedure

19  for the United States District Court, at

20  1700 Luther Lane, Suite 2200, Park Ridge, Illinois,

21  on the 22nd day of February, 2019, at the hour of

22  1:02 p.m.

23

24

1   APPEARANCES:

2    Present telephonically:

3      MR. ETHAN M.M. COHEN
      EEOC

4      500 West Madison Street, Suite 2000
      Chicago, Illinois 60661

5      312.353.2713
      ethan.cohen@eeoc.gov

6

7       On behalf of the U.S. Equal
       Employment Opportunity
       Commission;

8

9   Present telephonically:

10     MS. JOETTE S. DORAN
      JOETTE S. DORAN & ASSOCIATES, P.C.

11     2300 North Barrington Road
      Suite 400

12     Hoffman Estates, Illinois 60169
      847.490.5309

13     joette@joettedoran.com

14       On behalf of the Plaintiff
       Richard Rascher;

15   Present at 1700 Lutheran Lane, Suite 2200,
   Park Ridge, Illinois:

16

17     MR. L. BRANDON LISS
      FOX SWIBEL LEVIN & CARROLL LLP

18     200 West Madison Street, Suite 3000
      Chicago, Illinois 60606

19     312.224.1225
      bliss@foxswibel.com

20       On behalf of the Defendant.

21   ALSO PRESENT:

22   Present at 1700 Lutheran Lane, Suite 2200,
   Park Ridge, Illinois:

23     DR. JACOB BITRAN, M.D.

24

1    (Witness duly sworn.)

2    JACOB BITRAN, M.D.,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5    EXAMINATION

6    BY MR. LISS:

7    Q.   Good morning.  My name is Brandon Liss.  I

8    represent S&C Electric Company, who is the

9    defendant in this case, and I'll be taking your

10   deposition this afternoon.

11   Can you please state your name and address

12   for the record.

13   A.   It's Jacob Bitran, B-i-t-r-a-n,

14   1700 Luther Lane, Park Ridge, Illinois, 60068.

15   Q.   And, Dr. Bitran, have you ever had your

16   deposition taken before?

17   A.   Yes.

18   Q.   When was that?

19   A.   Probably sometime last fall.

20   Q.   And what type of case was that deposition

21   for?

22   A.   Okay.  So generally speaking when I do

23   depositions, they're in the context of medical

24   malpractice.

1   callus formation.  Can you explain the significance

2   of that?

3       A.   He had a broken rib that's in the process

4   of healing.

5       Q.   And regarding the thoracic and lumbar

6   spine degenerative change, is that something that

7   you recognized at a later point that's progressing

8   to be worse?

9       A.   Well, I mean, degenerative changes, you

10  know, tend to get worse over time.  I don't know

11  that I specifically commented on it later; but, you

12  know, that's the nature of arthritis.

13      Q.   Dr. Bitran, you're now being handed what's

14  been marked as Defendant's Exhibit No. 164.  This

15  is Bitran 172 to 173.

16              (Whereupon, Defendant's

17              Deposition Exhibit No. 164 was

18              marked for identification.)

19  BY MR. LISS:

20      Q.   Is this the February 16, 2015, report from

21  Mr. Rascher's CT scan of the chest, abdomen, and

22  pelvis that you ordered?

23      A.   Yes.

24      Q.   Again, it's signed by another doctor, but

1   was it accessible to you?

2   A.   Yes.

3   Q.   And something that you reviewed?

4   A.   Yes.

5   Q.   And part of your records?

6   A.   Yes.

7   Q.   The indication states rectal carcinoma,

8   recurrence, dehydration, and weakness.  What's the

9   significance of that?

10   A.   Those were -- those were the reasons for

11   doing the CT scan.

12   Q.   To check for those things?

13   A.   No.  That was the indication.  There were

14   concerns about whether we might be dealing with

15   recurrent disease that was contributing to his

16   overall weakness, so that was the indication for

17   doing the CT.

18   Q.   So the statement of recurrence there

19   doesn't mean that it did recur, is that what you're

20   saying?  You're checking to see if that's the cause

21   of some of these other notations?

22   A.   We're checking to see if that's the cause

23   of his ailments, not that we've documented

24   recurrent disease.

1    fall.

2        Q.    So you said he was seeing a specialist, a

3    rheumatologist, for the osteonecrosis and the

4    various arthritic conditions?

5        A.    He was seeing a rheumatologist because of

6    the arthritic conditions.

7        Q.    And the arthritic conditions combined with

8    the fractures, how does that affect one's ability

9    to be mobile?

10       A.    Well, if you've got osteonecrosis of the

11   hip, you're not going to be mobile.

12       Q.    Does that include walking?

13       A.    It includes walking.  The person is going

14   to be walking with a limp, great deal pain.  There

15   was a baseball/football player, Bo Jackson,

16   developed osteonecrosis of the hip.  I forgot what

17   hip it was, and he never played sports again.

18       Q.    Is it something that would cause

19   Mr. Rascher to need to stay away from machinery?

20       A.    Well, I think --

21       MR. COHEN:  Objection, vague and leading.

22       THE WITNESS:  I don't know how someone is going

23   to function with osteonecrosis including doing

24   sedentary work.

1    of recurrent disease.

2    Q.   Cancer?

3    A.   Cancer.

4    Q.   I see.  Dr. Bitran, you're now being

5    handed what's been marked as Defendant's Deposition

6    Exhibit No. 168.  This is Bitran 68 through 70.

7                    (Whereupon, Defendant's

8                    Deposition Exhibit No. 168 was

9                    marked for identification.)

10   BY MR. LISS:

11   Q.   Is this your progress note from

12   Mr. Rascher's July 13, 2015, appointment?

13   A.   Yes.

14   Q.   And what was the reason for this visit?

15   A.   To review the PET scan.

16   Q.   That was the routine PET scan?

17   A.   Yes.

18   Q.   And it's more than seven months since the

19   last appointment.  Is that significant?

20   A.   Well, you know, he had the arthroplasty.

21   He had rehab.  You know, he had lots of things that

22   were going on which took priority over surveillance

23   of his rectal cancer.

24   Q.   You're referring to the orthopedic

1   conditions?

2   A.   Correct.

3   Q.   There's a note here that says Mr. Rascher

4   was receiving physical therapy post-right hip

5   arthroplasty.  At this point when you saw him what

6   did you observe regarding the effects of the

7   surgery?

8   A.   Well, I mean, you know, he was ambulating.

9   I didn't note whether he was ambulating with a

10  cane.  I don't believe he was ambulating with a

11  walker at this point but he was also very

12  frustrated because I thought -- or he thought that

13  he would be a lot further along in terms of his

14  mobility.

15  Q.   So where it says "frustrated at place,"

16  does that mean pace?

17  A.   Pace, yes.

18  Q.   So was it your understanding that he was

19  significantly limited at that point?

20  A.   Well, he was limited because he wasn't --

21  I think his concept was I'm going to be as good as

22  I was prior to the time of this whole episode with

23  the rectal cancer and kind of coming and going as I

24  please and I think that it was -- he was frustrated

1    that he wasn't at that level.

2        Q.   And to clarify, is that as a result of the

3    orthopedic conditions?

4        A.   Yes.

5        Q.   Now you mention that you expected in

6    February you thought that Mr. Rascher would likely

7    have been able to return to work had it just been

8    the treatment of his cancer.

9        A.   Yes.

10       Q.   Was it your understanding at this point

11   that that was the case had his only treatment been

12   regarding the maintenance and oversight of the

13   cancer that he would have been okay to go back to

14   work?

15       A.   I believe so.

16       Q.   You also noted that he was following up

17   with his orthopedist.  Was it your understanding

18   that he at that point had ongoing appointments with

19   orthopedic specialists?

20       A.   Yes.

21       Q.   There's also a note in the medication

22   section that Mr. Rascher is taking Aleve and

23   hydrocodone.  Can you explain what hydrocodone is?

24       A.   Hydrocodone is a narcotic.  It's used in

C O N F I D E N T I A L
Page 86

1  the treatment of pain, and he was taking it because

2  of the surgery that he had performed by Dr. Jimenez

3  in terms of the right hip arthroplasty.

4     Q.   From July he was continuing to still take

5  the hydrocodone and is hydrocodone used for more

6  extreme pain than other -- than Aleve?

7     A.   Yes.

8     Q.   So here you make a note in the physical

9  examination section regarding pain and note that it

10  is not related to the rectal cancer.  You say four

11  in the right hip and both breasts.  Can you explain

12  the significance of that?

13     A.   Okay.  So the pain was a four out of ten

14  in the right hip, and he was complaining of some

15  chest pain.

16     Q.   And as of this time you still have the

17  same notation in terms of the restrictions on his

18  activities, correct?

19     A.   Correct.

20     Q.   Which has been consistent throughout?

21     A.   Correct.

22     Q.   Dr. Bitran, you're now being handed what's

23  been marked previously in another deposition as

24  Defendant's Deposition Exhibit No. 65.

1    A.  Correct.

2    Q.  And you said you were aware of the other

3  medical problems for which he was being treated.

4  Did you consult the orthopedic doctors when you

5  issued this note?

6    A.  No.

7    Q.  So is there any reason that your opinion

8  in this letter should be construed to override that

9  of one of his treating specialists?

10    A.  No.

11    Q.  So when you say that Mr. Rascher could

12  potentially do sedentary work, would you

13  characterize your return to work letter as one with

14  restrictions?

15    A.  Yes, sedentary work.

16    Q.  Dr. Bitran, you're now being handed what's

17  been marked as Defendant's Deposition Exhibit

18  No. 169.  This is Bitran 71 through 73.

19          (Whereupon, Defendant's

20          Deposition Exhibit No. 169 was

21          marked for identification.)

22  BY MR. LISS:

23    Q.  Is this your progress note for

24  Mr. Rascher's January 18, 2016, appointment?

1    A.   Yes.

2    Q.   This is the first appointment that you had

3  after you had issued that return to work letter

4  that we just described?

5    A.   Yes.

6    Q.   And what was the reason for this

7  appointment?

8    A.   Just routine followup from the standpoint

9  of his rectal cancer.

10    Q.   And at this point in time what generally

11  are you seeing Mr. Rascher for and then continuing

12  on to present?

13    A.   Again, it's just routine followup for the

14  rectal cancer.  I mean, more recently he's

15  developed deep vein thromboses and was on

16  anticoagulants, and he's had issues with edema.

17    Q.   And what's the reason for him seeing an

18  oncologist for those issues?

19    A.   Well, the -- okay.  So we do hematology

20  and oncology; and many times when it comes to the

21  anticoagulants, physicians, orthopedists, primary

22  care physicians refer a patient to us for

23  anticoagulant management.

24    Q.   And for those conditions, what kinds of

1  effects do they have on one's mobility including

2  their ability to walk around, their ability to

3  stand for a period of time, their ability to sit

4  for a period of time?

5      A.   Well, with the deep vein thrombosis, it's

6  severely limited because he had, you know,

7  significant swelling in both lower extremities.  He

8  was on anticoagulants.  It was exceedingly

9  difficult for him to walk.  He was using a cane to

10 walk, and the deep vein thrombosis significantly

11 impaired his overall mobility.

12     Q.   And at what time period are you talking

13 about with respect to that?

14     A.   This is -- the deep vein thrombosis

15 occurred last year, and he was taken off

16 anticoagulants in the fall of last year.

17     Q.   2018?

18     A.   2018.

19     Q.   In your note here there's a description of

20 two kyphoplasties.  What is that?

21     A.   So he had fractured bones in his back.

22 The bone collapsed upon itself, so he needed the

23 bone to be blown up which is what the kyphoplasty

24 procedure is for.

1    Q.   And what kind of limitations would that

2  condition or two of those conditions have on

3  Mr. Rascher?

4    A.   Well, they would probably prevent him from

5  even doing sedentary work.

6    Q.   And one of those kyphoplasties was in 2015

7  and one in 2016, is that correct?

8    A.   That's correct.

9    Q.   Do you recall when in 2015?

10    A.   I would have to go back and look at my

11  records.

12    Q.   And I take it if it's marked in a

13  January 18, 2016, document that you recorded and

14  this kyphoplasty took place in 2016 prior to that

15  appointment, it must have been sometime between the

16  first of the year and that appointment?

17    A.   Correct.

18    Q.   Did you make any specific observations as

19  to how you viewed Mr. Rascher's limitations or

20  restrictions at that appointment?

21    A.   No, other than the fact that he was using

22  a cane but he was preparing meals and doing his own

23  housework.

24    Q.   And at this point he's still taking

1  hydrocodone?

2  A.  Yes.

3  Q.  Was that consistent?

4  A.  Yes.

5  Q.  In your impression notes you indicate that

6  there's a need for every six months following up

7  with labs.  Is that with respect to routine

8  maintenance of cancer treatment?

9  A.  Yes.

10  Q.  Dr. Bitran, you are now being handed

11  what's been marked as Defendant's Deposition

12  Exhibit 170.  This is Bitran 167 and 168.

13          (Whereupon, Defendant's

14          Deposition Exhibit No. 170 was

15          marked for identification.)

16  BY MR. LISS:

17  Q.  Dr. Bitran, is this the July 13, 2016,

18  report for the PET/CT whole body study that you

19  referred Mr. Rascher for?

20  A.  Yes.

21  Q.  It's again signed by another doctor, but

22  is it still something you reviewed and part of your

23  records?

24  A.  Yes.

1    MR. LISS:  We will, and we'll designate this as

2   confidential, yes?

3    MS. DORAN:  Yes, thank you.  Yes, on behalf of

4   Mr. Rascher, I would like to designate the

5   deposition as confidential and subject to the

6   protective order.

7    MS. REPORTER:  Would you like to order a copy?

8    MS. DORAN:  Not at this time.

9    MR. COHEN:  EEOC will order.

10        FURTHER DEPONENT SAITH NOT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# Exhibit K

1       IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2         EASTERN DIVISION

3

U.S. EQUAL EMPLOYMENT     )
4 OPPORTUNITY COMMISSION,     )
            )
5       Plaintiff,    )
            )
6    and        )
            )
7 RICHARD RASCHER,      ) Civil Action No.
          ) 1:17-cv-06753
8       Plaintiff-    )
      Intervenor,    ) Judge Robert W.
9          ) Gettleman
   vs.        )
10           ) Magistrate Judge
S&C ELECTRIC COMPANY,     ) Maria Valdez
11          )
      Defendant.    )

12

13      The confidential deposition of JACOB

14 BITRAN, M.D., taken in the above-entitled cause,

15 before Angela M. Ingham, a Notary Public within and

16 for the County of Cook and State of Illinois, and a

17 Certified Shorthand Reporter of said state, taken

18 pursuant to the Federal Rules of Civil Procedure

19 for the United States District Court, at

20 1700 Luther Lane, Suite 2200, Park Ridge, Illinois,

21 on the 22nd day of February, 2019, at the hour of

22 1:02 p.m.

23

24

1    APPEARANCES:

2      Present telephonically:

3        MR. ETHAN M.M. COHEN
         EEOC
4        500 West Madison Street, Suite 2000
         Chicago, Illinois 60661
5        312.353.2713
         ethan.cohen@eeoc.gov
6
            On behalf of the U.S. Equal
7            Employment Opportunity
             Commission;
8
       Present telephonically:
9
         MS. JOETTE S. DORAN
10         JOETTE S. DORAN & ASSOCIATES, P.C.
         2300 North Barrington Road
11         Suite 400
         Hoffman Estates, Illinois 60169
12         847.490.5309
         joette@joettedoran.com
13
            On behalf of the Plaintiff
14           Richard Rascher;

15      Present at 1700 Lutheran Lane, Suite 2200,
       Park Ridge, Illinois:
16
         MR. L. BRANDON LISS
17         FOX SWIBEL LEVIN & CARROLL LLP
         200 West Madison Street, Suite 3000
18         Chicago, Illinois 60606
         312.224.1225
19         bliss@foxswibel.com

20            On behalf of the Defendant.

21    ALSO PRESENT:

22      Present at 1700 Lutheran Lane, Suite 2200,
       Park Ridge, Illinois:
23
         DR. JACOB BITRAN, M.D.
24

1          (Witness duly sworn.)

2          JACOB BITRAN, M.D.,

3   called as a witness herein, having been first duly

4   sworn, was examined and testified as follows:

5          EXAMINATION

6   BY MR. LISS:

7     Q.   Good morning.  My name is Brandon Liss.  I

8   represent S&C Electric Company, who is the

9   defendant in this case, and I'll be taking your

10  deposition this afternoon.

11         Can you please state your name and address

12  for the record.

13    A.   It's Jacob Bitran, B-i-t-r-a-n,

14  1700 Luther Lane, Park Ridge, Illinois, 60068.

15    Q.   And, Dr. Bitran, have you ever had your

16  deposition taken before?

17    A.   Yes.

18    Q.   When was that?

19    A.   Probably sometime last fall.

20    Q.   And what type of case was that deposition

21  for?

22    A.   Okay.  So generally speaking when I do

23  depositions, they're in the context of medical

24  malpractice.

1  callus formation.  Can you explain the significance

2  of that?

3  A.   He had a broken rib that's in the process

4  of healing.

5  Q.   And regarding the thoracic and lumbar

6  spine degenerative change, is that something that

7  you recognized at a later point that's progressing

8  to be worse?

9  A.   Well, I mean, degenerative changes, you

10  know, tend to get worse over time.  I don't know

11  that I specifically commented on it later; but, you

12  know, that's the nature of arthritis.

13  Q.   Dr. Bitran, you're now being handed what's

14  been marked as Defendant's Exhibit No. 164.  This

15  is Bitran 172 to 173.

16                    (Whereupon, Defendant's

17                    Deposition Exhibit No. 164 was

18                    marked for identification.)

19  BY MR. LISS:

20  Q.   Is this the February 16, 2015, report from

21  Mr. Rascher's CT scan of the chest, abdomen, and

22  pelvis that you ordered?

23  A.   Yes.

24  Q.   Again, it's signed by another doctor, but

1    was it accessible to you?

2    A.   Yes.

3    Q.   And something that you reviewed?

4    A.   Yes.

5    Q.   And part of your records?

6    A.   Yes.

7    Q.   The indication states rectal carcinoma,

8    recurrence, dehydration, and weakness.  What's the

9    significance of that?

10   A.   Those were -- those were the reasons for

11   doing the CT scan.

12   Q.   To check for those things?

13   A.   No.  That was the indication.  There were

14   concerns about whether we might be dealing with

15   recurrent disease that was contributing to his

16   overall weakness, so that was the indication for

17   doing the CT.

18   Q.   So the statement of recurrence there

19   doesn't mean that it did recur, is that what you're

20   saying?  You're checking to see if that's the cause

21   of some of these other notations?

22   A.   We're checking to see if that's the cause

23   of his ailments, not that we've documented

24   recurrent disease.

1  fall.

2      Q.   So you said he was seeing a specialist, a

3  rheumatologist, for the osteonecrosis and the

4  various arthritic conditions?

5      A.   He was seeing a rheumatologist because of

6  the arthritic conditions.

7      Q.   And the arthritic conditions combined with

8  the fractures, how does that affect one's ability

9  to be mobile?

10      A.   Well, if you've got osteonecrosis of the

11  hip, you're not going to be mobile.

12      Q.   Does that include walking?

13      A.   It includes walking.  The person is going

14  to be walking with a limp, great deal pain.  There

15  was a baseball/football player, Bo Jackson,

16  developed osteonecrosis of the hip.  I forgot what

17  hip it was, and he never played sports again.

18      Q.   Is it something that would cause

19  Mr. Rascher to need to stay away from machinery?

20      A.   Well, I think --

21      MR. COHEN:  Objection, vague and leading.

22      THE WITNESS:  I don't know how someone is going

23  to function with osteonecrosis including doing

24  sedentary work.

1  of recurrent disease.

2  Q.  Cancer?

3  A.  Cancer.

4  Q.  I see.  Dr. Bitran, you're now being

5  handed what's been marked as Defendant's Deposition

6  Exhibit No. 168.  This is Bitran 68 through 70.

7          (Whereupon, Defendant's

8          Deposition Exhibit No. 168 was

9          marked for identification.)

10  BY MR. LISS:

11  Q.  Is this your progress note from

12  Mr. Rascher's July 13, 2015, appointment?

13  A.  Yes.

14  Q.  And what was the reason for this visit?

15  A.  To review the PET scan.

16  Q.  That was the routine PET scan?

17  A.  Yes.

18  Q.  And it's more than seven months since the

19  last appointment.  Is that significant?

20  A.  Well, you know, he had the arthroplasty.

21  He had rehab.  You know, he had lots of things that

22  were going on which took priority over surveillance

23  of his rectal cancer.

24  Q.  You're referring to the orthopedic

1    conditions?

2        A.   Correct.

3        Q.   There's a note here that says Mr. Rascher

4    was receiving physical therapy post-right hip

5    arthroplasty.  At this point when you saw him what

6    did you observe regarding the effects of the

7    surgery?

8        A.   Well, I mean, you know, he was ambulating.

9    I didn't note whether he was ambulating with a

10   cane.  I don't believe he was ambulating with a

11   walker at this point but he was also very

12   frustrated because I thought -- or he thought that

13   he would be a lot further along in terms of his

14   mobility.

15       Q.   So where it says "frustrated at place,"

16   does that mean pace?

17       A.   Pace, yes.

18       Q.   So was it your understanding that he was

19   significantly limited at that point?

20       A.   Well, he was limited because he wasn't --

21   I think his concept was I'm going to be as good as

22   I was prior to the time of this whole episode with

23   the rectal cancer and kind of coming and going as I

24   please and I think that it was -- he was frustrated

1    that he wasn't at that level.

2        Q.    And to clarify, is that as a result of the

3    orthopedic conditions?

4        A.    Yes.

5        Q.    Now you mention that you expected in

6    February you thought that Mr. Rascher would likely

7    have been able to return to work had it just been

8    the treatment of his cancer.

9        A.    Yes.

10        Q.    Was it your understanding at this point

11    that that was the case had his only treatment been

12    regarding the maintenance and oversight of the

13    cancer that he would have been okay to go back to

14    work?

15        A.    I believe so.

16        Q.    You also noted that he was following up

17    with his orthopedist.  Was it your understanding

18    that he at that point had ongoing appointments with

19    orthopedic specialists?

20        A.    Yes.

21        Q.    There's also a note in the medication

22    section that Mr. Rascher is taking Aleve and

23    hydrocodone.  Can you explain what hydrocodone is?

24        A.    Hydrocodone is a narcotic.  It's used in

1    the treatment of pain, and he was taking it because

2    of the surgery that he had performed by Dr. Jimenez

3    in terms of the right hip arthroplasty.

4        Q.   From July he was continuing to still take

5    the hydrocodone and is hydrocodone used for more

6    extreme pain than other -- than Aleve?

7        A.   Yes.

8        Q.   So here you make a note in the physical

9    examination section regarding pain and note that it

10    is not related to the rectal cancer.  You say four

11    in the right hip and both breasts.  Can you explain

12    the significance of that?

13        A.   Okay.  So the pain was a four out of ten

14    in the right hip, and he was complaining of some

15    chest pain.

16        Q.   And as of this time you still have the

17    same notation in terms of the restrictions on his

18    activities, correct?

19        A.   Correct.

20        Q.   Which has been consistent throughout?

21        A.   Correct.

22        Q.   Dr. Bitran, you're now being handed what's

23    been marked previously in another deposition as

24    Defendant's Deposition Exhibit No. 65.

1    A.   Correct.

2    Q.   And you said you were aware of the other

3  medical problems for which he was being treated.

4  Did you consult the orthopedic doctors when you

5  issued this note?

6    A.   No.

7    Q.   So is there any reason that your opinion

8  in this letter should be construed to override that

9  of one of his treating specialists?

10    A.   No.

11    Q.   So when you say that Mr. Rascher could

12  potentially do sedentary work, would you

13  characterize your return to work letter as one with

14  restrictions?

15    A.   Yes, sedentary work.

16    Q.   Dr. Bitran, you're now being handed what's

17  been marked as Defendant's Deposition Exhibit

18  No. 169.  This is Bitran 71 through 73.

19              (Whereupon, Defendant's

20              Deposition Exhibit No. 169 was

21              marked for identification.)

22  BY MR. LISS:

23    Q.   Is this your progress note for

24  Mr. Rascher's January 18, 2016, appointment?

1    A.   Yes.

2    Q.   This is the first appointment that you had

3   after you had issued that return to work letter

4   that we just described?

5    A.   Yes.

6    Q.   And what was the reason for this

7   appointment?

8    A.   Just routine followup from the standpoint

9   of his rectal cancer.

10    Q.   And at this point in time what generally

11   are you seeing Mr. Rascher for and then continuing

12   on to present?

13    A.   Again, it's just routine followup for the

14   rectal cancer.  I mean, more recently he's

15   developed deep vein thromboses and was on

16   anticoagulants, and he's had issues with edema.

17    Q.   And what's the reason for him seeing an

18   oncologist for those issues?

19    A.   Well, the -- okay.  So we do hematology

20   and oncology; and many times when it comes to the

21   anticoagulants, physicians, orthopedists, primary

22   care physicians refer a patient to us for

23   anticoagulant management.

24    Q.   And for those conditions, what kinds of

1   effects do they have on one's mobility including

2   their ability to walk around, their ability to

3   stand for a period of time, their ability to sit

4   for a period of time?

5       A.   Well, with the deep vein thrombosis, it's

6   severely limited because he had, you know,

7   significant swelling in both lower extremities.  He

8   was on anticoagulants.  It was exceedingly

9   difficult for him to walk.  He was using a cane to

10  walk, and the deep vein thrombosis significantly

11  impaired his overall mobility.

12      Q.   And at what time period are you talking

13  about with respect to that?

14      A.   This is -- the deep vein thrombosis

15  occurred last year, and he was taken off

16  anticoagulants in the fall of last year.

17      Q.   2018?

18      A.   2018.

19      Q.   In your note here there's a description of

20  two kyphoplasties.  What is that?

21      A.   So he had fractured bones in his back.

22  The bone collapsed upon itself, so he needed the

23  bone to be blown up which is what the kyphoplasty

24  procedure is for.

1    Q.  And what kind of limitations would that

2  condition or two of those conditions have on

3  Mr. Rascher?

4    A.  Well, they would probably prevent him from

5  even doing sedentary work.

6    Q.  And one of those kyphoplasties was in 2015

7  and one in 2016, is that correct?

8    A.  That's correct.

9    Q.  Do you recall when in 2015?

10    A.  I would have to go back and look at my

11  records.

12    Q.  And I take it if it's marked in a

13  January 18, 2016, document that you recorded and

14  this kyphoplasty took place in 2016 prior to that

15  appointment, it must have been sometime between the

16  first of the year and that appointment?

17    A.  Correct.

18    Q.  Did you make any specific observations as

19  to how you viewed Mr. Rascher's limitations or

20  restrictions at that appointment?

21    A.  No, other than the fact that he was using

22  a cane but he was preparing meals and doing his own

23  housework.

24    Q.  And at this point he's still taking

1   hydrocodone?

2   A.  Yes.

3   Q.  Was that consistent?

4   A.  Yes.

5   Q.  In your impression notes you indicate that

6   there's a need for every six months following up

7   with labs.  Is that with respect to routine

8   maintenance of cancer treatment?

9   A.  Yes.

10   Q.  Dr. Bitran, you are now being handed

11   what's been marked as Defendant's Deposition

12   Exhibit 170.  This is Bitran 167 and 168.

13            (Whereupon, Defendant's

14            Deposition Exhibit No. 170 was

15            marked for identification.)

16   BY MR. LISS:

17   Q.  Dr. Bitran, is this the July 13, 2016,

18   report for the PET/CT whole body study that you

19   referred Mr. Rascher for?

20   A.  Yes.

21   Q.  It's again signed by another doctor, but

22   is it still something you reviewed and part of your

23   records?

24   A.  Yes.

1      MR. LISS:  We will, and we'll designate this as

2   confidential, yes?

3      MS. DORAN:  Yes, thank you.  Yes, on behalf of

4   Mr. Rascher, I would like to designate the

5   deposition as confidential and subject to the

6   protective order.

7      MS. REPORTER:  Would you like to order a copy?

8      MS. DORAN:  Not at this time.

9      MR. COHEN:  EEOC will order.

10         FURTHER DEPONENT SAITH NOT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# Exhibit L

<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    U.S. EQUAL EMPLOYMENT              )
      OPPORTUNITY COMMISSION, et al.,    )
 4                                       )
                     Plaintiffs,         )
 5                                       )
                vs.                      )  No. 17 C 6753
 6                                       )
      S&C ELECTRIC COMPANY,              )  Chicago, Illinois
 7                                       )  March 5, 2020
                     Defendant.          )  1:35 p.m.
 8

 9                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT W. GETTLEMAN
10

11    APPEARANCES:

12    For Plaintiff         EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
      U.S. EEOC:            BY:  MR. BRADLEY S. FIORITO
13                          230 South Dearborn Street, Suite 2920
                            Chicago, Illinois  60604
14                          (312) 872-9661

15
      For Plaintiff         JOETTE S. DORAN & ASSOCIATES, P.C.
16    Rascher:             BY:  MS. JOETTE SUSAN DORAN
                            2300 North Barrington Road, Suite 400
17                          Hoffman Estates, Illinois  60619
                            (847) 490-5309
18

19    For the Defendant:   FOX SWIBEL LEVIN & CARROLL LLP
                           BY:  MR. STEVEN L. BRENNEMAN
20                              MR. LOUIS BRANDON LISS
                           200 West Madison Street, Suite 3000
21                         Chicago, Illinois  60606
                           (312) 224-1200
22

23    Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                                219 South Dearborn Street, Room 1706
24                              Chicago, Illinois 60604
                                (312) 435-7626
25                              nancy_bistany@ilnd.uscourts.gov
</pre>

1        (Proceedings heard in open court:)

2        THE CLERK:  17 C 6753, EEOC versus S&C Electric.

3        MR. FIORITO:  Good morning, Your Honor.

4        Brad Fiorito for the EEOC.

5        MS. DORAN:  Good afternoon, Your Honor.

6        Joette Doran on behalf of Richard Rascher.

7        MR. BRENNEMAN:  Good afternoon, Your Honor.

8        Steve Brenneman with Brandon Liss here for defendant

9    S&C Electric Company.

10        THE COURT:  Good afternoon, folks.

11        All right.  So I asked you to come in because I had

12    some questions that I didn't think were completely answered by

13    the papers that I have reviewed.  I've run through them again.

14        And before we get to anything, I just wanted to

15    disclose to you that I -- that I noticed for maybe not the

16    first time, but it was driven home to me when I reviewed the

17    documents again that there are some doctors from Illinois Bone

18    and Joint who were --

19        MR. FIORITO:  I didn't hear the last thing you just

20    said.

21        THE COURT:  There are some doctors from Illinois Bone

22    and Joint --

23        MS. DORAN:  Yes.

24        THE COURT:  -- in this case.  My son-in-law is a

25    partner at Illinois Bone and Joint.  In fact, I have an

1    he might have -- he might have been led to believe that he

2    didn't even have to think about an accommodation.  And that's

3    what's bothering me here.

4                 MR. BRENNEMAN:  Here's --

5                 THE COURT:  The whole point of the interactive

6    process is that the burden is on both parties to do that.

7                 And I know if somebody ever asks for one, there may

8    be situations -- and I know some cases that say that, that you

9    don't have to even talk about it.  But here he really didn't

10   know he was going to be fired until he was fired.

11                MR. BRENNEMAN:  Your Honor, here's what --

12                THE COURT:  And then -- excuse me.

13                And the other thing that you've said -- and I don't

14   think I accept this, frankly -- is that, you know, his time --

15   that his period was up on August 29th.  That was clearly waived

16   because you were still dealing with him after this.  He saw the

17   doctor on the 31st and then gave you his papers after that in

18   September.  And you were still making decisions, it seems to

19   me, around the doctors to terminate him.

20                So I just think there's a lot of factual nuance here

21   that leaves me very uncomfortable, even though I realize that

22   there are good points to be made on both sides here.

23                MR. BRENNEMAN:  Let me try to address those points,

24   Your Honor.

25                First of all, counsel misstated the record on what

# Exhibit M

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


U.S. EQUAL EMPLOYMENT            )
 OPPORTUNITY COMMISSION,         )
et al.                          )   CASE NO.:
                                ) 1:17-CV-06753
        Plaintiff,              )
                                ) JUDGE ROBERT W.
        v.                      )GETTLEMAN
                                )
S&C ELECTRIC COMPANY            ) MAGISTRATE JUDGE
                                )MARIA VALDEZ
        Defendant.              )


_____




DEPOSITION OF MARCIA BURTON

TAKEN ON DECEMBER 19, 2018 AT 10:07 AM

```
                                                       Page 2
 1   APPEARANCES:

 2   UNITED STATES EQUAL EMPLOYMENT
            OPPORTUNITY COMMISSION
 3   BY: MS. DIANE SMASON
        & MR. BRADLEY FIORITO
 4   500 West Madison, Room 2000
     Chicago, IL 60661
 5   312.869.8104
     Diane.Smason@EEOC.gov
 6   Appearing on behalf of the Plaintiffs;

 7   FOX, SWIBEL, LEVIN & CARROLL, LLP
     BY: MR. STEVEN L. BRENNEMAN
 8   200 West Madison Street, Suite 3000
     Chicago, IL 60606
 9   312.224.1206
     sbrenneman@foxswibel.com
10   Appearing on behalf of S&C Electric Co;

11   JOETTE S. DORAN & ASSOCIATES, P.C.
     BY: MS. JOETTE S. DORAN, ESQ.
12   2300 North Barrington Road, Suite 400
     Hoffman Estates, IL 60169
13   847.490.5309
     joette@joettedoran.com
14   Appearing on behalf of Richard Rascher.

15   ALSO PRESENT:

16   MR. STEPHEN GOETHALS
     MS. DONNA BAGGETT
17

18

19

20

21

22

23

24
```

Page 5

```
 1              MS. SMASON:  The witness, please.
 2              M A R C I A   B U R T O N ,
 3              called as a witness herein, having been
 4     first duly sworn, was examined and testified as
 5     follows:
 6              THE COURT REPORTER:  Please raise your right
 7     hand.  Do you swear or affirm that the testimony you
 8     give will be the truth, the whole truth and nothing
 9     but the truth so help you God?
10              THE WITNESS:  Yes, I do.
11              THE COURT REPORTER:  I'll just -- I have a
12     short redone.  And then --
13              MS. SMASON:  Sure.
14              THE COURT REPORTER:   -- we are on the
15     record.  The time is 10:07 a.m.  This is the
16     deposition of Marcia Burton in the matter of EEOC
17     versus S&C Electric Company.  My name is Stephen
18     Goethals of Thompson Court Reporters.
19              Will counsel please introduce themselves for
20     the record and state whom they represent.
21              MS. SMASON:  I'm Diane Smason on behalf of
22     Plaintiff, EEOC.
23              MR. FIORITO:  Brad Fiorito on behalf of
24     EEOC.
```

Page 101

```
 1    be cleared to return to work, he needed to know this
 2    information and understand what the next steps of the
 3    process would be for him.
 4            Q:  Did you have any expectation that he
 5    would not be cleared by Health Services?
 6            A:  No.
 7            Q:  And did you go through each of these
 8    items and check them off as you spoke to him about
 9    them?
10            A:  Yes.
11            Q:  So is it that you asked him, do you have
12    medical coverage?  And he says yes or no?
13            A:  No.
14            Q:  How does that work?
15            A:  No, I go through it.  Noting that yes,
16    he does have medical coverage with us, dental.
17    Whether or not he's eligible for the retiree coverage
18    or he needs Medicare.  So this is a checklist for
19    myself.
20            Q:  And are you doing this in front of him
21    such that he can see this or did you do this after you
22    met with him?
23            A:  No, this was done in front of him.
24            Q:  On the second page, the third box, it
```

1    says "verify effective date of retirement". Is that

2    your handwriting "8/29/2015" --

3             A:  Yes.

4             Q:  -- then "(LTD retirement)"?

5             A:  Yes.

6             Q:  Why did you write that date?

7             A:  Because that was the date that was

8    communicated to him in all of the letters in regards

9    to the one year from his last day worked.

10           Q:  But he told you when you met with him on

11    August 20th that he intended to provide documentation

12    from his doctors to Health Services, right?

13           A:  Yes.

14           Q:  So why did you anticipate that he would

15    be retired on August 29th, which was only nine days

16    later?

17           A:  In the event he was not cleared to

18    return to work, this was the date that was going to be

19    used to proceed with his termination of employment.

20           Q:  So is it your practice to put down the

21    date that is one year from when someone went on leave,

22    whether or not they actually were terminated from the

23    company on that date?

24           MR. BRENNEMAN:  Objection.

Page 103

1          Go ahead.

2          A:  Can you rephrase that?  I did't

3     understand that.

4          Q:  I'm trying to find out why you put that

5     date down when nine days before that date, you did not

6     know if he would be cleared to return to work?

7          MR. BRENNEMAN:  It's been asked and

8     answered.

9          Go ahead.

10         A:  It's a standard process.

11         Q:  And what is the standard process?

12         A:  The standard process is we use the date

13    one year from last they worked for the termination.

14    If somebody is able to return to work and they, you

15    know, are, you know, able to return then we don't

16    proceed with the termination.  But in the event that

17    we do, the individual needs to be aware of what's

18    going to happen.

19         Q:  And why did you write LTD retirement

20    there?

21         A:  Because when somebody's employment

22    ending due to LTD and they are over age 65, we refer

23    to it as an LTD retirement.

24         Q:  And in your meeting with Mr. Rascher on

1  29th to do so.

2          Q:  And you told him that?

3          A:  Yes.

4          Q:  And you told him as you wrote here "if

5  he is not clear to return, then we will proceed with

6  termination and it will be an LTD retirement"?

7          A:  Yes.

8          Q:  What did he say in response to that?

9          A:  I don't recall if he responded.

10         Q:  And then you said "discuss with Rich

11  that this is our policy regarding separation, that if

12  an employee is out for one year and they are not able

13  to return at that point, they are separated", correct?

14         A:  Yes.

15         Q:  Did you tell him anything else about the

16  termination process?

17         A:  Not other than what we covered.

18         Q:  Did he ask you any questions in this

19  meeting?

20         A:  I don't recall what questions he -- he

21  had asked me.  It may have been going back to what we

22  covered in the letter.  Talking about medical

23  coverage, applying for Medicare, benefits

24  continuation.

Phone: 312-421-DEPS (3377)
www.thompsonreporters.com

**THOMPSON**
COURT REPORTERS, INC.

1017 W. Washington Blvd.
Suite 2F Chicago, IL 60607

Re:  Deposition of **Marcia Burton**
     12/19/2018
     EEOC v S&C

I wish to make changes for the following reasons:

Page   Line

10   3   Change:  Bryn Mawr in Cumberland (in should be and)
         Reason:  transcription incorrect

11   13  Change:  assitance — change to (a systems)
         Reason:  transcription incorrect

13   3   Change:  or — change to (for)
         Reason:  transcription incorrect

19   24  Change:  under — change to (on their)
         Reason:  transcription incorrect

20   6   Change:  inaudible — change to (I am)
         Reason:  transcription incorrect

41   13  Change:  on — change to (in)
         Reason:  transcription incorrect

43   5   Change:  that up — change to (out)
         Reason:  transcription incorrect

                  Signed:  Marcia Burton

12580             Date:  1-29-2019   Sheet 1 of 3

Phone: 312-421-DEPS (3377)                 1017 W. Washington Blvd.
www.thompsonreporters.com    THOMPSON    Suite 2F Chicago, IL 60607
                             COURT REPORTERS, INC.

Re:    Deposition of **Marcia Burton**
       12/19/2018
       EEOC v S&C

I wish to make changes for the following reasons:

Page   Line

71   5    Change:   that — change to (is what)

          Reason:   transcription incorrect

74   1    Change:   appointment — change to (employment)

          Reason:   transcription incorrect

74   13   Change:   and — change to (on)

          Reason:   transcription incorrect

85   7    Change:   inaudible —(the question)  change to

          Reason:   transcription incorrect

90   15   Change:   agnd — change to (and)

          Reason:   transcription incorrect

90   20   Change:   long — change to (well)

          Reason:   transcription incorrect

111  4    Change:   refuse — change to (reviews)

          Reason:   transcription incorrect

          Signed:   Marcia Burton

12580     Date:     1-29-2019        Sheet 2 of 3

Phone: 312-421-DEPS (3377)          1017 W. Washington Blvd.
www.thompsonreporters.com          Suite 2F Chicago, IL 60607

**THOMPSON**
COURT REPORTERS, INC.

Re:     Deposition of **Marcia Burton**
        12/19/2018
        EEOC v S&C

I wish to make changes for the following reasons:

Page    Line

117   8     Change:   we – change to (we've)

            Reason:   transcription incorrect

159   13    Change:   them – change to (him)

            Reason:   transcription incorrect

26    23    Change:   non – occupational nurse – change to (occupational nurse)

            Reason:   transcription incorrect

131   6     Change:   me – change to (meet)

            Reason:   transcription incorrect

____  ____  Change:   _____

            Reason:   _____

____  ____  Change:   _____

            Reason:   _____

____  ____  Change:   _____

            Reason:   _____

                Signed:   Marcia Burton

12580           Date:     1-29-2019        Sheet 3 of 3

# Exhibit N

Case: 1:17-cv-06753 Document #: 150 Filed: 07/06/21 Page 276 of 295 PageID #:2523

# RICHARD L. RASCHER

**FUNERAL HOME**

Lauterburg - Oehler Funeral Home

2000 East Northwest Highway

Arlington Heights, IL 60004

Send Flowers



**M**OUNT PROSPECT - Richard L. Rascher, 79, was born June 1, 1941, to Henry and Caroline (Bohne) Rascher and passed away May 5, 2021. Richard was the beloved husband of the late Susan; loving father of Christopher Rascher and Stephanie Rascher; dear brother of the late Patricia (late Dick) von Kampen; devoted uncle of Kurt (Jen) von Kampen, Keith (Laura) von Kampen and Kevin (Sonja) von Kampen; great-uncle of Sarah, David, Lucas, Danica, Renninah and Ronald; fond cousin of Janice (Scott) Allen, and preceded in death by his cherished dogs, Ozzie and Patch. Richard was a 1959 graduate of Arlington High School in Arlington Heights and went on to become a Principal Designer for S & C Electric Company retiring after 52 years of service. He loved antique cars and was a member of the Kaiser Darrin Car Club. He also enjoyed all sports especially hockey and baseball and had been to many of the Cubs Conventions. Richard loved music and would often take his dog Ozzie to the Mt. Prospect Park District Community Band Concerts at Lions Park. Visitation will be Wednesday, May 12, 2021

from 4-7 PM at Lauterburg & Oehler Funeral Home, 2000 E. Northwest Highway, Arlington Heights and Thursday, May 13 from 10 AM until the time of the Funeral Service at 11 AM at St. Paul Lutheran Church, 100 S. School Street, Mt. Prospect. Interment will follow at Mt. Emblem Cemetery in Elmhurst. In lieu of flowers, contributions to The Buddy Foundation, 65 W. Seegers Road, Arlington Heights, IL 60005 (thebuddyfoundation.org) appreciated. Funeral information, 847-253-5423 or lauterburgoehler.com.



To plant trees in memory, please visit our Sympathy Store.

Published by Daily Herald from May 9 to May 11, 2021.

## MEMORIAL EVENTS







# Exhibit O

From: Peter Dodzik    Fax: (847) 577-0904    To: Lutheran Home Social L Consul (847) 754-3354    Page 1 of 2  03/26/2015 11:17 AM    1304

# Northwest Behavioral Health Services

**121 S. Wilke Rd STE 200**
**Arlington Heights, IL 60005**

Phone: (847) 577-0904    Fax (847) 577-1558

**www.nwbhs.net**



03-26-2015

## NEUROPSYCHOLOGICAL CONSULTATION

**Patient's Name:** Richard Rascher    **Date of Birth:** 06-01-1941
**Psychologist:** Peter Dodzik, Psy.D., ABPdN, ABN **Age:** 73
**Referring Physician:** Theodore Homa, MD (Phone: 847-754-3624)
**Length of Consult:** 1 Unit    **Date of Consult:** 03-26-2015

Mr. Rascher was seen for a psychological consultation while on the rehabilitation and at the Lutheran Home. He has a history of multiple medical issues dating back to May 2014. My understanding is that he was working full-time up until recently. He was diagnosed with rectal cancer last year and underwent resection, chemotherapy and had a colostomy bag until recently. He also has a history of gout, which has been treated often on with prednisone and drainage. This year he underwent a total hip replacement and continues to be unable to bear weight on that leg. Consequently, his rehabilitation has been delayed considerably. Recently, he was diagnosed with norovirus and C-Diff and has undergone a course of antibiotics and rehydration.

He was seen recently by psychiatry due to increasing symptoms of depression. There is a long-standing history of difficulty within his family. His wife died of an embolism nearly 20 years ago and his daughter returned from college to help take care of him and his home after that. She moved out for five years ago but continues to help with his day-to-day affairs and more actively since he has been hospitalized. He reports that there has been a tremendous amount of tension with his daughter in recent years. She has told him that he is responsible for "ruining her life", making excessive demands of her and there certainly seems to be issues of enmeshment and guilt. His son is somewhat less actively involved though Mr. Rascher has concerns of alcohol and drug use with him and indicated that neither child maintains meaningful or consistent employment.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

From. Peter Dodzik  (847) 577-0904 To. Lutheran Home Social  1 (847) 754-3354  of 2 03/26/2015 11:17 A

## Confidential Medical Record for Richard Rascher
## Dob: 06-01-1941

He has accumulated a rather substantial home-equity loan over the years and much of this is the result of money spent on his children and their debts. He has worked full-time until his illnesses and has disability until August where he must return to work or lose his job. He needs to work financially and appears to derive enjoyment from it.

My understanding is that his insurance will not pay for continued inpatient stay given that he has eight more weeks until he can bear weight on his leg. However, the alternative would be to return to his home and given the extent of his G.I. infection, chronic diarrhea, physical limitations and delayed treatment of his cancer, I have grave concerns regarding his ability to function at home. I met with social work and asked if we could consider an extension based on his emerging depression, limited resources, physical deficits, and unresolved systemic infections. Otherwise, he would need home health support and potentially two people at unpredictable times during the day to aid with his diarrhea. He is currently wearing a diaper and I frankly think he would benefit from a prolonged stay at least until such time as these issues resolved.

We have arranged to meet with them tomorrow and following his discharge. I want to help set limits with his kids, buildings and structure of home health support, plan for outpatient rehabilitation and work with his employer to establish adequate time for return to work. I will follow-up with Dr. Homa as soon as possible.

Peter A. Dodzik, Psy.D, HSPP
Board Certified, Pediatric Neuropsychology
Board Certified, Professional Neuropsychology
Indiana License #20041718
Illinois License #071-006408

PAD/clb
(Dictated but not read for expediency)

Page   2

Exhibit P

Summary View for RASCHER, RICHARD L                                    Page 1 of 2



## LM PRASAD MD SC
### Colon and Rectal Surgery

# RASCHER, RICHARD L
73 Y old Male, DOB: 06/01/1941
Account Number: 52141
605 S GEORGE ST, MOUNT PROSPECT, IL-60056-3915
Home: 847-404-3402
Guarantor: RASCHER, RICHARD L  Insurance: BLUE
CROSS BLUE SHIELD OF ILLINOIS Payer ID: SB621
PCP: Gabriel Kibrit, MD    Referring: Marc Fine, MD
Appointment Facility: LM Prasad, MD, SC

01/13/2015                                          Progress Notes: John J Park, MD

### Current Medications
**Taking**
- Acetaminophen Extra Strength 500 mg Tablet 1 tablet as needed every 4 hrs
- Hydrocodone-Acetaminophen Tablet 1 tablet every 3 hrs
- Loperamide HCl 2 MG Tablet 1 tablet every 8 hours
- Xarelto 15 MG Tablet 1 tablet twice a day (bid)
- Diphenoxylate-Atropine 2.5-0.025 MG Tablet 1 tablet as needed Four times a day
**Discontinued**
- Lomotil 2.5-0.025 MG Tablet 1 tablet three times a day with each meal
- Aleve
- Megestrol Acetate 800 MG/20ML Suspension 1 ml
- Ondansetron HCl 8 MG Tablet 1 tablet Once a day
- Prochlorperazine Maleate 10 mg Tablet 1 tablet
- Medication List reviewed and reconciled with the patient

### Past Medical History
Rectal cancer

### Surgical History
Laparoscopic ultra low anterior resection with coloanal anastomosis 09/17/2014
Ileostomy reversal 12/22/2014

### Family History
Non-Contributory

### Social History
TOBACCO USE:
TOBACCO USE-  Are you a:: Non tobacco user .
AUDIT-C:
Alcohol Points: 0, Interpretation: Negative.

### Allergies
N.K.D.A.

### Hospitalization/Major

### Reason for Appointment
1. Patient c/o difficulty using the bathroom, and mushy stool. Patient also c/o swollen ankles.

### History of Present Illness
Visit:
    The patient returns. He was recently admitted for ascitic drainage coming from his ileostomy reversal site. He has also been complaining of incontinence. He was in the hospital for a few days and placed on anti-diarrheals. He put a stoma appliance over the stoma site, which has since dried up.

### Vital Signs
Temp 97.1 F, Ht 6 ft 4 in, Wt 184 lbs, BMI 22.39 Index, HR 72 /min, BP-Treatment 109/57 mm Hg.

### Physical Examination
    There is only a bandage over the ileostomy closure site as that area is now closed. Rest of his abdominal exam is unremarkable. He has an inguinal hernia repair done by Dr. Khorsand in the left groin. Lower extremity exam shows significant +2 pitting edema.

### Assessments
1. Stoma complication - 569.60 (Primary)
2. History of cancer: anorectal - V10.06

+2 pitting edema after re-admission to the hospital for ascitic drainage from the wound.

### Treatment
**1. Stoma complication**
Clinical Notes: He has been on a liquid diet, but I said it would be okay to advance him to a soft diet. This should help with the edema as he has been drinking a lot of liquids. He does not have shortness of breath or any cardiac issues, so I think it is safe for us to send him back out. I did tell him to go see his medical doctor for a water pill if his pitting edema does not improve. In the meantime, the soft diet should also help with that. He will follow up with me in three weeks. I told him to continue with Imodium three times a day as well as Metamucil one tablespoon in 4 ounces of water twice a day.

Patient: RASCHER, RICHARD L  DOB: 06/01/1941  Progress Note: John J Park, MD  01/13/2015
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

LM Prasad045
https://ilalpmapp.eclinicalweb.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?enco...  1/18/2018

Summary View for RASCHER, RICHARD L                                    Page 2 of 2

**Diagnostic Procedure**
Laparoscopic ultra low anterior resection
with coloanal anastomosis 09/17/2014
Dehydration and acute kidney failure
11/25/2014
Ileostomy reversal 12/22/2014

**2. Others**
Continue Diphenoxylate-Atropine Tablet, 2.5-0.025 MG, 1 tablet as
needed, Orally, Four times a day
Continue Xarelto Tablet, 15 MG, 1 tablet, Orally, twice a day (bid)
Continue Loperamide HCl Tablet, 2 MG, 1 tablet, Orally, every 8 hours
Continue Hydrocodone-Acetaminophen Tablet, 1 tablet, Orally, every 3
hrs
Continue Acetaminophen Extra Strength Tablet, 500 mg, 1 tablet as
needed, Orally, every 4 hrs
Notes: Patient Education was published to portal.

**Procedure Codes**
99024 POSTOP*Global***

**Follow Up**
3 Weeks

Electronically signed by JOHN PARK M.D., MD on
01/21/2015 at 01:44 PM CST

**Sign off status: Completed**

---

**LM Prasad, MD, SC**
**1550 NORTHWEST HIGHWAY**
**PARK RIDGE, IL 60068-1458**
Tel: 847-759-1110
Fax: 847-759-8273

---

Patient: RASCHER, RICHARD L    DOB: 06/01/1941    Progress Note: John J Park, MD    01/13/2015

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

9/13/2018 4:... Confidential — Subject to Protective Order ... 051 OF 067

Summary View for RASCHER, RICHARD L                                    Page 1 of 3

---



**LM PRASAD MD SC**
Colon and Rectal Surgery

### RASCHER, RICHARD L
73 Y old Male, DOB: 06/01/1941
Account Number: 52141
**605 S GEORGE ST, MOUNT PROSPECT, IL-60056-3915**
Home: 847-404-3402
Guarantor: RASCHER, RICHARD L   Insurance: BLUE
CROSS BLUE SHIELD OF ILLINOIS
PCP: Gabriel Kibrit, MD   Referring: Marc Fine, MD
Appointment Facility: LM Prasad, MD, SC

---

04/16/2015                                    Progress Notes: Leela M Prasad, MD

### Reason for Appointment
1. Patient is here today for a surgical consultation – Per medical director Dr.Theo Homa schedule cscope dx blood loss

### History of Present Illness
Visit:
The patient is here for possibility of anemia. The patient has a long history. He had a history of rectal cancer and was taken care of by Dr. Park. Recently, he had a hip replacement by Dr. Jimenez and now he is having anemia postoperatively. The doctor at the nursing home did a Hemoccult test that was positive and is sent here for a colonoscopy. Because of his recent multiple surgeries, I decided that the decision should be made by Dr. Park.

### Current Medications
**Taking**
- Loperamide HCl 2 MG Tablet 1 tablet every 8 hours
- Hydrocodone-Acctaminophen Tablet 1 tablet every 3 hrs
- Acetaminophen Extra Strength 325MG Tablet 1 tablet as needed every 6 hrs
- Metamucil 30.9 % Powder as directed twice a day (1/2 glass water)
- Folic Acid 1 MG Tablet 1 tablet Once a day
- Ferrous Sulfate 325 (65 Fe) MG Tablet 1 tablet Once a day
- Procrit 10000 UNIT/ML Solution
- MethylPREDNISolone 4 MG Tablet
- Colchicine 0.6 MG Tablet 1 tablet Once a day
- Ensure
- Medrol (Pak)
- Juven
- Vancomycin HCl 125 MG Capsule 1 capsule once a day
- Gabapentin 300 MG Capsule 1 capsule twice a day (bid)
- Omeprazole 20 MG Capsule Delayed Release 1 capsule Once a day
- PredniSONE 2.5 MG Tablet 1 tablet with food or milk Twice a day
- Reguloid
- Dulcolax 10 MG Suppository Once a day
- Hydrocodone-APAP-Dietary Prod 10-325 MG Miscellaneous
- Milk of Magnesia
- Senna Plus
- Simethicone-80

**Discontinued**
- Diphenoxylate-Atropine 2.5-0.025 MG Tablet 1 tablet as needed Three times a day
- Xarelto 15 MG Tablet 1 tablet twice a day (bid)
- Aleve
- Megestrol Acetate 800 MG/20ML Suspension 1 ml
- Ondansetron HCl 8 MG Tablet 1 tablet Once a day
- Prochlorperazine Maleate 10 mg Tablet 1 tablet
- Medication List reviewed and reconciled with the patient

---

Patient: RASCHER, RICHARD L   DOB: 06/01/1941   Progress Note: Leela M Prasad, MD   04/16/2015
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

LM Prasad050
https://ilalpmapp.eclinicalweb.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?enco...   1/18/2018

Summary View for RASCHER, RICHARD L                                          Page 2 of 3

## Past Medical History
Inguinal hernia
Rectal cancer
Rectal polyp

## Surgical History
Flexible sigmoiscopy, ERUS 05/09/2014
Flexible sigmoiscopy w BX, ERUS 08/29/2014
Laparoscopic ultra low anterior resection with coloanal anastomosis 09/17/2014
Flexible sigmoiscopy 12/19/2014
Ileostomy reversal 12/22/2014
Repair of indirect large left inguinal hernia with high ligation. 01/06/2015
Total hip replacement 02/20/2015

## Family History
Non-Contributory

## Social History
TOBACCO USE:
    TOBACCO USE-  Are you a:: Non tobacco user .
AUDIT-C:
    Alcohol  Points: 0, Interpretation: Negative.

## Allergies
N.K.D.A.

## Hospitalization/Major Diagnostic Procedure
Laparoscopic ultra low anterior resection with coloanal anastomosis 09/17/2014
Dehydration and acute kidney failure 11/25/2014
Ileostomy reversal 12/22/2014
Repair of indirect large left inguinal hernia with high ligation. 01/06/2015
Total hip replacement 02/20/2015

## Vital Signs
Temp 98.9 F, Ht 6 ft 4 in, HR 76 /min, BP-Treatment 170/84 mm Hg
Unable to get patient's weight intake 4/17/15 -SM.

## Physical Examination
    His abdominal examination at this time is completely normal. The patient is not orthostatic.

## Assessments
1. History of cancer: anorectal - V10.06 (Primary)
2. Anemia - 285.29

1. Anemia with a hemoglobin of 7.7 g/dL and Hemoccult test positive.
2. Last year, he had surgery for rectal cancer with ileostomy followed by ileostomy closure.
3. Recently he had hip replacement surgery.

## Treatment
1. History of cancer: anorectal
Notes: Patient Education was printed.
Clinical Notes: Because of all these multiple procedures, I have advised him to come in and see Dr. Park sometime in May
2015, at which time he can decide about his colonoscopy.


2. Others
Continue Simethicone-80
Continue Senna Plus
Continue Milk of Magnesia
Continue Hydrocodone-APAP-Dietary Prod Miscellaneous, 10-325 MG, Orally

---

Patient: RASCHER, RICHARD L   DOB: 06/01/1941   Progress Note: Leela M Prasad, MD   04/16/2015
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

LM Prasad051
https://ilalpmapp.eclinicalweb.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?enco...   1/18/2018

Case: 1:17-cv-06753 Document #: 150 Filed: 07/06/21 Page 286 of 295 PageID #:2533
Confidential – Subject to Protective Order

Summary View for RASCHER, RICHARD L                                    Page 3 of 3

Continue Dulcolax Suppository, 10 MG, Rectal, Once a day
Continue Reguloid
Continue PredniSONE Tablet, 2.5 MG, 1 tablet with food or milk, Orally, Twice a day
Continue Omeprazole Capsule Delayed Release, 20 MG, 1 capsule, Orally, Once a day
Continue Gabapentin Capsule, 300 MG, 1 capsule, Orally, twice a day (bid)
Continue Vancomycin HCl Capsule, 125 MG, 1 capsule, Orally, once a day
Continue Juven
Continue Medrol (Pak)
Continue Ensure
Continue Colchicine Tablet, 0.6 MG, 1 tablet, Orally, Once a day
Continue MethylPREDNISolone Tablet, 4 MG, Orally
Continue Procrit Solution, 10000 UNIT/ML, Injection
Continue Ferrous Sulfate Tablet, 325 (65 Fe) MG, 1 tablet, Orally, Once a day
Continue Folic Acid Tablet, 1 MG, 1 tablet, Orally, Once a day
Continue Metamucil Powder, 30.9 %, as directed, Orally, twice a day (1/2 glass water)
Continue Acetaminophen Extra Strength Tablet, 325MG, 1 tablet as needed, Orally, every 6 hrs
Continue Hydrocodone-Acetaminophen Tablet, 1 tablet, Orally, every 3 hrs
Continue Loperamide HCl Tablet, 2 MG, 1 tablet, Orally, every 8 hours

**Follow Up**
Follow up with Dr.Park.

Electronically signed by LEELA PRASAD MD on 05/01/2015 at 03:39 PM CDT

Sign off status: Completed

---

**LM Prasad, MD, SC**
**1550 NORTHWEST HIGHWAY**
**PARK RIDGE, IL 60068-1458**
Tel: 847-759-1110
Fax: 847-759-8273

---

Patient: RASCHER, RICHARD L    DOB: 06/01/1941    Progress Note: Leela M Prasad, MD    04/16/2015

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

LM Prasad052

Confidential — Subject to Protective Order

Summary View for RASCHER, RICHARD L                                    Page 1 of 2



**LM PRASAD MD SC**
Colon and Rectal Surgery

# RASCHER, RICHARD L

74 Y old Male, DOB: 06/01/1941
Account Number: 52141
605 S GEORGE ST, MOUNT PROSPECT, IL-60056-3915
Home: 847-404-3402
Guarantor: RASCHER, RICHARD L   Insurance: BLUE
CROSS BLUE SHIELD OF ILLINOIS Payer ID: SB621
PCP: Gabriel Kibrit, MD   Referring: Marc Fine, MD
Appointment Facility: LM Prasad, MD, SC

09/24/2015                                    Progress Notes: John J Park, MD

## Current Medications

**Taking**
- Colchicine 0.6 MG Tablet 1 tablet Once a day
- Dulcolax 10 MG Suppository Once a day
- Tramadol-Acetaminophen 50 mg Tablet four times a day (qid)
- Meloxicam 15 mg Tablet 1 tablet as needed (prn)
- Potassium Chloride 20MEQ ER 1 TABLET Once a day
- Furosemide 20 mg 1 tablet daily
- Ferrous Sulfate 325 (65 Fe) MG Tablet 1 tablet Once a day

**Discontinued**
- Ensure
- Medrol (Pak)
- Juven
- Omeprazole 20 MG Capsule Delayed Release 1 capsule Once a day
- PredniSONE 2.5 MG Tablet 1 tablet with food or milk Twice a day
- Reguloid
- Hydrocodone-APAP-Dietary Prod 10-325 MG Miscellaneous
- Milk of Magnesia
- Senna Plus
- Simethicone-80
- Loperamide HCl 2 MG Tablet 1 tablet every 8 hours
- Hydrocodone-Acetaminophen Tablet 1 tablet every 3 hrs
- Acetaminophen Extra Strength 325MG Tablet 1 tablet as needed every 6 hrs
- Metamucil 30.9 % Powder as directed twice a day (1/2 glass water)
- Folic Acid 1 MG Tablet 1 tablet Once a day
- Procrit 10000 UNIT/ML Solution
- MethylPREDNISolone 4 MG Tablet
- Gabapentin 300 MG Capsule 1 capsule twice a day (bid)
- Vancomycin HCl 125 MG Capsule 1 capsule once a day
- Medication List reviewed and reconciled with the patient

## Past Medical History

Anemia

## Reason for Appointment

1. Patient is here for a 4 month follow up - s/p LSC ULAR 9/17/2014, s/p Ileostomy reversal 12/22/2014 - Hx: Rectal cancer

## History of Present Illness

Visit:
   The patient returns. He is here for followup for coloanal pull-through procedure. His continence has gotten better primarily because the medications he has been taking has caused him to have some constipation. That is fortunate as he is no longer having accidents.

## Vital Signs

Temp 97.1 F, Ht 6 ft 4 in, Wt 166 lbs, BMI 20.20 Index, HR 101 /min, BP-Treatment 141/76 mm Hg.

## Physical Examination

   His abdomen is soft and nontender. He has no hepato or splenomegaly. The incisions are well healed. No incisional hernias are seen. He has no inguinal lymphadenopathy. Lower extremity exam shows no clubbing, cyanosis or edema. Rectal exam shows improved sphincter tone. Anastomosis is palpable. No new masses are seen. There is no blood per rectum.

## Assessments

1. History of cancer: anorectal - V10.06 (Primary)

History of rectal cancer with no evidence of recurrent disease.

## Treatment

**1. Others**
Continue Colchicine Tablet, 0.6 MG, 1 tablet, Orally, Once a day
Continue Dulcolax Suppository, 10 MG, Rectal, Once a day
Continue Tramadol-Acetaminophen Tablet, 50 mg, Orally, four times a day (qid)
Continue Meloxicam Tablet, 15 mg, 1 tablet, orally, as needed (prn)
Continue Furosemide, 20 mg, 1 tablet, daily
Continue Ferrous Sulfate Tablet, 325 (65 Fe) MG, 1 tablet, Orally, Once a day
Continue Potassium Chloride, 20MEQ ER, 1 TABLET, Orally, Once a day
Notes: Patient Education was printed-09/24/15.

Patient: RASCHER, RICHARD L   DOB: 06/01/1941   Progress Note: John J Park, MD   09/24/2015
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

https://ilalpmapp.eclinicalweb.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?enco...   1/18/2018

LM Prasad056

Summary View for RASCHER, RICHARD L                                    Page 2 of 2

Inguinal hernia
Rectal cancer
Rectal polyp

**Surgical History**
Flexible sigmoiscopy, Endorectal ultrasound
05/09/2014
Flexible sigmoiscopy w biopsy and endorectal
ultrasound 08/29/2014
Laparoscopic ultra low anterior resection
with coloanal anastomosis 09/17/2014
Flexible sigmoiscopy 12/19/2014
Ileostomy reversal 12/22/2014
Repair of indirect large left inguinal hernia
with high ligation, 01/06/2015
Total hip replacement 02/20/2015

**Family History**
Non-Contributory

**Social History**
TOBACCO USE:
TOBACCO USE-  Are you a: Non tobacco
user .
AUDIT-C:
Alcohol Points: 0, Interpretation: Negative.

**Allergies**
N.K.D.A.

**Hospitalization/Major
Diagnostic Procedure**
Laparoscopic ultra low anterior resection
with coloanal anastomosis 09/17/2014
Dehydration and acute kidney failure
11/25/2014
Ileostomy reversal 12/22/2014
Repair of indirect large left inguinal hernia
with high ligation, 01/06/2015
Total hip replacement 02/20/2015

Clinical Notes: 1. Follow up in three months for a repeat examination.
2. Follow up with Dr. Mark Fine for colonoscopy as he is now due.

**Preventive Medicine**
COUNSELING:
  BMI MANAGEMENT
    BMI Management Provided & Dietary Consultation Order
Provided  *Yes*
    EXERCISE ASSESSMENT PROVIDED:  *Yes*
    Patient received educational materials on physical activity-  *Yes*
    Agreed upon exercise goal-  *>60 minutes*
    Nutrition/Dietary Counseling-  *Yes*
    Agreed upon fruits and vegetables goal-  *at least 3 servings per
day*
    Agreed upon weekly limit for eating high fat foods-  *3 or less*
    Given printed information about nutrition-  *Yes*
Health & nutrition packet given to patient-09/24-ER.

**Follow Up**
3 Months



Electronically signed by JOHN PARK M.D., MD on
10/16/2015 at 08:53 AM CDT

**Sign off status: Completed**

LM Prasad, MD, SC
1550 NORTHWEST HIGHWAY
PARK RIDGE, IL 60068-1458
Tel: 847-759-1110
Fax: 847-759-8273

Patient: RASCHER, RICHARD L   DOB: 06/01/1941   Progress Note: John J Park, MD   09/24/2015

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

LM Prasad057

Exhibit Q

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



**ILLINOIS BONE & JOINT INSTITUTE®**

Move better. Live better.

**Brian S. Clay, MD**
9000 Waukegan Road, Suite 200 ~ Morton Grove, IL 60053
Phone (847) 375-3000 ~ Fax (847) 929-1184

**PROGRESS NOTE**
**Follow-Up Visit**

**Patient:** Richard L Rascher
**MR#:** 828861
**DOB:** 6/1/1941
**DOV:** 11/19/2015

**Present History:**
The patient is a 74 year old male who presents for follow-up regarding his left hip and groin pain. Last seen back on 9/11/2015 at which time I recommended that he continue with PT. In the interim, the patient states that he has since developed a new problem with his low back however his left hip and groin pain is markedly improved. He endorses new onset low back pain 3 weeks ago which occurred without any trauma or falls. Regarding the treatment plan, he did see a chiropractor for adjustments who ordered a CT scan showing multiple vertebral fractures which appear to be acute and subacute in nature. Pain is currently described as constant, sharp, radiates around the abdomen. Intensity of pain/discomfort is rated 8/10 today.

The medical update form in the patients chart was reviewed and the patient reports no updates to his medical history.

**Physical Examination:**
General - The patient is well appearing. Body habitus is normal.
Eyes - Conjunctiva area clear.
HENT - Mucous membranes are moist.
Respiratory - Respirations are non-labored.
Gastrointestinal - The abdomen is soft and not distended.
Neurological - Gait is not antalgic.
Musculoskeletal – There is tenderness with palpation over the thoracolumbar spinous processes. Forward flexion reproduces back pain.

**Diagnostic Testing:**
I reviewed the imaging report from a recent CT lumbar spine showing multiple vertebral compression fractures at L1 and T11 as well as sacral insufficiency fractures.

**Impression and Plan:**
We discussed further treatment options today. Regarding medication management, I recommended starting Norco as needed for short term pain control. Regarding physical therapy, I recommended continuing home PT for the left hip for ongoing pain and symptom management. Regarding procedures, I will defer further interventions for now. I am referring him to Dr. Gleason for consideration for kyphoplasty. I also recommended that he follow-up again with Dr. Eisenberg to work him up for osteoporosis. The patient was counseled at length regarding the risks vs. benefits of this treatment plan. I educated the

IBJI000056

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

patient regarding the treating diagnosis at the time of this encounter.  The patient was instructed to follow-up with me in 1 month.

_____

Brian S. Clay, MD        Date: 11/19/2015

RF308mg

IBJI000057

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER


ILLINOIS
BONE & JOINT
INSTITUTE®

Move better. Live better.

## PROGRESS NOTE

**RE:** Rascher, Richard L
**LOCATION:** Des Plaines
**MRN:** P828861
**DOB:** 06/01/1941
**DOS:** 09/11/2015
**Page 1**

**PRESENT HISTORY:** The patient is a 74-year-old gentleman who I have been following for chronic osteoarthritis of the hip and sacroiliac joint pain. I last saw him back on 08/26 at which time I performed an ultrasound-guided injection of the left sacroiliac joint. In the interim, the patient has been making significant progress with physical therapy and is currently able to ambulate significant distances with an assistive device without much discomfort. He is at an independent level with ADLs and functional mobility. However, he does require an assistive device with ascending and descending stairs at this time. The pain today is rated 2/10 intensity. It localizes to the left lower buttock without radiation into the groin or lower extremity. There is no associated numbness and tingling or weakness with the exception of what appears to be bilateral paresthesias involving the feet which does not appear to be related to any prior pathology of the hip or lumbar spine. The patient has expressed the desire to return to work, and from my perspective, is cleared to do so.

Complete review of systems and past family/social history documented on history intake form was reviewed and signed. Her medical history is otherwise unremarkable.

**PHYSICAL EXAMINATION:** The patient is well appearing and in no acute distress. There is no peripheral edema. Respirations are nonlabored. Abdomen is soft and nontender. He ambulates with a straight cane.

**DIAGNOSTIC STUDIES:** No new imaging studies were obtained.

9000 Waukegan Rd, Suite 200
Morton Grove, IL 60053

ibji.com

P 847.375.3000

IBJI000058

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**RE:** Rascher, Richard L
**MRN:** P828861
**DOB:** 06/01/1941
**DOS:** 09/11/2015
**Page 2 of 2**

**PLAN:** We discussed further treatment options. I recommended that he continue with the physical therapy and incorporate the exercises and a home exercise program for ongoing maintenance of his hip pain. I also recommend that he continue to use tramadol as needed for breakthrough pain and that he finish the prescription of meloxicam. However, he was instructed to discontinue use of meloxicam after 3 months. There is no indication for further injection therapy at this time. The patient is making good functional gains and is appropriate to return to work as stated above. He will follow up with me as needed in the future.

Digitally signed by proxy Brian S. Clay, M.D.

BSC JOB 116932910

IBJI000059

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



ILLINOIS
BONE & JOINT
INSTITUTE®

Move better. Live better.

## PROGRESS NOTE

**RE:** Rascher, Richard L
**LOCATION:** DR Ortho Access
**MRN:** P828861
**DOB:** 06/01/1941
**DOS:** 08/26/2015
**Page 1**

**PRESENT HISTORY:** The patient is a 74-year-old gentleman, who presents to me for followup regarding his left hip pain and left lower back pain. He was last seen on 08/11/2015 for left hip injection which he states did help with his left groin pain and anterior thigh pain. Today, he endorses more left buttock pain and low back pain. The pain is constant, aching, 7/10 intensity, worse with walking, worse with rolling over in the bed, better with rest. There is no associated numbness, tingling, or weakness. At this time, he has been participating with physical therapy and notes gradual improvement with his gait and balance. He also continues on tramadol as needed for pain. Medical history update form is reviewed in the medical chart and the patient reports no updates to his medical history.

**PHYSICAL EXAMINATION:** On physical exam, the patient is thin appearing, not in acute distress. There is bilateral pedal edema which is 1+. Respirations are nonlabored. Abdomen is soft and nontender. Reflexes and sensation are diminished with bilateral patellar and Achilles. There is tenderness to palpation over the left sacroiliac joint, but not the right. FABER's, Gaenslen's, and SI compression tests are positive on the left, but not the right.

**DIAGNOSTIC STUDIES:** No new imaging studies were obtained today.

**IMPRESSION AND PLAN:** We discussed further treatment options today. I did recommend that he continue with physical therapy program for maintenance and ongoing improvement with his gait. I also recommended that he continue to use tramadol as needed for breakthrough pain. We did proceed with a left SI joint injection today under ultrasound. The patient did report some immediate relief in his pain symptoms prior to being discharged in stable condition. He will follow up with me in approximately 2 weeks' time.

Digitally signed by proxy Brian S. Clay, M.D.

BSC JOB 116217302

9000 Waukegan Rd, Suite 200
Morton Grove, IL 60053

ibji.com

P 847.375.3000

IBJI000060

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
From: 8473124488 Fax At: 08/10/2015 06:47 #020 P.019/019



ILLINOIS
BONE & JOINT
INSTITUTE®
Move better. Live better.

**Treatment Note**

Illinois Bone & Joint Institute Rehabilitation Services
Des Plaines
900 Rand Road
Suite 110
Des Plaines, IL 60016
tel: 847-954-7646
fax: 847-954-7648

**Patient:** Richard Rascher (MRN # P828861)
**Gender:** M
**DOB:** 06/01/1941

**Visit #4:** 08/06/2015
**Evaluation Date:** 07/27/2015
**Injury Date:** n/a
**Onset Date:** n/a

**Therapist of Record:** Ann Phelps PT, DPT, OCS

**Referring Practitioner:** MATTHEW JIMENEZ MD

**Provider:** Heather Elliott-Smith
PT, DPT, ATC
**Provider Email:**
helliottsmith@ibji.com

**Account #:** ACVMP

| # | Medical Diagnoses | ICD9 | | # | Treating Diagnoses | ICD9 |
|---|---|---|---|---|---|---|
| 1) | Aftercare for healing traumatic fracture of hip | V54.13 | | 1) | Difficulty in walking | 719.7 |

**Patient Status**

The pain varies. Sometimes its in the tailbone. Today its here (indicates buttock, proximal posterior thigh).

I saw the doctor Tuesday. He gave me a few pills for the pain and a 6 pack (steroid). I don't have any relief yet.

I want to go back to work but I have to walk up 18 stairs and I can't focus because of the pain.

**Additional Evaluative Findings**

Pt observed to shift weight to R on Nustep.

**Treatment Provided Today**

The following interventions were performed for the patient's hip and thigh condition:

*Therapeutic Exercise (97110):* 40 min
Recumbent Bicycle - L 4 U/LE 10 min for gait retraining
glut squeeze - x10 with 10s hold in supine- with passive hip ext stretch L
Trunk Stabilization / Abdominal Strengthening: Supine activation - 2 sets 10 reps
PROM L hip flexion - 2 x10
Pelvicore Alt ADD/ABD - hooklying 2 x 10 3s hold
long arc quad - 3x10 RL progressed to 1lb
sit to stand - 2x10 table high UE required VC needed for standing straight for gait
balance - NBOS 15 sec x 4 ea
standing HR - 3x10
standing marching - 2x10 RL to assist with reciprocal movements with walking
Hip Extension / Gluteus Maximus Strengthening: Standing reverse leg raises - 2x10 RL to assist with hip extension during
ambulation

*Therapeutic Activities (97530):* 0 min

*Neuromuscular Reeducation (97112):* 0 min

*Self-care / Home Management Training (97535):* 0 min

*Hot/Cold Pack (97010):* 10 min
CP 10 min to hip after ex

*Electrical Stimulation - Unattended 97014 (97014):* 0 min

**Provider Interactions With Patient During Visit**

Pt monitored for pain and exercise modified as needed. Cuing provided for proper performance of ex.

**Assessment**

Patient reports continued pain in the L >R hip at this time, despite recent change in medication which further impairs
performance of ADLs. Continued supervised exercise is medically necessary to restore functional mobility as protection of the
R hip is needed secondary to poor bone quality and recent ORIF/THA.

IBJI000300